# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

**Richard Katz**

Plaintiff                                                        Case No.: **3:15-cv-01187**


v.

**NATIONAL BOARD OF MEDICAL EXAMINERS (NBME)**

3750 Market Street

Philadelphia, PA 19104


and


**FEDERATION OF STATE MEDICAL BOARDS (FSMB)**

400 Fuller Wiser Road, Suite 300

Euless, Texas 76039-3855

Defendants

_____


### PLAINTIFF'S RESPONSE TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL RESPONSIVE ANSWERS TO SUPPLEMENTAL INTERROGATORIES NO. ONE


Pro se plaintiff Richard Katz responds to DEFENDANTS' National Board of Medical Examiners (NBME) and Federation of State Medical Boards (FSMB) OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL RESPONSIVE ANSWERS TO SUPPLEMENTAL INTERROGATORIES NUMBER ONE.

In the Course of Discovery Plaintiff has produced:

1. Plaintiff's Medical School Transcripts – 4 pages
2. Job Application History documenting a copious effort on the part of plaintiff to gain employment over the last several years in an attempt to mitigate the circumstance that defendants have put him in – 44 pages.
3. Tax documentation (including his spouses W-2's) dating as far back as 2006 substantiating his claims of economic hardship – 12 pages.
4. Plaintiff's Curriculum Vitae – 2 pages
5. Plaintiff's Correspondence with NBME regarding 'Six Attempt Limit Rule' - 4 pages
6. Communications with Pennsylvania State Medical Board regarding 'Six Attempt Limit Rule' and waiver provision - 5 pages.
7. Communication and documentation with Government Officials, Senator Pat Toomey, Congressman Tom Marino, Rep. David Parker of the 115th Legislative District, and Nabina Sinha Trial Attorney for the Disability Rights Section of the Department of Justice – 21 pages.

Since January 2011 the defendants have been cited for deficiencies in their evaluation of testing accommodations for people with documented disabilities by the United States Department of Justice (DOJ) and the US Government Accountability Office (GAO) an independent, nonpartisan agency that works for Congress. Often called the "congressional watchdog," GAO investigates how the federal government spends taxpayer dollars.

In determining whether to provide testing accommodations, testing companies like the defendants are required to adhere to Section 309 of the ADA and, in some circumstances, Section 504 of the Rehabilitation Act of 1973, as amended[1] (the Rehabilitation Act), as well as regulations implementing those laws. Section 309 of the ADA provides that "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes" must offer them "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements…[.]"[2] **Section 504 prohibits discrimination against individuals with disabilities by entities receiving federal financial assistance.[3] The defendants are both recipients of federal funds.**

Frederick Romberg a Yale Medical Student with dyslexia (now an Anesthesiology Resident at the University of Utah) only waited a year for the DOJ to settle with NBME for his disability DJ# 20216181.  On February 23, 2011, NBME entered into a settlement agreement with DOJ resolving a complaint by Romberg who was refused the accommodations he requested because of his disability. **The Board agreed to provide reasonable testing accommodations to people with disabilities when taking the U.S. Medical Licensing Examination and agreed to grant the**

---

[1] 329 U.S.C. § 794.

[2] 42 U.S.C. § 12189. Section 309 is found in Title III of the ADA, which prohibits discrimination by private entities owning, leasing, or operating places of public accommodation. Justice has stated, however, that section 309, with its reference to "any person" that offers examinations, applies to both public and private entities. See Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164, 56,236 (Sept. 15, 2010) (codified at 28 C.F.R. pt. 35, app. A).

[3] Nonfederal entities, including testing companies, can receive federal financial assistance through a variety of arrangements such as grants, loans, and cooperative agreements. Federal financial assistance does not include procurement contracts.

**complainant the accommodations he needed -- double the standard testing time and a separate testing area to take the test.[4]**

Under the agreement, the NBME was to:

**Only request documentation about (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions.[5]**

**<u>Unfortunately this agreement was short lived by testimony of plaintiff's case and others (see Densmore v. NBME and Petrie v. NBME) filing legal claims against the defendants for violations under the ADA.</u>**

The GAO states in a report entitled "Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations":

"Since we found testing companies believe their practices are already in compliance with the new regulatory requirements, it is unclear whether these changes will better protect the rights of students with disabilities. In order to ensure individuals with disabilities have equal opportunity to pursue their education and career goals, it is imperative for Justice (DOJ) to establish a credible enforcement presence to detect, correct, and prevent violations."[6]

This report goes on to say:

"Given the critical role that standardized tests play in making decisions on higher education admissions, licensure, and job placement, federal laws require that individuals with disabilities are able to access these tests in a manner that allows them to accurately demonstrate their skill level. Test takers and disability advocates continue to raise questions about whether testing companies are complying with the law in making their determinations."[7]

The defendants state that:

"In the course of discovery, defendants have answered plaintiff's interrogatories, his request for documents (and supplied 273 pages of documents), his first set of supplemental interrogatories, and are in the process of answering his second set of supplemental interrogatories and his requests for admission. Defendants have complied fully with the letter and the spirit of the discovery rules, and respectfully request that the Court review the interrogatories in question together with defendants' answers, and deny plaintiff's motion to compel."

**The defendants have provided watered down, diluted interrogatory responses that have been processed and filtered by opposing Counsel.  Consequently the interrogatory responses provided**

---

[4] See http://www.ada.gov/nbme.htm

[5] Ibid.
[6] Government Accountability Office. (2011). Higher Education and disability: Improved federal enforcement needed to better protect students' rights to testing accommodations (GAO 12-40). Washington, DC: Author.
[7] Ibid.

**are so general that they are of little use to plaintiff at this point, in some instances portions of the interrogatory have been ignored and completely disregarded by opposing Counsel.**

**Plaintiff respectfully requests that the Court acknowledge that the only discovery tools available to him are requests for documents, interrogatories and his requests for admissions.  Because of his forma pauperis status plaintiff has attempted to be resourceful as possible while the Court considers providing relief to plaintiffs' discovery efforts.**


**Part II "Factual Background" the defendants' state:**

"In the mid-1990s, after graduating from Parsons School of Design with a Bachelor of Fine Arts degree, and having taken no math or science courses since he was a sophomore in high school, plaintiff decided he wanted to become a doctor. He took "post-bacc" courses at various colleges, and in approximately 2000 began attending Saint Matthew's School of Medicine in Case 3:15-cv-01187-RDM-JFS Document 96 Filed 03/28/16 Page 2 of 13.  Belize. Plaintiff graduated from a different medical school in 2004."[8]

Plaintiff objects to the above statement, the defendants have attempted to discredit plaintiff throughout this suit, making statements like:

1. "Plaintiff Richard Katz, a 2004 medical school graduate who has taken and failed Step 1 of the United States Medical Licensing Exam on nine occasions, sued defendants, the National Board of Medical Examiners (NBME) and the Federation of State Medical Boards (FSMB)….."

2. "purported disability ADHD"

Based on the above statement the defendants can now add discrimination of unconventional students and to medical students who have studied abroad in United States Accredited Medical (ACCM) programs to their list of prejudices.  Although, plaintiff does not find the need to validate himself to defendants, his decision to leave one medical school and graduate from another, was a strategic one, because of clinical rotation availability in the North East where plaintiff resides, having nothing to do with academic standing as the above statement implies.

If the defendants properly performed their research they would see that plaintiff has already made considerable contributions to the Medical Sciences completing a Post-doctoral Fellowship at Weill Cornell and The Nathan S. Kline Institute for Psychiatric Research with accolades, first author publications in peer-reviewed medical journals (see

---

[8] The defendants claim that they have provided an overview of plaintiff's educational background based on his deposition testimony.  The defendants perceive Post-Bach training of an unconventional student in the basic sciences in a prejudicial manner "plaintiff decided he wanted to become a doctor."  The accomplished doctor has a bedside manner that is humane and compassionate, empathetic and supportive, medicine is an art and those physicians crossing over from the arts and humanities have a tremendous advantage over conventional medical graduates in this regard.  Defendants also claim that plaintiff objected to defendants obtaining records by subpoena concerning his educational background, this is due to the fact that the defendants have made requests that are over broad and unlikely to lead to any admissible evidence through discovery.   The defendants made a request for educational records from a school that plaintiff never even matriculated at, the defendants are on a "fishing-expedition" and this is strictly prohibited by the Bar and the Courts.

below).



**NIH Public Access**
**Author Manuscript**
*Am J Geriatr Psychiatry.* Author manuscript; available in PMC 2013 September 11.

Published in final edited form as:
*Am J Geriatr Psychiatry.* 2010 November ; 18(11): 1017–1025. doi:10.1097/JGP.0b013e3181d695f2.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

### Cognitive Control in Late-Life Depression: Response inhibition deficits and dysfunction of the Anterior Cingulate Cortex

Richard Katz[a,b,φ], Pierfilippo De Sanctis[a,c,φ], Jeannette R. Mahoney[a], Pejman Sehatpour[a], Christopher F. Murphy[b], Manuel Gomez-Ramirez[a], George S. Alexopoulos[b], and John J. Foxe[a,c,#]

[a]The Cognitive Neurophysiology Laboratory, Nathan S. Kline Institute for Psychiatric Research, Program in Cognitive Neuroscience and Schizophrenia, 140 Old Orangeburg Road, Orangeburg, New York 10962, USA

[b]Department of Psychiatry, Institute of Geriatric Psychiatry, Weill Medical College of Cornell University, White Plains, New York 10605, USA

[c]The Cognitive Neurophysiology Laboratory, Children's Evaluation and Rehabilitation Center, Departments of Pediatrics and Neuroscience, Albert Einstein College of Medicine, Van Etten Building – 1C, 1300 Morris Park Avenue, Bronx, New York 10461, USA

### Abstract

**Objectives**—Geriatric depression is associated with frontolimbic functional deficits, and this frontal dysfunction may underlie the marked executive control deficits often seen in this population. Our goal was to assess the integrity of frontal cortical functioning in geriatric depression while these individuals performed a standard cognitive control task. The N2 component of the event-related potential (ERP), an evoked response generated within the anterior cingulate cortex (ACC), is significantly enhanced when non-depressed individuals successfully inhibit a response, providing an excellent metric of frontal inhibitory function.

**Design**—We used a variant of a demanding Go/NoGo task-switching paradigm that required participants to inhibit response execution during NoGo trials by overcoming a potent response tendency established by frequent Go trials.

**Participants**—We compared a cohort of depressed geriatric outpatients (n=11) with a similarly aged group of non-depressed participants (n=11).

The defendants tout their USMLE Exam as if it has some statistical significance or merit for the postgraduate medical residency selection process. In actuality the USMLE Step 1 and 2 Exams are indicative of nothing and have no merit based on current research (see below).

Assessment and Testing

# Are United States Medical Licensing Exam Step 1 and 2 Scores Valid Measures for Postgraduate Medical Residency Selection Decisions?

William C. McGaghie, PhD, Elaine R. Cohen, and Diane B. Wayne, MD

## Abstract

**Purpose**
United States Medical Licensing Examination (USMLE) scores are frequently used by residency program directors when evaluating applicants. The objectives of this report are to study the chain of reasoning and evidence that underlies the use of USMLE Step 1 and 2 scores for postgraduate medical resident selection decisions and to evaluate the validity argument about the utility of USMLE scores for this purpose.

**Method**
This is a research synthesis using the critical review approach. The study first describes the chain of reasoning that underlies a validity argument about using

test scores for a specific purpose. It continues by summarizing correlations of USMLE Step 1 and 2 scores and reliable measures of clinical skill acquisition drawn from nine studies involving 393 medical learners from 2005 to 2010. The integrity of the validity argument about using USMLE Step 1 and 2 scores for postgraduate residency selection decisions is tested.

**Results**
The research synthesis shows that USMLE Step 1 and 2 scores are not correlated with reliable measures of medical students', residents', and fellows' clinical skill acquisition.

**Conclusions**
The validity argument about using USMLE Step 1 and 2 scores for postgraduate residency selection decisions is neither structured, coherent, nor evidence based. The USMLE score validity argument breaks down on grounds of extrapolation and decision/ interpretation because the scores are not associated with measures of clinical skill acquisition among advanced medical students, residents, and subspecialty fellows. Continued use of USMLE Step 1 and 2 scores for postgraduate medical residency selection decisions is discouraged.

The defendants claim:

"In 2005, after failing Step 1 of the USMLE 5 times, and failing Step 2 CK (Clinical Knowledge) once, plaintiff requested accommodations on STEP 2 CK and CS of the USMLE based upon documentation from medical care providers regarding a claimed disability of Attention Deficit Hyperactivity Disorder (ADHD), depression and anxiety. The NBME evaluated plaintiff's documentation according to its regular procedures, including reviewing the information from plaintiff and his health care providers, submitting the information to an **outside expert** as well as its **in-house experts**, and in March 2006, denied plaintiff's request for accommodations. The NBME informed plaintiff that his documentation did not establish a significant impairment of a major life activity."

Based on Catherine Farmer's Curriculum Vitae obtained from defendants she graduated Immaculata University in 2004 with a PsyD. **This is the same year that plaintiff graduated Medical School with his Medical Degree. A year later she was reviewing plaintiff's medical records for accommodations for his USMLE Exams.**

*It must be brought to the Courts attention that the criteria of what constitutes an "EXPERT" will become a very important point in this case citing:*

**Rush v. NBME**, a second-year medical student with reading and visual processing skills impairments requested and was denied extended time on USMLE Step 1. The court found that the student was substantially limited in his ability to read and process information compared to most people. The court also ruled that the student would suffer an irreparable injury if the requested injunction for additional time

was denied. Plaintiff was a medical student with a learning disability who requested and was denied double time in which to take the U.S. Medical Licensing Exam. The court found that Rush was an individual with a disability because he was substantially limited in the major life activities of reading and learning compared to most people**. THE COURT, CRITICAL OF THE BOARD'S (NBME) EXPERTS, granted an injunction requiring the NBME to provide Rush with the accommodations of double time for the exam, stating that without such accommodations the exam would test his disability and not his mastery of the subject matter.[9]**

As for the NBME Disability Services **"in-house expert"** Mr. J. Abram Doane, he did not have the credentials to constitute an **"expert"** as he had no advanced degree to justify such a designation.

The defendants claim:

"Plaintiff continued taking, and failing, the USMLE Steps 1 and 2.  In August 2011, the USMLE adopted, for the first time, a limit of six attempts to pass any Step of the USMLE. For examinees such as plaintiff, who had already taken one or more Steps of the USMLE, the six attempt limit was deferred for an extra year, and became effective on January 1, 2013, for registrations after that date.[10]  Plaintiff took Step 1 three more times after he learned of the six attempt limit, and failed each time. Having failed to achieve a passing score on Step 1 after nine attempts, plaintiff is now barred from registering for Step 1."

---

[9] See https://www.ahead.org/node/238

[10] The defendants make a statement that is nonsensical to the point of embarrassment; "that plaintiff repeatedly asserts that the defendants adopted the six attempt limit without any exception for individuals with disabilities. To the contrary, the limit applies to all examinees, so those who request accommodations and receive them have up to six attempts with their accommodations, just as those who do not request (or receive) accommodations have up to six attempts without accommodations. That is, effectively, a "level playing field."  How can the below illustration be a "level playing field."  Should the disabled individual in the wheelchair below only be given six attempts to get up the flight of stairs in his wheel chair?   What about the man to the right?  The facts of this case are no different.



**"SIX ATTEMPT LIMIT RULE"**
YOU HAVE **SIX ATTEMPTS** TO GET UP THE LONG FLIGHT OF STAIRS IN YOUR
WHEELCHAIR!  GOOD LUCK!

Plaintiff continued taking and failing USMLE Step 1 and 2 because he has disabilities that were not accommodated for by defendants in 2006 and again in 2014.

**Plaintiff was already registered for the USMLE Step I prior to learning of his Bipolar Disorder in March of 2013.** Plaintiff could be given infinite attempts to take the USMLE and unless the correct accommodations are in place plaintiff will continue to fail despite his 123 +/- 7 IQ Score of Superior intelligence.[11]  Therefore the above point that defendants make is meaningless.


**Part III under Procedural Overview the defendants claim:**

"Both parties have conducted discovery. Plaintiff served interrogatories and document requests and defendants answered them and provided responsive documents (other than those that are the subject of a pending motion for protective order). Defendants requested documents from plaintiff and plaintiff has provided some documents.[12]  Defendants deposed plaintiff, and seek to obtain documents by subpoena concerning plaintiff's medical and psychiatric background, as well as his educational and vocational background. Plaintiff objected to all proposed subpoenas, notwithstanding that such documents are relevant, among other things, to plaintiff's claim for damages. Defendants have refrained from serving those subpoenas until the Court rules on the discovery motions."

Plaintiff appeared at deposition promptly and professionally without counsel and was fully compliant with the defendants' line of questioning that lasted several hours**.  It is interesting that during deposition when plaintiff had something meaningful to say about his struggles and his history of disabilities, the defendants were quick to redirect these statements in an effort to minimize plaintiffs' claims**.


**Part IV defendants Claim that Plaintiff's Motion to Compel Should be Denied.**

**The defendants have provided watered down, diluted interrogatory responses that have been processed and filtered by opposing Counsel. Consequently the interrogatory responses provided are so general that they are of little use to plaintiff at this point, in some instances portions of the interrogatory have been ignored and completely disregarded by opposing Counsel.  And therefore, plaintiff's Motion to Compel should not be denied.**

---

[11] Plaintiff has undergone recent psychological testing (Wechsler Abbreviated Scale of Intelligence or WASI) over a ten week period, revealing a Verbal IQ Score of 122 and a Performance IQ Score of 117 with an estimated full scale IQ of 123 +/- 7.  This score is placed him in the 94th percentile and a qualitative interpretation classification of Superior Intelligence. Yet the defendants attempt to exploit plaintiff and his unconventional student background suggesting he does not have the intellectual accoutrements to be a physician.  This is evidence of the discriminatory disposition of the defendants.

[12] The defendants claim that plaintiff has not produced all documents in his possession that defendants have requested, how defendants know what plaintiff has in his possession is beyond plaintiff's comprehension.  Perhaps they are soothsayers or have a crystal ball.  The defendants are on a "fishing expedition" and have made 25 or more subpoenas, most of which are unfounded and not likely to lead to admissible evidence, this is an abuse of process.

**V. Conclusion**

Plaintiff disagrees that defendants have worked cooperatively with plaintiff throughout the discovery phase of this case. Opposing Counsel has made 25 subpoena requests, the majority of them meritless spanning some 25 years or greater, having no bearing on this case what-so-ever and likely not to yield any admissible evidence for discovery. **It is almost as if this pro se plaintiff is the defendant in the case subject to a microcosm of scrutiny, as if it were he who discriminated against the defendants and not the other way around.**

Opposing Counsel attempted to misuse authority as an officer of the Court in the abuse of process of the proposed subpoenas. Plaintiff believes that discipline and sanctions are now warranted.

Throughout plaintiff's experience with opposing counsel there have been questionable, taunting, aggressive and manipulative tactics that plaintiff feels have not been in the true Spirit of the discovery process. Plaintiff stands by his characterizations of defendants' use of "scorched earth" and "fishing expedition defense tactics" and he believes that such representations *"speak for themselves."*

**It is for the above reasons that plaintiff believes that his Motion to Compel Interrogatories Number One from defendants should be granted.**

Respectfully submitted,

Date: March 30, 2016

/s/ Richard Katz

Richard Katz

Pro se

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL RESPONSIVE ANSWERS  TO
SUPPLEMENTAL INTERROGATORIES NO. ONE was filed electronically on March 30,
2016. Parties may access this document through that system.

Date: March 30, 2016

_____

Richard Katz

Pro se