# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD KATZ<br>Plaintiff | : | |
| | : | |
| | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| NATIONAL BOARD OF MEDICAL<br>EXAMINERS | : | NO. 3:15-cv-01187 |
| | : | |
| | : | **(MARIANI, J.)** |
| and | : | **(SAPORITO, M.J.)** |
| | : | |
| FEDERATION OF STATE MEDICAL BOARDS | : | **JURY TRIAL DEMANDED** |
| Defendants | : | |

## PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pro se Plaintiff Richard Katz respectfully opposes the Defendants National Board of Medical Examiners (NBME) and Federation of State Medical Boards (FSMB) Amended Motion for Summary Judgment.  In support of this opposition, Plaintiff submits the following: Memorandum in Support of Plaintiff's Opposition to the Amended Summary Judgment, Plaintiff Richard Katz's Opposition to Defendant's Statement of Material Facts, a Proposed Order Denying the Amended Motion for Summary Judgment and an Affidavit of the Pro se Plaintiff Richard Katz Opposition to the Amended Summary Judgment.

_____
Richard Katz
*pro se*
3364 Parker Lane
East Stroudsburg, PA 18301
Telephone: 570-517

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD KATZ | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | NO. 3:15-cv-01187 |
| EXAMINERS | : | |
| | : | **(MARIANI, J.)** |
| and | : | **(SAPORITO, M.J.)** |
| | : | |
| FEDERATION OF STATE MEDICAL BOARDS | : | **JURY TRIAL DEMANDED** |
| Defendants | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO AMENDED MOTION
FOR SUMMARY JUDGMENT**

Richard Katz
*pro se*
3364 Parker Lane
East Stroudsburg, PA 18301
Telephone: 570-517-9314

# TABLE OF CONTENTS

**I.** INTRODUCTION ................................................................................................1-2

**II.** SIGNIFICANT PROCEDURAL HISTORY.................................................................2-4

**III**. STATEMENT OF FACTS

A. Plaintiff's Opposition of Undisputed Facts and Additional Facts About the Defendants..............................4-5

B. Plaintiff's Opposition Controverting  Defendants Summary of Undisputed Facts and Additional Facts Concerning Plaintiff's Background........................................................................5-7

C. Controverting The Defendants' Feable Attempt To Discredit Plaintiff's Scientific And Academic Inclination........................................................................................7-8

D. Plaintiff's Material Facts Regarding NBME Disabilities Services, Employee Credentials, Competency, Credibility Issues And ADA Noncompliance ......................................................................8-14

E. Plaintiff's Analysis In Opposition Of  Defendant's Case-Law Arguments: Their Cited Cases Actually Work Against Them!........................................................................14-16

F. Application Of The Federal Tolling Doctrine........................................................16-17

G. LEGAL PRECEDENT – Equitable Tolling And Mental Incapacity........................................17-18

H. OPPOSING COUNSEL The "PHILADELPHIA POWER LAWYERS" ("PPL") MAKE A FALSE STATEMENT: "The Statute of Limitations Bars All of Plaintiff's Claims Under the Americans with Disabilities Act." The ADA, like many federal civil rights statutes, does NOT contain a specific statute of limitations...   ........................................................................18-19

I. Accrual........................................................................................19-20

J. Federal Discovery Rule........................................................................20-21

K. Continuing Violation Doctrine........................................................................21-22

**IV**.  RESPONSE TO DEFENDANT'S STATEMENT OF THE QUESTIONS INVOLVED........................................................................22-23

**V.** RESPONSE TO DEFENDANT'S ARGUMENT........................................................23-29

**VI.**CONCLUSION........................................................................30

## I. INTRODUCTION

A swimmer caught in a riptide may notice that he is moving away from the shore quite rapidly. Riptides are not capable of pulling a swimmer under the water; instead they carry the swimmer away from the shore in a narrow channel of water.[1]  *The swimmer may drown if he becomes exhausted.*[2]

Due to the defendants, the National Board of Medical Examiners (NBME) and the Federation of State Medical Boards (FSMB) the riptide analogy became a reality for Richard Katz.  The riptide is like a treadmill which the swimmer needs to *"step off" but can't.*[3]  The defendants misled Katz and lulled him into a repetitive mentally grueling position of study/fail, study/fail, etc., etc., etc..  By concealing and misrepresenting their **UNLICENSED** so-called **"EXPERT(S)"** and "external evaluation" procedures in 2006, the defendants disregarded Katz's *due process rights* and ignored **scientific evidence** that pointed to the absolute need for accommodations on his United States Medical Licensing Exams (USMLE).  The defendants would repeat this pattern of disregard ignoring Katz's 2013 diagnosis of bipolar disorder as described and substantiated in depth in his April 1, 2014 APPEAL.  The defendants negligence carried Katz further away from the shoreline and from achieving his career objectives.  *Eventually he would be carried away from reality.*  The inability to *"step-off"* and move forward with his career had ramifications on his familial, economic, mental and overall well-being.  Without a life preserver ring, exhaustion would inevitably set in and he would go under.  By defendants implementing a 'make or break' 'Six Attempt Limit Rule' Katz suffered a mental breakdown in March of 2013 requiring a week long hospitalization in the Behavioral Health Unit at Pocono Medical Center where he was diagnosed for the first time with bipolar disorder (EXHIBIT 59)

The defendants *own* and *sponsor* the United States Medical Licensing Examination® ("USMLE"), a high stakes standardized exam used in evaluating applicants for medical licensure in the United States. (EXHIBIT 1).  In 2012 they placed an attempt limit to the number of times examinees can take to pass a USMLE Step Exam (EXHIBIT 39). *The previous policy allowed examinees to take the exam as many times as they needed until passing.*  In creating this so-called "Six Attempt Limit Rule" the defendants made NO concession in their policy development for people with documented mental disabilities (EXHIBIT 18).

Katz sent an APPEAL to NBME on April 1, 2014 (EXHIBIT 22) requesting modification of the "Six Attempt Limit Rule" as a reasonable accommodation under the ADA (see Doe v. Samuel Merritt

---

1 Rip Current Characteristics College of Earth, Ocean, and Environment, University of Delaware. Retrieved 16 January 2009
2  Ibid.
3  http://www.joshbenson.com/how-to-survive-a-rip-current/

University, 921 F. Supp. 2d. 958 (N.D. Cal. 2013) – see also Bartlett v. NYSBL 970 F. Supp. at 1117 ).[4] The defendants denied the Appeal on April 17, 2014 ignoring his diagnosis of bipolar disorder.

The United States Department of Justice (hereinafter Justice) has been conducting an investigation (EXHIBIT 29) into the defendants demands for unnecessary or redundant documentation, burdensome and expensive repeated professional evaluations, irrelevant evaluative testing unrelated to the ability to demonstrate one's knowledge or skills on the USMLE.

## II.  SIGNIFICANT PROCEDURAL HISTORY

This action was commenced on June 17, 2015 by Katz submitting a complaint (Dkt#1) and communications from Senator Pat Toomey's Office who forwarded his complaint to Justice Civil Rights Division in July of 2014 (EXHIBIT 29).[5]  On June 17, 2015 Katz submitted a MOTION for leave to proceed in forma pauperis (DKT#3) and MOTION to Appoint Counsel (DKT#2).   On September 16, 2015 the Court (DKT#43) denied Katz's Motion to Appoint Counsel stating he had *"not undertaken a diligent enough effort to obtain counsel."*   Katz consulted **_seven_** attorneys between December 2013 and December 2014[6].   The Court was under the mistaken impression that he had only consulted **_one_** attorney.   On December 1, 2015 a second MOTION (DKT#66) to appoint counsel was submitted, with Katz making a copious effort, speaking with disability advocacy groups, special interest groups, and private attorneys locally and nationally.   He consulted a total of 29 advocacy groups and private attorneys (EXHIBIT 40) with no success on a pro bono or contingency basis, he tabulated this data and submitted to the Court with his Second Motion to Appoint Counsel.   The chart

---

4 Doe v. Samuel Merritt University, 921 F. Supp. 2d. 958 (N.D. Cal. 2013) Preliminary Injunction granted allowing **student with a disability to take a podiatric licensing examination unlimited times as an accommodation to University's policy providing for a three exam limit.**   The case was allowed to go forward on issues of whether test taking is a major life activity. --- see also Bartlett v. NYSBLE, 970 F. Supp. at 1117 ("[I]n the modern era, where test-taking begins in the first grade and standardized tests are a regular and often life altering occurrence thereafter, both in school and at work, **I find test-taking is within the ambit of 'major life activity.'"Judge Sotomayor) on remand from the Second Circuit Court of Appeals, ruled in favor of a bar exam applicant by holding that she was entitled to  accommodations.   The court held that the NYSBLE illegally discriminated against the plaintiff when it failed to accommodate her dyslexia on five separate and unsuccessful exam attempts.**   The court found that the plaintiff  was substantially limited in the major life activities  of reading and working, **even though she had employed coping strategies to overcome some of her reading and processing problems..**

5  *Note.  The current Justice investigation into Plaintiffs' claims against NBME is an aggregate to a larger existing ongoing investigation of defendants that was already under way prior to Plaintiff's complaint in 2014. There are several other complainants filed with Justice.   **According to Justice NBME is aware that they are under investigation.  Nabina Sinha Trial Attorney Civil Rights Division – Justice.**

6 The Tabulated Chart Plaintiff provided the Court with his Second Motion to Appoint Counsel on 12/01/2015 listed five attorneys contacted between Dec. 2013 and Dec. 2014, two were not listed, (1) Attorney Stephen G. Rhoads of Gawthrop Greenwood PC., West Chester, PA.  Attorney Rhoads was contacted by Plaintiff on 12/18/2013. (2) Welch, Gold, Siegel & Fiffik, PC , Pittsburgh, PA was contacted 01//2014.

also contained five attorneys and advocacy groups contacted prior to his First MOTION to Appoint Counsel.  The Court responded (DKT#118) on May 12, 2016  denying Katz's second motion to appoint counsel, stating under *Ficken and Poindexter* that he met all criteria, except *criteria two* which pertains to the *'merits of the plaintiff's case*.'  The defendants submitted their Motion for Summary Judgment (DKT#105) on May 2, 2016.  The Court took defendants claims *prima facie* based on a statute of limitations argument (*countered and disproved shortly).*  **Limitations are said to reduce the number of meritless cases filed, _but the assumed connection between merit and timeliness requires further empirical analysis._[7]**

The Court cited the defendants precedent generally: *Disabled in Action (DIA) of Se Pa. v. Pa. Transp. Auth (SEPTA):*

> Here the parties filed cross motions for summary judgment on April 5, 2006.  The U.S. District Court of Eastern District of Pennsylvania held that DIA's claims were barred by the two-year statute of limitations, as claims accrued when DIA knew, or had reason to know, SEPTA's renovations would not include elevators.  **Taking  *prima facie* that DIA filed its claims more than two years after those dates.**  DIA appealed.  On March 27, 2007, an amicus curiae brief was filed by the United States in support of DIA urging a **REVERSAL** of the Court's summary judgment in favor of SEPTA.  On August 19, 2008 the U.S. Court of Appeals for Third Circuit **REVERSED** the District Court and remanded the case. Disabled in Action of  Pa. v. Southeastern Pa. Transp. Auth., 539 F.3d 199 (3rd Cir. 2008). **THE THIRD CIRCUIT HELD THAT THE ACCRUAL  DATE OF A DISCRIMINATION CLAIM DEPENDS ON <u>WHEN THE DISCRIMINATION OCCURRED.</u>**  DIA's claims were **NOT** barred by statute of limitations.   On September 11, 2009, the U.S. District Court Eastern District of Pennsylvania. granted DIA's motion for summary Judgment.

The Court stated in the May 12, 2016 denial of Plaintiff's Second Motion to Appoint Counsel:  **"**In his pleadings and motion papers, Katz has clearly demonstrated an ability to adequately present his own case.  Moreover this case is likely to turn on legal issues alone, with little need for factual investigation beyond that already undertaken, and little or no need for credibility determinations or expert testimony"

**<u>Katz respectfully disagrees:</u> "State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies" Cf. Occidental Life Insurance Co. v. EEOC, 432 U. S. 355, 432 U. S. 367 (1977).**

Katz *has countless hours* of self advocacy invested in this lawsuit his proficiency in self-representation and examining the case-law has been compensatory, both in the application of his time and the implementation of other strategies to help ameliorate the effects of his mental illness and subsequent cognitive impairment. Many of these same strategies were implemented when Katz was a medical student in order to get through the rigors of medical education (EXHIBIT 55).  "Individuals who have

---

7   Ochoa & Wistrich, supra note 43, at 497-499

difficulty reading as a result of their disability may, nonetheless, possess superior intelligence and reasoning skills (see *Turner et al. v. Association of American Medical Colleges*).[8]"

> **"Those with bipolar disorder – suffer from <u>cognitive impairment.</u>** Investigators suggest that **<u>tasks that demand the most effort or speed are difficult for individuals with bipolar disorder.</u>** " [9]

Individuals requesting accommodations on professional licensing exams often have a history of academic success, which has caused courts to question whether such individuals could possibly have an impairment that substantially limits a major life activity Sutton v. United Air Lines, Inc. has become the most commonly cited case.  Mitigating measures are corrective actions that ameliorate the effects of an impairment without actually eliminating the impairment itself.  In Bartlett v. NYSBLE, (970 F. Supp. at 1117) Judge Sotomayor held that Bartlett's real world achievements were "not inconsistent with" the court finding her to be substantially limited in the major life activity of reading.  The court held that Bartlett's success was the result of her **"creativity in finding methods around reading . . . and [is] further evidence that she is substantially limited in reading when compared to 'most people.'"** The House Committee on Education and Labor expressed its belief that someone should not be penalized simply because they have **"managed their own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of their disability."**

<u>**Other Significant Procedural History**</u>

Katz amended his complaint (DKT #23) on August 12, 2015.   The defendants Answer and Affirmative Defenses (DKT#33) were submitted on August 28, 2015.  Katz *traversed*  (DKT#39) defendants Affirmative Defenses on September 8, 2015.  Katz submitted his Second Amended Complaint (DKT # 63) on November 17, 2015, this was granted by ORDER (DKT#106) and filed by the Court on May 3, 2016.  The defendants submitted their Affirmative Defenses on May 11, 2016 *under seal.*

## III. STATEMENT OF FACTS

### A. Plaintiff's Opposition of Undisputed Facts and Additional Facts About the Defendants.

The pro se plaintiff controverts the defendants Undisputed Material Facts (UMF) in his Opposition of Amended Summary Judgment set forth separately in accordance with Local Rule 56.1.

---

8 IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE DISTRICT DIVISION FIVE  caselaw.lp.findlaw.com/data2/californiastatecases/A117071.DOC

9http://www.treatmentadvocacycenter.org/test/1366-cognitive-impairment-a-major-problem-for-individuals-with-schizophrenia-and-bipolar-disorder-

In November 2011 the U.S. Government Accountability Office (GAO) in a report to Congressional Requesters "HIGHER EDUCATION AND DISABILITY: *Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations*" (EXHIBIT 41) stated: "Since we found testing companies believe their practices are already in compliance with the new regulatory requirements, it is unclear whether these changes will better protect the rights of students with disabilities. In order to ensure individuals with disabilities have equal opportunity to pursue their education and career goals, it is imperative for Justice to establish a credible enforcement presence to detect, correct, and prevent violations." This report says: "Given the critical role that standardized tests play in making decisions on higher education admissions, licensure, and job placement, **federal laws require that individuals with disabilities are able to access these tests in a manner that allows them to accurately demonstrate their skill level.** Test takers and disability advocates continue to raise questions about whether testing companies are complying with the law in making their determinations." **The NBME was one of the participant organizations in this study leading to the above determinations by GAO.**

On February 23, 2011, NBME entered into a settlement agreement DJ# 20216-181 with Justice (EXHIBIT 17) resolving a complaint by Frederick Romberg a Yale Medical Student with dyslexia. Romberg was twice refused accommodations by NBME. **The Board agreed to provide reasonable testing accommodations to people with disabilities when taking the USMLE and agreed to grant the accommodations he needed -- double the standard testing time and a separate testing area. Under the agreement, NBME was only to request documentation about (a) the existence of a physical or mental impairment; (b) whether the impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions.**

The NBME – Justice settlement agreement DJ# 20216-181 was signed February 2011 and was over February 2013. Katz sent an appeal to the defendants in April of 2014 and was *denied* accommodations by the USMLE Secretariat's Office (EXHIBIT 30)

**B. Plaintiff's Opposition Controverting  Defendants Summary of Undisputed Facts and Additional Facts Concerning Plaintiff's Background.**

- Richard Katz was born in New York City the product of a Sicilian mother and an unconventional Jewish father. From the ages of 6 to 12 he suffered from a neurological disorder (Rolandic Epilepsy) that caused *left* sided seizures. The seizures had prolonged postictal periods, meaning he suffered from severe migraines, confusion and somnolence lasting

24 hrs after occurrence.  He was treated with phenobarbital a barbiturate medication (EXHIBIT 6 pg. 33).  He was also afflicted with speech delay, *slur* impediment on the *left* side making it difficult to pronounce "SH-", "TR-", "CH-" "J-" prefixes (EXHIBIT 5).  He received special accommodations by speech pathologists from N.Y.C. Board of Education on a bi-weekly basis.

- From fourth through sixth grade he was placed in intellectually gifted classes, for his artistic abilities.   Like many creative individuals (i.e. Edison, Picasso) he experienced academic difficulties[10], problems following directions, slow reading, poor comprehension, problems with working memory, behavioral problems, porous memory and recall (EXHIBIT 5).

- He attended the H.S. of  Art & Design an art specialized H.S. in NYC.  He then attended Parson's School of Design in 1988, receiving a Bachelor of Fine Arts Degree.

- In his second year of college his family relocated to East Stroudsburg, PA., he remained  in N.Y.C. and had to financially fend for himself.   Depression set in for multiple reasons necessitating  psychotherapy.

- He located employment working weekends in a Trauma Center in Elmhurst, N.Y. as he completed his BFA.  The old adage '*medicine is more of a calling than it is a profession'* rang true.  Two years after completion of his BFA, with careful consideration and deliberation he began taking pre-med courses in preparation for medical school.

- **<u>Cognitive and emotional decrements set in with the stress of heavier academic coursework and workloads causing Katz to get off to a rocky start with his premed courses.</u>  The need for accommodations was based on a physicians evaluation that in addition to an anxiety disorder, Katz suffered from Attention Deficit Disorder (ADD).   These findings were documented after a thorough intake and this report was provided to  SUNY College at Old Westbury Office of Student Services (EXHIBIT 8).**

- William Lupardo, M.S, Director of Student Services stated by letter on 6/24/2005 to defendants, that Katz submitted documentation justifying the need for accommodations. Lupardo took an intake to determine the requirements needed to accommodate him. He was provided a separate room to take his exams, a proctor, and given double time.  Lupardo also conducted study skill workshops, time management workshops, stress management and other therapeutic groups (EXHIBIT 8).

The defendants mischaracterize plaintiff's testimony in their Amended Summary Judgment

---

10 Bipolar illness, creativity, and treatment.  http://www.ncbi.nlm.nih.gov/pubmed/11433879

motion stating: "Plaintiff's 2005 request for accommodations to the NBME contained no documentation of any accommodations in medical school and in the section of the Request for Test Accommodations form titled "Accommodation History," he checked "No" for medical school. Exhibits 1 and 2, p. NBME/Katz 0168, 211. At his deposition, plaintiff testified that he received "informal accommodations" at medical school, by which he meant that without submitting any documentation, the school permitted him to take as much time as he wanted on examinations."

- Brian M. Matayoshi, Ph. D. Is professor of the Department of Bio-Medical Science PCOM-Georgia is Associate Director for Graduate Program in Biomedical Science/Professor of Neuroscience, Physiology, and Pharmacology.  Dr. Matayoshi was Katz's professor at St. Mathew's School of Medicine.  He was involved with student services at St. Matthews.  Dr. Matayoshi's bio is provided (Exhibit 42).  He  has over 25 years of diverse teaching, **academic and student support experience**.  **He is a trained educational consultant.**  Dr. Matayoshi met with Katz regularly, he provided study skills instruction, and arranged additional testing time to take his basic science exams. Katz states in Errata correction deposition page 143 line 10 **"this form (Request for Test Accommodation) was not regarded at the time to be all encompassing of all accommodations (formal and informal) ever received (EXHIBIT 43)."**

## C. Controverting The Defendants' Feable Attempt To Discredit Plaintiff's Scientific and Academic Inclination:

- **D:** "Plaintiff Richard Katz, *pro se*, now 46 years of age and more than 11 years out of medical school, sued NBME....."  **P: A direct result of defendants' negligence!  The main reason why this case must be permitted to go forward.  D:** "Plaintiff attended the High School for Art and Design in New York City, where he stopped taking math and science courses after his sophomore year." **P: So what! By the completion of his pre-med coursework _with honors_ (EXHIBIT 7)  Katz had as much science background as any other medical school applicant! Because Katz had a different vocational trajectory at the time and 'medicine had not yet found him' has no bearing on this case, especially in light of his scientific contributions and accomplishments (below). D:** "He then attended Parson's School of Design, where he received a Bachelor of Fine Arts degree. Again, he took no math or science courses other than one science course in Wildlife of North America. **P: So what! By the completion of his pre-med coursework _with honors_ (EXHIBIT 7)  Katz had as much science background as any other medical school applicant! Katz's non-traditional student status and accomplishments should be commended, NOT chastised!  D: "**Plaintiff scored 400 on the math SAT, and 425 on the verbal." **P: Without exam accommodations for his disabilities (bipolar disorder, first diagnosed and treated in March, 2013 also anxiety and specific phobia associated with test taking) testimony that a problem has always existed EXHIBIT 6 & EXHIBIT 27.  D:** "Plaintiff got a "C" in a math course and

withdrew from a physics course when he attended Nassau Community College in 1996." **P:  Plaintiff received a "C" in "PRECALCULUS" (one of the hardest college level math classes) during an abbreviated summer session while working at Elmhurst Hospital full time.  Plaintiff withdrew from physics at Nassau Community College because he felt like he needed more math background in preparation for physics.  Hence the rationale for enrolling in Precalculus.  In the fall of 1996 Plaintiff enrolled in Physics at SUNY Old Westbury and received a "B" in the lecture and an "A" in the lab (EXHIBIT 57).  The fact that Katz received a "C" in Precalculus during  the Summer of 1996 has no bearing on this case.  What is more relevant are his accomplishments in the medical sciences as outlined below and documented in EXHIBIT 56.  Katz's stellar premed record speaks for itself.**

### Richard Katz's Scientific Accomplishments and Accolades:  (EXHIBIT 56)

1. **Deans list for accomplishments in the pre-medical sciences  SUNY Old Westbury (EXHIBIT 7).**

2. **Post-doctoral Research Fellowship Weill Cornell Institute of Geriatric Psychiatry.** White Plains, New York  NIMH Institutional Research Training Grant (T32), **2005-2007** Geriatric Mood Disorders Weill Cornell Advanced Center for Interventions And Services Research for Geriatric Depression (ACISR) & Nathan S. Kline Institute for Psychiatric Research, Orangeburg, New York.

3. University of Pittsburgh The NIMH-funded Summer Research Institute (SRI) July 2006

4. Major facilitator of RO1 Multi-Institutional grant awarded to Weill Cornell ACISR by NIMH, which investigated treatment response to Escitalopram in Geriatric Depression measured with electrophysiological neuromarkers. 2006

### Richard Katz's Peered Reviewed Medical Journal Publications:  (EXHIBIT 56)

1. Alexopoulos GS, Kanellopoulos D, Murphy CF, Gunning-Dixon F, **Katz R**, Heo M: Placebo Response: Does It Predict Antidepressant Response of Geriatric Depression? Am J Geriatr    Psychiatry.2007 Feb15 (2): 149-58.

2. Alexopoulos GS, Kanellopoulos D, Murphy CF, Gunning-Dixon F, **Katz R**, Foxe JJ: Electrophysiological Responses to an Emotional Go/No-Go Test and Remission of Geriatric Depression. Neuroreport. 2007 Feb 12:18(3): 217-21.

3. De Sanctis PF, **Katz R**, Wylie GR, Alexopoulos GS, Foxe JJ: Enhancement and bi-lateralization of early sensory processing in the ventral visual stream may be a feature of normal aging: A high-density electrical mapping study. Neurobiology of Aging, doi:10.1016/j.neurobiolaging.2007.03.021

4. **Katz R**, De Sanctis PF, Sehatpour P, Mahoney, Gomez MR, Murphy CF, Alexopoulos GS, Foxe JJ.**Cognitive Control in Late-Life Depression: Response inhibition deficits and dysfunction of the AnteriorCingulate Cortex. The American Journal of Geriatric Psychiatry, 11 March 2010** doi: 10.1097/JGP.0b013e3181d695f2.

## D. Plaintiff's Material Facts Regarding NBME Disabilities Services, Employee Credentials Competency, Credibility Issues And ADA Noncompliance.

1. Catherine Farmer's resume states she was employed by NBME in various capacities from 1993 to 2016, she was therefore **NOT an objective "external consultant."** The term **"external consultant"** is a misnomer (EXHIBIT 13). The correct term is **"internally affiliated consultant,"** Farmer was NOT an "Expert" as she only graduated as a Psy.D. in 2004. One year later she was evaluating Katz for accommodations on the USMLE. Farmer **NEVER achieved a Psy.D. LICENSE to Practice in the Commonwealth of Pennsylvania, she is NOT licensed to practice in any other U.S. state either (EXHIBIT 14). She does have an EXPIRED (2008) LPN Nursing License (EXHIBIT 14). There is no such thing as an EXPERT Psy.D. after one year of practice. Especially one that holds NO LICENSE!** An EXPERT is a qualified authority in their respective field. **Katz questions why the defendants in their Amended and Primary Summary Judgment Motions employ the phrase "external consultant" and abandons J. Abram Doane's 2006 "Expert(s)" designation?** Considering that the USMLE Test Accommodations Guidelines posted on the defendants' website states; **"Documentation submitted in support of a request may be referred to <u>experts</u> in the appropriate area of disability <u>for a fair and impartial review</u> (EXHIBIT 47)."**

2. J. Abram Doane stated in his March 13, 2006 denial letter to Katz (EXHIBIT 16); "we (NBME) consulted **expertS** in the **fieldS** of **Learning Disability** and **Mental DisorderS** to assist *us* (NBME) in reviewing the documentation." **This goes beyond a plural grammatical error as the defendants would like the Court to believe, it also does not excuse the fact that there were NO EXPERTS evaluating Katz's file, only one UNLICENSED neophyte Psy.D. of one year named Catherine Farmer.** The defendants admit in plaintiff's Request for Admission (items #20-21- EXHIBIT 44) and Interrogatory 7a (below) that the external "expert(s)" that Doane refers to in his March 13, 2006 Denial letter to Katz is Catherine Farmer.

**Interrogatory 7a:**
Do **YOU** contend that Catherine Farmer, Psy.D is the **EXPERT** that J. Abram Doane refers to in his March 13, 2006 denial letter to Plaintiff?

**ANSWER:** "The reference to "experts" in the March 13, 2006, letter pertains to Catherine Farmer, Psy.D. who was an "outside" expert, and to Greg Baker, Psy.D., an "inhouse" expert, in addition to Mr. Doane himself. Resumés containing the qualifications of each of the listed individuals have been provided."

Katz was therefore deceived in black and white print by Doane's March 13, 2006 denial letter. If Katz was aware of this material fact at the time he would have initiated a lawsuit against defendants in 2006. **It should be noted for the record that in 2006 to current day, neither J. Abram Doane or Gregory Baker hold any professional licensure in the state of Pennsylvania or any other U.S. state for that matter (EXHIBIT 48).[11]**

---

11 **Gregory E. Baker Psy.D** has been employed by NBME Disability Services since 2005 to present according to his resume. Mr. Baker has minimal involvement in this case, he did have some communication with Katz's caregivers David Kreditor, M.D., Ph.D. on Dec. 21, 2005 for a 10 minute conversation and Fred Holtz, Ph.D.

3.   Farmer an "External Consultant" and so-called "EXPERT" for NBME in 2006 (now acting NBME Compliance Officer) was the **ONLY** "external" evaluator of Katz's file (EXHIBIT 24).  Prior to receiving a Psy.D. in 2004 Farmer held an LPN in nursing (EXHIBIT 14).  LPN's work under the direction of Registered Nurses (RN's).

4.   Farmer's Resume states she graduated as Psy.D. the same year Katz graduated medical school, in 2004 (EXHIBIT 13).  **Farmer did not have adequate experience to constitute an "EXPERT" designation. She also had/has NO LICENSE (EXHIBIT 14).  The NBME leveraged themselves with an internally affiliated evaluator to get around ADA compliance issues and to control for incoming accommodation requests (EXHIBIT 36).  A search of Pubmed accessing Medline database of references and abstracts in the life sciences reveals NO publication history in peered reviewed medical journals for Farmer to date (EXHIBIT 45).  A material fact that she is NO "EXPERT" in her respective field.**

In ***Rush v. NBME***, a second-year medical student with reading and visual processing skills impairments requested and was denied extended time on USMLE Step 1. **THE COURT, CRITICAL OF THE BOARD'S (NBME) "EXPERTS", granted an injunction requiring the NBME to provide Rush with the accommodations of double time for the exam, stating that without such accommodations the exam would test his disability and not his mastery of the subject matter.[12]  (EXHIBIT 46)**

An expert who—either due to lack of experience, education, or simply because the sources are inadequate—manipulates either the data or the process to reach a desired outcome should not be relied on because his extrapolations are mere ipse dixit.[13] As the Court held in Donahue v. Barnhart, "[e]vidence is not 'substantial' if vital testimony has been conjured out of whole cloth."[14]

5.   Farmer spent just four hours (EXHIBIT 15) reviewing Katz's documentation from two LICENSED psychiatrists and two LICENSED clinical psychologists that personally examined him on many occasions.  **Farmer recommended that Katz's application be denied for accommodations despite ever meeting or evaluating him, or speaking directly to his caregivers for additional information (EXHIBIT 24).**

6.   On February 2, 2006, Farmer stated in her letter to J. Abram Doane, M.S. (the Compliance Officer from 2003-2006) (EXHIBIT 24); **"As you know, I have not met or examined Mr. Katz. My recommendation is based upon my review of the request and supporting documentation submitted by and on behalf of Mr. Katz."**

---

On Jan. 3, 2006 for a 10-15 minute conversation.  Other than this Mr. Baker has little mention in the record. Plaintiff has attached Mr. Baker's communications with Katz's caregivers as EXHIBIT 54.

12 Rush v. National Bd. of Medical Examiners, 268 F. Supp. 2d 673 (N.D. Tex. 2003) U.S. District Court for the Northern District of Texas 268 F. Supp. 2d 673 (N.D. Tex. 2003) June 20, 2003

13   *See McKinnie*, 368 F.3d at 910

14   Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) (citing Peabody Coal Co. v. McCandless, 255 F.3d 465 (7th Cir. 2001); Elliott v. CFTC, 202 F.3d 926 (7th Cir. 2000)).

**Response and Opposition to Farmer's Affidavit Testimony:**

- Farmer claims Katz had no clinical impairment during childhood. **False.** He suffered from a neurological disorder (Rolandic Epilepsy) from age 6 to 12 and treated with phenobarbital. He also had associated speech impairment (EXHIBIT 6 pg. 33 & EXHIBIT 5).

- Farmer states Katz's diagnosis of ADHD in 2005 was based on self reports, rating scales and showed no long standing impairment. **False.** ADHD remains a clinical diagnosis.[15] Clinicians far more experienced than the UNLICENSED Farmer made this determination in 2005. **The *"gold standard"* for ADHD diagnosis includes a comprehensive clinical history and examination, rating scales, direct behavioral observations, psychological testing**[16] all performed in 2005. The scientific evidence demonstrated Katz had attention problems consistent with a diagnosis of ADHD (EXHIBIT 6).

- Farmer states that cognitive and academic achievement were well within average range and showed no impairment. **False.** As stated in his April 1, 2014 APPEAL, the type of epilepsy Katz suffered from is well documented in the medical literature to be associated with a **neurological sequelae of cognitive and attentional** problems (EXHIBIT 47). Moreover, defining disability solely based on academic outcomes excludes students who have achieved success by *compensating* for limitations caused by their impairments.[17] Farmer's statement goes against the spirit of the ADA Amendments Act (ADAAA).

- Farmer states that documentation for depression and anxiety was lacking with no assignment of DSM-IV diagnosis in 2005-06. **False.** Katz's caregivers are clear in stated diagnosis under the DSM-IV (EXHIBIT 6). Farmer was not qualified to go against his licensed caregivers. **Katz's caregivers are now required to be given deference by law under ADAAA. Citing *Jenkins v. National Board of Medical Examiners,*[18] the court applied the ADAAA retroactively to reverse the district court's finding that the student did not have a disability.**

- Farmer states: "after the new diagnosis of bipolar disorder, Plaintiff could have submitted a new request for test accommodations with his USMLE Step I registration." **False.** Katz was diagnosed with bipolar disorder **after** registering for his USMLE exams (EXHIBIT 19). Katz also poses a rhetorical question; **would a disability applicant return to a Disabilities Service (DS) that previously denied him/her service? A DS that made demands for unnecessary or redundant documentation, burdensome and expensive repeated professional evaluations, irrelevant evaluative testing unrelated to the ability to demonstrate one's knowledge or skills (EXHIBIT 12)!** Katz decided to conduct his own experiment into the above question, he presented an analogical argument to 12 objective people he never met before

---

15 Gualtieri CT, Johnson LG. ADHD: Is Objective Diagnosis Possible? *Psychiatry (Edgmont)*. 2005;2(11):44-53.
16 http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2993524/
17 *See, e.g., Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1068 (9th Cir. 2005) (Judge Thomas in his dissent stated, "To do so places the ADA plaintiff in an untenable situation where"[s]uccess negates the existence of the disability, whereas failure justifies dismissal for incompetency," citing Andrew Weiss, *Jumping to Conclusions in "Jumping the Queue,"* 51 Stan. L.Rev. 183, 205 (1998) (J. Thomas, dissenting).
18  *Jenkins v. Nat'l Bd. of Med. Exam'rs*, No. 08-5731, 2009 WL 331638 (6th Cir. Feb. 11, 2009).

(EXHIBIT 20).

"…analogical argument is "imperfect" and contains a "logical fallacy." Nevertheless it is the "basic pattern of legal reasoning" and is "indispensable to peace in a community," because it is the means by which the law grows and changes in conformity with the community's views, even as it is being applied.[19]

- The defendants state: "Even if plaintiff's claim of disability discrimination were not clearly barred by the two year statute of limitations, that plaintiff has provided no actual evidence  that the NBME wrongly denied his request for accommodations in 2006, or acted in any kind of discriminatory manner. In her affidavit, Dr. Catherine Farmer states that the NBME Disability Services office handled plaintiff's request for accommodations in its usual manner (which she describes), and the NBME's well reasoned basis for denial provided at Exhibits 8 and 9. Moreover, according to Dr. Farmer, if the NBME received a request with the same documentation today, it would come to the same conclusion. Plaintiff's suggestion that the NBME wrongly denied his request for accommodations is further undermined by the 2013 letter that he provided from his own doctor saying that the 2005 diagnosis of ADHD, on which plaintiff relied in his request for accommodations, was incorrect."

**FALSE:**   NBME has interpreted the ADA to severely limit who is covered by the ADA— totally disregarding the spirit and intent of the ADA as Congress intended, they also ignore *scientific evidence* pointing to the absolute need for the accommodation of extra time for people with disabilities.   **The NBME never met or examined Katz.   Based on the ADAAA Katz's evaluators are now to be given deference.   The defendants employ UNLICENSED evaluators with NO CREDENTIALS to go against LICENSED caregivers.   This is illogical!**   There has been an ongoing investigation into NBME's practices by Justice even predating Katz's complaint.[20]

The defendant's comment on  Dr. Garloff's statement that plaintiff suffers from bipolar disorder  and not ADHD in March of 2014.   Dr. Garloff ascribes to a debate in the medical literature that a person is unlikely to have both ADHD and bipolar disorder.   Plaintiff's current psychiatrist Dr. Arif Hussain believes otherwise. **The medical literature states that ADHD in adults can resemble, and often co-occurs with bipolar disorder (EXHIBIT 50).**   This debate is beyond the parameters of this lawsuit. Attention and cognitive problems exist as a sequelae to Plaintiff's history of Rolandic Epilepsy (EXHIBIT 6 pg. 33 & EXHIBIT 49).   Plaintiff applied for accommodations for anxiety and depression as well as ADHD on the USMLE in 2005-2006, all cause cognitive and attentional impairment (EXHIBIT 58).   Plaintiff was refused accommodations by NBME in March of 2006 (EXHIBIT 16).

**7.** J. Abram Doane (no longer employed by NBME) stated in his NBME denial letter to Katz dated March 13, 2006: **"We consulted 'EXPERT**S**' in the field**S** of Learning Disability and Mental**

---

19 Edward H. Levi, *An Introduction to Legal Reasoning* 3 and n.5 (1949). "The logical fallacy is the fallacy of the undistributed middle or the fallacy of assuming the antecedent is true because the consequence has been affirmed." Id. at n.5. Levi referred to analogical reasoning as "reasoning by example" or "reasoning from case to case." Id. at 1.
20.  If the Court wants to validate this fact they can contact Nabina Sinha Trial Attorney for Justice Civil Rights Division -- telephone # (202) 616-2730.   Attorney Sinha instructed Plaintiff that if the Court requires documentation regarding the ongoing investigation of NBME a Court Order will be necessary.

**DisorderS to assist us in reviewing the documentation (EXHIBIT 16)."** In actuality, there were NO "EXPERTS" just one neophyte **UNLICENSED** Psy.D. of one year, Catherine Farmer (EXHIBIT 24). **The defendants 2006 denial should therefore be rendered null and void especially in light of the fact that no evaluator from NBME had/has any type of credentials or professional LICENSE (EXHIBIT 14 & EXHIBIT 48).**

**8.** Prior to the ADAAA the NBME and similar testing entities had a penchant for denying accommodations for students in higher education on the basis that they were not diagnosed at an earlier age or that they performed well academically. In passing the ADAAA, Congress targeted these testing entities (EXHIBIT 32).

**9.** Based on Doane's LinkedIn Profile, he states he was Manager of Disability/ADA Compliance for NBME from July 2003 to July 2006 (EXHIBIT 35). He:"Reviewed documentation and reports in support of student requests for services, and was; **Decision-Maker** for accommodations for NBME testing programs and state medical licensing boards." **But Doane had/has NO professional LICENSE, and was not qualified to make any such determinations on disability applicants requests for accommodations (EXHIBIT 48).**

**10.** After his role of Manager of Disability/ADA Compliance and "'Decision-Maker" for NBME Doane became a Consultant for NBME Office of General Counsel on July 2006 until leaving the NBME in July 2008. In his March 13, 2006 letter he made a false representation stating that Katz's documentation was given to "EXPERT**(S)**" in the fields of Learning Disability and Mental Disorders to assist NBME Disability Services in reviewing the documentation." **NO such expert(s) ever evaluated Katz's file.**

**11.** Doane misled Katz expecting that he would believe his story about expert(s) evaluation(s) as true and move on without the much needed accommodation he required for success. **Doane knew that Katz would never get to see NBME EXPERT(S) review(s) denying his accommodation as it was never made available to him despite his request (EXHIBIT 36).**

**12.** Katz sent a notarized request to NBME Disability Services on January 27, 2014 requesting his documentation from 2005-2006. On February 4th, 2014 Catherine Farmer replied by mail stating: **"The NBME does not copy or return the comments of an examinee's disability file or send copies to examinees or third parties." Justice informed Katz that this goes against the policies of the ADA (EXHIBIT 33).**

**13.** Pursuant to the ADAAA and its regulatory guidance, the defendants are now mandated to give deference to Katz's evaluators and their recommendations to provide accommodations. The guidelines to the regulations promulgated by the ADA, provide that testing entities should accept without further inquiry, **"documentation provided by a qualified professional who has made an individualized assessment of an applicant, that supports the need for modifications, accommodations or aid**

requested (EXHIBIT 34)."

**14.** The ADAAA and its regulatory guidance explains that **"reports from experts who have personal familiarity with candidates should take precedence over those from, for example reviewers from testing agencies (Farmer) who never personally met the candidate (Katz) or conducted the requisite assessments for diagnosis and treatment (EXHIBIT 34).**

## Response and Opposition to Gerard Dillon's Affidavit Testimony:

- The six-attempt limit applies to all examinees, **without regard to disability status.** If an examinee applies for and receives accommodations in connection with his or her first registration for USMLE Step 1, for example, then he or she would be entitled to accommodations on up to six attempts at Step I. If an examinee does not apply for or is found not to be entitled to accommodations, then each attempt is made without accommodations. — defendants Exhibit 22, Affidavit of Gerard F. Dillon, Ph.D**.**

**Response:** The above statement is confusing. To be clear, would it be fair to give the disabled individual depicted in panel **A** below only six attempts to ascend the long flight of stairs in his wheelchair without assistance? How about for the gentleman on the right? The defendant's 'Six Attempt Limit Rule' is no different. If you break your arm and your arm is in a cast, there is visible evidence of a disability. If a person is in a wheelchair it is apparent that he is disabled. In contrast, mental disabilities like bipolar disorder (Katz) or dyslexia (Romberg) are hidden disabilities; there are no external signs. Panel **B** below depicts the likely outcome of the given scenario, something that would never be tolerated in today's society. So why should the defendants' "Six Attempt Limit Rule" be tolerated for individuals with mental disabilities?

 

**A.**                                                                                    **B.**

**Disabilities - Faulty Policy and Perception:** If a person is in a wheelchair it is apparent he is disabled. In contrast, mental disabilities like bipolar disorder or dyslexia are hidden disabilities; with no external signs. **A.** Would it be a level playing field to give the disabled individual on the left in the wheelchair 'six attempts' to ascend the long stairway without assistance? Can he compete with the non-disabled gentleman on the right who is also given six attempts to ascend the long stairway without assistance? **B.** A likely outcome of the disabled individual is depicted. This is no different than the defendants faulty 'Six Attempt Limit' Policy! **The above scenario would never be tolerated by today's society, so why should it be tolerated for individuals with mental disabilities?**

The defendants state on page 16 ¶ 3 of their Amended Summary Judgment Motion: "As set forth in detail below, plaintiff's interpretation of the disability laws is flawed, and his claims of disability discrimination...." **However**

the defendants never offer any information that disproves the validity of plaintiff's arguments. They instead run for statute of limitations never explaining or producing any evidence of how plaintiff's interpretation of the disability laws are flawed?

- "The primary impetus for the Composite Committee's consideration of a six attempt limit was a security issue involving the computerized Steps of the USMLE, in which the concern was that examine es who took a Step multiple times might be contributing to the "leak" of examination questions."

-Gerard F. Dillon

**Response:** It is the defendants prerogative to safeguard their exam product, this concern should however **NOT** be imposed on people with documented mental disabilities nor should people with mental disabilities be prejudiced and penalized because of the defendants hyper-vigilance and paranoia.

- "A secondary but important motivation was the concern within the Composite Committee that among the very small percentage of examinees who repeatedly failed a Step of the USMLE, an unqualified examinee might eventually pass by chance alone if give enough opportunities." -Gerard F. Dillon

**Response:** On 05/25/2016 at approximately 11:40 AM Katz had a telephone conversation with Dr. William C. McGaghie, Ph. D (EXHIBIT 4). A medical education expert from Northwestern University Feinberg School of Medicine a researcher of medical education and the the USMLE. Dr. McGaghie stated that **"an examinee could pass by chance alone even on their first attempt of the USMLE."** It is the defendants prerogative to safeguard their exam product but **NOT** at the expense of people with documented mental disabilities.

## E. Plaintiff's Analysis In Opposition Of Defendant's Case-Law Arguments: Their Cited Cases Actually Work Against Them!

**The defendants cite Soignier v. Am. Bd. of Plastic** Surgery, 92 F.3d 547 (7th Cir. 1996) stating that "Federal courts in Pennsylvania have consistently followed Soignier and Disabled in Action in applying the two-year statute of limitations for personal injury actions to ADA/RA cases."

**Soignier's disability (auditory processing disability, and dyslexia) was acknowledged and well accommodated for by the American Board of Plastic Surgery. In Katz's case the defendants never acknowledged his 2013 diagnosis of bipolar disorder and despite an APPEAL in April of 2014 he was never granted accommodations.** To illustrate a point in *Steere v. George Washington University the plaintiff was not seeking a second chance but a "first chance to successfully handle his disability."* The court rejected the school's argument that the plaintiff's later request for accommodations amounted to asking for a "second chance" and was therefore unreasonable.[21] The court stated: "The second chance doctrine, in so far as it is a doctrine, works to deny already accommodated and at-fault plaintiffs from winning an endless string of new accommodations after each failure. **The doctrine does not apply to plaintiffs who, through no fault of their own, have not yet had a chance to get the modifications they need."[22] Here, the plaintiff was not seeking a second**

---

21*Id.* at 56.

22*Id.*

chance but a "first chance to successfully handle his disability."[23]

In *Soignier v. Am. Bd. of Plastic Surgery* a plastic surgeon claimed disabilities prevented him from passing an oral board examination. **On his fifth attempt the American Board of Plastic Surgery <u>gave him extra time to complete the test and allowed him to use demonstrative aids</u>. <u>He still did not pass.</u>**   Soignier pursued an internal appeal of this failure and the denial of his requested accommodations, which the Board denied. He then sued alleging the accommodations offered to him failed to satisfy Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA"). The district court found Soignier discovered his injury in November 1992.  Because Soignier's claim accrued in November 1992, but he did not file his complaint in federal court until May 1995, the district court dismissed as time-barred pursuant to Fed. R. Civ. P. 12.

**Katz did not find out his diagnosis of bipolar disorder until March of 2013, he contacted the defendants on April 1, 2014 notifying them of changes to his diagnosis via an APPEAL.  The defendants responded on April 17, 2014 never acknowledging the changes to his diagnosis and denying his request for accommodations.  This tolls the statute of limitations period to April 17, 2016.  Katz's filing was timely as he initiated this lawsuit against defendants on June 17, 2015.**

**The ADA does not contain a specific statute of limitations.**  Here the actions of the defendants April 17, 2014 denial of the 'Six Attempt Limit Rule' constitutes a **NEW** discriminatory act separate from the discrimination that took place in Katz's 2006 accommodation request.  **This is actionable under the ADA.  Katz differs from Soignier because the defendants committed TWO distinct and different wrongs.  With the 'NEW" wrong occurring on April 17, 2014 with the denial of Katz's APPEAL of the 'Six-Attempt Limit Rule' and refusal to acknowledge his 2013 diagnosis of bipolar disorder.**

**Rawdin v. American Bd. of Pediatrics, 985 F.Supp.2d 636, 647-648** (E.D. Pa. 2013), aff'd., 582 Fed.Appx. 114 (3d Cir. 2014) works against defendants because Rawdin returned to medicine in 1999 with a disability—a memory deficiency—caused by a brain tumor, **he applied to take Step III of the USMLE for the third time, and for the first time requested accommodations from NBME (EXHIBIT 51).  <u>His request was granted by NBME,</u> and he was provided double time to take the exam, an individual testing room, and additional "off the clock" breaks. Rawdin passed Step III of the USMLE on this third attempt and earned a Pennsylvania medical license in 2000.   The American Board of Pediatrics (ABP) would NOT grant Rawdin accommodations for his ABP exam because he had made the following *spectacular* accommodations requests: (1) either award him board certification without requiring him to pass the multiple choice exam (2) or provide him with an alternative form of**

---

[23]*Id.*

testing.  ***The Court rightfully determined that Rawdin's requested accommodations were not reasonable and would fundamentally alter ABP's exam and place an undue burden on ABP.***   In Katz's case his requested accommodation of extra time and waiver of the 'Six Attempt Rule' for disability applicants who qualify under the ADA does NOT  fundamentally alter the USMLE program as stated by Attorney Charles Weiner (EXHIBIT 23) an expert in Education, Civil rights and Discrimination law.

**Rawdin has no place in this discussion considering that the defendants (NBME) themselves found him disabled under the ADA, (but the ABP did not) and granted him accommodations for the USMLE Step III.**  By even addressing Rawdin the defendants are essentially *"cutting off their nose to spite their face."*

The defendants also cite the very **peculiar** case of Mahmood v. NBME, 2012 WL 2368462, at *4 (E.D. Pa. 2012). Where Maria Mahmood an individual with a disability sued the NBME over claims that they violated the ADA when she was not given appropriate accommodations while taking her USMLE CK-2 on August 8, 2011.  NBME argued that the undisputed facts established Mahmood, in fact, disrupted efforts by test administrators to implement her agreed-upon accommodations **when she set a fire in the bathroom at the test center**.    This very **bizarre** case has no bearing on the legitimacy of Katz's claims.


## F. APPLICATION OF THE FEDERAL TOLLING DOCTRINE

Equitable tolling applies when a plaintiff, despite due diligence and through no fault of his own, cannot determine information to bringing a complaint. Thelen, 64 F.3d at 268 (citing Chakonas v. City of Chicago, 42 F.3d 1132, 1135 (7th Cir. 1994); Cada, 920 F.2d at 451).

Katz suffers from bipolar disorder he experiences mood swings, there are highs and lows, the highs are marked by unrealistically powerful, important, and an invincible, and "nothing can stop me reality." After diagnosis of bipolar disorder in March of 2013 he continued to experience highs as a new medication regimen was introduced to combat these symptoms (EXHIBIT 59).  **The point is that Katz mentally would not have been in a "sound frame of mind" and can not be deemed a "reasonable person" until April of 2014 (EXHIBIT 59).**  In keeping with the riptide analogy, Katz was still immersed in mental illness due to the defendants negligence and failure to previously accommodate him. **Grounds for tolling may exist when the plaintiff suffers from a practical or legal disability that prevents him from bringing suit while a plaintiff pursues a different remedy against the**

defendant, or when the defendant uses fraud to dissuade a plaintiff from going to court.[24]

The U.S. Court of Appeals For Third Circuit Ruled in Lake v. Arnold 232 F.3d 360 (2000) stated "application of the federal tolling doctrine leads us to conclude that the federal claims may **NOT** be barred." **"Although the Pennsylvania statute of limitations is applied to the federal claims, federal tolling doctrine may be applicable to determine whether Lakes' federal claims are timely. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994) (applying federal tolling to limitations period in employment discrimination case); Heck v. Humphrey, 997 F.2d 355, 357-58 (7th Cir. 1993).** There is one other circumstance under which a plaintiff can escape the rigors of Pennsylvania's statute of limitations: <u>**when the defendants have intentionally misinformed the plaintiff or concealed information from her so that they are estopped from invoking the statute of limitations See Walters v. Ditzler, 227 A.2d 833 (Pa. 1967)."**</u>

Katz sent a notarized request to NBME DS on 1/27/2014 requesting his documentation from 2005-2006 per attorney recommendation. On February 4th, 2014 Farmer replied by mail; "The NBME does not copy or return the comments of an examinees' disability file or send copies to examine-es or third parties (EXHIBIT 33)." **Katz did receive the documents he requested via the discovery phase of this lawsuit, to find that the sole reviewer of his documentation in 2005-2006 was no other than Catherine Farmer.** J. Abram Doane fraudulently concealed the fact that there was only ONE *neophyte internally affiliated UNLICENSED reviewer.* ***The fraudulent concealment d*octrine "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception."[25] The Pennsylvanian Supreme court held that, " …the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises."[26]** The discovery rule is examined shortly. In Wilson v. Garcia , 471 U.S. 161 (1985), and Hardin v. Straub, 490 U.S. 536 (1989), the Court held that, in situations where a federal action does not have a statute of limitations, the practice has been to adopt a local limitation as long as that limitation is not inconsistent with a federal law or policy. **Looking at the language of Section 1983, the Court determined that Congress intended to create a federal cause of action; therefore,**

---

24 http://www.law.gonzaga.edu/law-review/2008/03/10/the-continuing-violations-doctrine/
25 *Fine v. Checcio*, 870 A.2d 850, 860 (2005).

26 Id.

**it is up to the federal courts to determine the proper statute of limitation.**

**G. LEGAL PRECEDENT – Equitable Tolling And Mental Incapacity Cases:**

**'principles of equity would make the rigid application of a limitation period unfair."** Jones v. Morton, 195 F.3d 153, 159 (3d Cir.1999). **"Although the Pennsylvania statute of limitation is applied to the federal claims, federal tolling doctrine may be applicable to determine whether . . . federal claims are timely."** Lake v. Arnold, 232 F.3d 360, 366 (3d Cir. 2000). **"In addition, 'equitable tolling requires the plaintiff to demonstrate that he or she could not, by the exercise of reasonable diligence, have discovered essential information bearing on his or her claim."** Ruehl, 500 F.3d at 384 (quoting In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004)) **A variety of situations can give rise to equitable tolling, including "extraordinary circumstances beyond the [claimant's] control [that] made it impossible to file the claims on time."** Harris, 209 F.3d at 330; accord United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004) (quoting Rouse v. Lee,339 F.3d 238, 246 (4th Cir. 2003) (en banc)). **The First Circuit has established that mental incapacity is a suitable basis upon which to equitably toll a statute of limitations.** <u>**Mental Illness has also warranted Equitable Tolling outside of the two-part test**</u> See :Meléndez-Arroyo v. Cutler-Hammer de P.R., Co., 273 F.3d 30, 39 (1st Cir.2001) **(remanding for factual inquiry into whether plaintiff's mental state warranted equitable tolling)**; Nunnally, 996 F.2d at 5 **(holding that 5 U.S.C. § 7703(b) (2) can be tolled due to mental incapacity)**; Oropallo v. United States, 994 F.2d 25, 28 n. 2 (1st Cir.1993) **(holding that 26 U.S.C. § 6511 may not be equitably tolled, <u>but that mental incapacity is a grounds for tolling when available</u>)**. T**he Second, Sixth, Seventh, Ninth and D.C. Circuits have held the same in a variety of circumstances**. See Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80 (2d Cir.2003) **("Equitable tolling is generally considered appropriate where a plaintiff's medical condition or mental impairment☐ prevented her from proceeding in a timely fashion."**) (citations omitted); Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 514 (2d Cir.2002) **(recognizing mental incapacity as a basis for equitable tolling under ERISA)**; Brown v. Parkchester S. Condos., 287 F.3d 58, 60 (2d Cir.2002) **(Title VII case finding that plaintiff proffered sufficient evidence to warrant a hearing on whether her mental incapacity required tolling)**; Boos v. Runyon, 201 F.3d 178, 184 (2d Cir.2000) **(holding that 29 C.F.R. § 1614.105(a)(1) is subject to equitable tolling based on mental illness)**; Canales v. Sullivan, 936 F.2d 755, 756 (2d Cir.1991)

(holding that 42 U.S.C. § 405(g) may be equitably tolled based on a plaintiff's mental impairment); Cantrell v. Knoxville Cmty. Dev. Corp., 60 F.3d 1177, 1180 (6th Cir.1995) (holding that attorney's mental illness may justify equitable tolling); Miller v. Runyon, 77 F.3d 189, 191 (7th Cir.1996) (finding that 29 U.S.C. § 791 may be tolled "if the plaintiff because of disability, irremediable lack of information, or other circumstances beyond his control just cannot reasonably be expected to sue in time"); Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir.1999) (holding that mental incapacity is an extraordinary circumstance that may warrant equitable tolling); Smith-Haynie v. Dist. of Columbia, 155 F.3d 575, 579 (D.C.Cir.1998) (holding that the doctrine of equitable tolling "can fairly be read to encompass cases where a plaintiff has been unable to [timely file] because of disability").

## H. OPPOSING COUNSEL The "PHILADELPHIA POWER LAWYERS" (hereinafter "PPL") MAKE A FALSE STATEMENT: "The Statute of Limitations Bars All of Plaintiff's Claims Under the Americans with Disabilities Act."

The ADA, like many federal civil rights statutes, does NOT contain a specific statute of limitations. The defendants state: "For the following reasons, the Court should find both of plaintiff's claims of alleged violation of the Americans with Disabilities Act barred by the statute of limitations.

The ADA, does not contain a specific statute of limitations.[27] Applying a time bar in a case where the plaintiff had no opportunity to raise his claim within the time period may be unfair.[28] Applying a strict time bar under a statute designed to bring equality of opportunity to a traditionally underrepresented group, may not deter discrimination and undermine the remedial purposes of the civil rights law. Given that the ADA is a relatively new law with a broad scope and complexity, judicial interpretation is needed to guide behavior. Tight limitations prevent judicial input into the statute's meaning, leaving all prospective parties limited guidance to shape their behavior.[29]

Attorney David Ferleger (EXHIBIT 52) is a University of Pennsylvania Law School professor, a pioneer in Civil Rights advocacy with extensive experience litigating against testing agencies, he is a leader of the Disability Rights Bar Association (DRBA), a founding member of the Academy of Court Appointed Masters (ACAM), and on the publications committee for its Bench Book for judges. He

---

27 Hill, E. & Blanck, P. (2009). Future of Disability Rights: Part Three—Statutes of Limitations in Americans with Disabilities Act, "Design and Construct" Cases, Syracuse Law Review, 60, 125-159.
28 Hill, E. & Blanck, P. (2009). Future of Disability Rights: Part Three—Statutes of Limitations in Americans with Disabilities Act, "Design and Construct" Cases, Syracuse Law Review, 60, 125-159.
29Hill, E. & Blanck, P. (2009). Future of Disability Rights: Part Three—Statutes of Limitations in Americans with Disabilities Act, "Design and Construct" Cases, Syracuse Law Review, 60, 125-159.

spent considerable time analyzing Katz's disability claims pro bono in October of 2015. His commentary regarding statute of limitations and the 'six attempt limit rule' is stated below:[30]

> "The 6 Attempt Rule. The applicability to you of the 6 attempt rule was denied by USMLE April 17, 2014. The statute of limitations on that claim would require that it be made by April, 2016, but you have asserted it in your lawsuit."
>
> — David Ferleger   October 8, 2015

### I. Accrual:

In situations where a federal statute borrows a state limitations period, the state law governs the length of the limitations period, **but federal law governs the accrual of the limitations period. Federal courts are NOT bound by the state law regarding when the limitations period begins to run.** There are several possible dates that statute of limitations for an ADA case may begin to run: (1) the date plaintiff encounters/discovers the violation (encounter or discovery rule); (2) the date construction is completed; (3) the date the defendant ceases to control the facility or corrects the violation (continuing violation).

### J. Federal Discovery Rule:

In *Voices for Independence v. Pennsylvania Department of Transportation*, the district court addressed a Title II transportation case brought by an organization and several residents with disabilities seeking injunctive relief for alleged inaccessible new or altered curb ramps. Some of the ramps were constructed outside the limitations period and some constructed within the limitations period.  The court determined that the discriminatory act under Title II is construction or alteration. However, applying the federal discovery rule, the court found that **the cause of action for that act is not complete until the plaintiff's injury arises.  In other words, the cause of action is not complete, and the limitations period does not begin, "until a plaintiff—a qualified individual with a disability—is denied access by virtue of a defective curb cut, irrespective of the date on which the curb was defectively installed."**
**The application to the six attempt rule is as follows, regardless of when the 'six attempt limit rule' was constructed and 'defectively installed' for people with documented mental disabilities the limitations period does not begin "until a plaintiff – a qualified individual with a disability" is**

---

30  This document is not submitted in its entirety under work-product doctrine, "tangible material or its intangible equivalent" that is collected or prepared in anticipation of litigation is not discoverable.

denied access (Katz - April 17, 2014).

In *HIP  v. Port Authority of New York and New Jersey*, the court, in a Title II transportation case, considered whether a claim for an alteration completed more than two years before the lawsuit was barred by the statute of limitations.  **The court concluded that the discrimination was continuing and the <u>cause of action was not complete until the plaintiffs were excluded by the inaccessible element.  In other words, their injury did not arise until they either attempted to access or were deterred from accessing, the facility</u>.  Katz attempted to access the USMLE Step I exam on April 1, 2014 with an APPEAL, requesting administrative barrier removal and was denied and deterred access by defendants on April 17, 2014.**

**This approach is based on the tort principle that a cause of action for personal injury is not complete until an injury occurs.  This is consistent with standing principles requiring a plaintiff to have suffered "an injury in fact—an invasion of a legally protected interest which is  *(a) concrete and particularized, and  (b) actual or imminent, not conjectural or hypothetical."*  In an** ADA Title III district court case, *Speciner v. Nationsbank*, the court found that the requirements for **barrier removal were ongoing and NOT time-barred**.  Title III defines inaccessible design and construction to constitute discrimination in the context of "full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations" of a public accommodation.  Therefore, **to complete a cause of action under Title III, <u>an attempt </u> to achieve enjoyment of goods, services and so forth, must occur.  This language would argue that the <u>statute of limitations does not run until an individual with a disability attempts to access the place of public accommodation.</u>**

### K. Continuing Violation Doctrine:

The continuing violation doctrine was originated by federal courts in Title VII employment  cases.  It has been applied in diverse contexts, **including civil rights**.  Courts have developed tests for applying the doctrine.  **One test "takes a series of related wrongful acts, decisions, or failures to act occurring both within and outside of the limitations period prior to suit, and aggregates them into a single unit for limitations purposes." This type of violation is cumulative and the statute of limitations begins to run only when the defendant stops its behavior. In determining the applicability courts should consider (1) subject matter -- whether the violations are of the same type, tending to connect them in a continuing violation; (2) frequency –– whether the acts are recurring  (3) degree of permanence –– whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his rights. See Id.**
**The "PPL" attempt to delude the Court by stating:**  "Plaintiff's discussion of the administrative

resolution of a matter involving a different examinee who applied for accommodations, Frederick Romberg, is incomplete, misleading, and has no bearing whatsoever on plaintiff's case or his claim for damages. His quotation of things that people said regarding Mr. Romberg are irrelevant and the Court should disregard them."

**NBME is currently under investigation by Justice Civil Rights Division, Katz is not the only complainant, there are several others.   The defendants entered into a two-year settlement agreement with Justice DJ# 20216-181 in February of 2011 it was over February of 2013.  When it ended the defendants reverted back to their discriminatory behavior, as testament to this and other existing lawsuits against the defendants.   The agreement was for all individuals with disabilities, not just Romberg.  Katz's case is not much different than Romberg's.  Romberg's disability is dyslexia, <u>Katz's disability is bipolar disorder, anxiety and specific phobia associated with test-taking (medical boards) (EXHIBIT 27).</u>   Romberg was offered relief under Title III and provided with accommodations as the NBME preferred to enter into settlement agreement then defend themselves against Justice in Court.**

**In Conclusion**  **(1)** Katz was misled and lulled by defendants denial of accommodations in 2006 preventing him from asserting his due process rights until diagnosed with bipolar disorder in 2013; **(2)** The pattern remained obscured in the face of diligence in seeking to identify it; **he was unable to obtain vital information bearing on the existence of his claim."** Katz contends with mental illness. **(3)** The continuing violation exception aggregates a series of wrongs and applies a single limitations period beginning after the commission of the **last wrong suffered** ("SixAttempt Limit" (2014)  + ADA violations in 2006. **(4) The delayed discovery exception postpones accrual of the limitations period until** the plaintiff discovers the cause of action. By defendants submission during discovery Katz was better able to examine what took place in 2005-2006.   **(5) To obtain equitable tolling, a plaintiff must show that the failure to file was a result of  mental illness that rendered him incapable of "rational thought or deliberate decision making,"** Meléndez-Arroyo, 273 F.3d at 37,  Katz was not diagnosed with bipolar disorder until 2013. He was lacking in insight and judgment he can not be deemed a "reasonable person" until April of 2014 (EXHIBIT 59).

## IV. RESPONSE TO DEFENDANT'S STATEMENT OF THE QUESTIONS INVOLVED:

**Defendants' Question One.**

1. **Are all of plaintiff's claims under the Americans with Disabilities Act barred by the statute of limitations?**   Defendants Suggested answer: yes.

   **Plaintiff's Suggested answer: No.    The ADA, like many federal civil rights statutes, does <u>NOT</u> contain a specific statute of limitations.**  Applying a time bar in a case where the plaintiff had no opportunity to raise his claim within the time period may be unfair.  Moreover, applying a strict time bar under a statute designed to bring equality of opportunity to a traditionally underrepresented

group, may not deter discrimination and undermine the remedial purposes of the civil rights law.

**Defendants' Question Two.**

   2.   **Do the breach of contract or tort claims in the second amended complaint provide any basis for recovery?**   Defendants Suggested answer: No.

   **Plaintiff's Suggested answer. Yes.**
   •   NBME Failed To Abide By Their Own Disability Guidelines As Stated In Their USMLE Bulletin, As Evidence Of The 2011 Settlement Agreement With Justice DJ# 20216-181 (NBME Website- EXHIBIT 47), The GAO Determinations and Recommendations to Justice in 2011 (EXHIBIT 41), The Current Justice Investigation, Katz's 2006 And 2014 Claims.  A cause of action generally encompasses both the legal theory (the legal wrong the plaintiff claims to have suffered) and the remedy (the relief a court is asked to grant) *Both have been clearly delineated in Plaintiff's Second Amended Complaint.*

## V. RESPONSE TO DEFENDANT'S ARGUMENT

**A. Legal Standard for Summary Judgment**
**The "PPL" cite a case for their Legal Standard for Summary Judgment that has no bearing on the merits of this case, it should therefore be completely disregarded by the Court.**

**In Thomas v. NBME-National Board of Medical Examiners, 2015 WL 667077** (E.D. Pa. 2015), the pro se plaintiff Thomas troubles began with a 2008 federal investigation and 2009 lawsuit by NBME and FSMB against, a test preparation company known as Optima University for copyright infringement of USMLE test questions.  Plaintiff attended Optima as a student before taking one of the USMLE exams on December 31, 2007, he was also an Optima employee from February through August of 2008.  Thomas alleged that NBME wrongly rescinded his passing score on a segment of the USMLE Step 2 CK examination. **Thomas <u>did not</u> assert discrimination based on any of the <u>protected categories.</u>  Thomas testified that *he believed* he "<u>was discriminated against based solely on the fact that [he] was an employee at Optima."</u>**

**The "PPL" state: "The Court Should Deny Plaintiff's Proposed Second Amended Complaint as Futile Because None of the Asserted Claims Could Give Rise to Relief."**

**Response:** A cause of action generally encompasses both the legal theory (the legal wrong the plaintiff claims to have suffered) and the remedy (the relief a court is asked to grant). ***Both have been clearly delineated in the Second Amended Complaint.***

**1). "The Court Should Reject Plaintiff's Proposed Claim for Breach of Contract."** "Plaintiff never had a contract with the NBME or the FSMB to receive accommodations, and the duty of good faith and fair dealing that plaintiff cites arises only in the context of a contract, and cannot be imposed in the absence of a contract. Donahue v. Federal Express Corp., 753 A.2d 238, 243 (Pa. Super. 2000)."

**Response:** To maintain an action for breach of contract under Pennsylvania law a plaintiff must demonstrate: **(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.** Jones v. Select Portfolio Servicing, Inc., 2008 WL 1820935, at *5 (E.D. Pa. 2008), quoting J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002).   The determination of a meeting of their minds, and thus offer and acceptance, is based on the **objective standard of what the parties said and did and not their subjective state of mind.**[31]  **Unexpressed subjective intent is irrelevant. In determining whether mutual assent is present, the court looks to the communications between the parties and to the acts and circumstances surrounding these communications**.[32]

Contracts may be oral, in writing **or inferred from the acts and conduct of the parties**   J.F. Walker, 792 A.2d at 1272, citing John Edward Murray, Jr., Cases and Materials on Contracts 184 (3rd ed.1983); Axilbund v. McAllister, 180 A.2d 244, 249 (Pa. 1962), **noting that commissions can be proven through oral agreement.   An enforceable contract requires an offer, acceptance, consideration and mutual meeting of the minds. Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993).**  In "meeting of the minds" if one party had no reasonable basis for believing that the second party had a different understanding, but the second party had a reasonable basis for understanding that his or her interpretation was different from that of the first party, then the court will likely find that there was a meeting of the minds and will interpret the contract in accordance with the first party's intent. See, Merced County Employees v. County of Merced (1987) 188 Cal. App.2d662; Restatement of Contracts 2d § 201(2).  **This rule essentially penalizes a party for not being straightforward, consistent with a similar legal rule that an ambiguity should be construed against the party causing it to be present.  CC § 1654.**

**Material Breach of Contract - Failure of one party to perform his obligations** under the contract in such a way that the value of the contract is destroyed, exposes that party to liability for breach of contract damages.  As already established the NBME made a false statement regarding their external procedures and the qualifications of their evaluators ("expert(s)") in their respective fields.  The NBME evaluators in 2006 were NO EXPERTS and to date hold NO Professional LICENSURE this is likely why they were hidden from public view by J. Abram Doane.  This constitutes a  material breach of contract, the aggrieved party (Katz) is well within his right to sue for damages. Such a total breakdown of the material provisions of a contract may be referred to as a "fundamental" or "repudiatory" breach. NBME provided a case coordinator that they employed by the name of Maria Fuentes in 2005-2006.

---

31  Weynand v Weynand, 990 S.W.2d 843, 846 (Tex. App.-Dallas 1999, pet. denied).
32  Wiley V. Bertelson, 770 S.W.2d 878,882 (Tex. App.-Texarkana 1989, no writ).

This individual was Katz's point of contact for all communications with NBME (EXHIBIT 53).  Katz established a *therapeutic alliance* with Fuentes via telephone and email, who in turn forwarded his materials to NBME.  There was an obvious **acceptance of Katz's materials from his caregivers by Fuentes, there was a consideration and a subsequent "mutual meeting of the minds" between Katz and Fuentes**  Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993).

**Katz learned of violation of his due process rights via the discovery process of this lawsuit when he had the opportunity to examine what took place in 2005-2006.  Katz submitted an April 1, 2014 APPEAL to the defendants, they had an ethical fiduciary duty to consider his 2013 diagnosis of bipolar disorder, instead of completely ignoring it.**

**2). The PPL state: "The Court Should Reject Plaintiff's Proposed Claim for "Misleading Conduct" Because It Fails to State a Cognizable Claim."**    The PPL flatteringly adopts Plaintiff's vernacular by employing an old New York expression "throws in the kitchen sink" that plaintiff employs in previous motions, "into the third cause of action in his proposed Second Amended Complaint, which he calls "Misleading Conduct.""  The breach of duty has already been clearly justified,  as has the misleading conduct and incompetence of the NBME employees been established. It is in black and white print, a material fact, and NOT a derived theoretical or hypothetical construct as the PPL would like the Court to believe.

**3). The PPL state: "Plaintiff Fails to State a Claim for Negligent or Intentional Infliction of Emotional Distress."** Jurisdictions that have rejected the claim of negligent infliction of emotional distress **do not forbid the recovery of damages for mental injuries**. Instead, these jurisdictions usually allow recovery for emotional distress where such distress:

**1. is inflicted intentionally (i.e., intentional infliction of emotional distress)** ( EXHIBIT 16, EXHIBIT 24, EXHIIT 36)
**2.** is directly associated with a **physical injury** negligently inflicted upon a victim   (EXHIBIT 28)
**3.** is caused by defamation and libel;
**4.** stems from witnessing a gruesome accident as a bystander
**5. is the product of some misconduct universally recognized (i.e. discrimination) as causing emotional distress....[33]**     (EXHIBIT 5, EXHIBIT 8, EXHIBIT 17, EXHIBIT 22, EXHIBIT 23, EXHIBIT 29, EXHIBIT 30, EXHIBIT 31, EXHIBIT 32, EXHIBIT 33, EXHIBIT 34, EXHIBIT 35, EXHIBIT 36, EXHIBIT 38, EXHIBIT 39, EXHIBIT 41, EXHIBIT 44, EXHIBIT 46, EXHIBIT 47, EXHIBIT 49, EXHIBIT 50, EXHIBIT 58, EXHIBIT 59)

F.R.D. 279, 281 (E.D. Pa. 1992).
        [5] The *pro se* plaintiff has labeled this cause of action as "impairment of economic opportunity," which the Court has liberally construed as a claim of tortious interference with a prospective employment relationship.

---

33 https://en.wikipedia.org/wiki/Negligent_infliction_of_emotional_distress

**4). The "PPL" state: "The Court Should Reject Plaintiff's Proposed Claim for "Impairment of Economic Opportunity," Because No Such Cause of Action Exists.**
**The Court has already clarified this point (DKT# 116) in their Memorandum of Law (above) dated May 10, 2016.** Tortious interference in the common law of torts, occurs when a person intentionally damages the plaintiff's contractual **OR** other business relationships. **This tort is broadly divided into two categories, one specific to contractual relationships (irrespective of whether they involve business), and the other specific to business relationships or activities (irrespective of whether they involve a contract).[34]** Typical legal damages for tortious interference include economic losses, if they can be proven with certainty, and mental distress. Additionally punitive damages may be awarded if malice on the part of the wrongdoer can be established. Equitable remedies may include injunctive relief in the form of a negative injunction that would be used to prevent the wrongdoer from benefiting out of the interference (see EXHIBITS 25 & 26 documenting Katz's claims)

**5). The PPL State: "Plaintiff Fails to State A Claim for Fraudulent Misrepresentation."** Liability for misrepresentation, can be predicated on more than intentional fraudulent misrepresentation. Misrepresentation is separated into negligent misrepresentation, based on careless misrepresentation, and innocent misrepresentation, supported by strict liability and express warranty rationales. **The law of misrepresentation, therefore, is much broader than the cause of action for fraud.[35] Liability for intentional misrepresentation requires a showing that the defendant was aware that he or she was consciously and purposefully deceiving the victim.[36]** In order to sustain a viable tort cause of action for deceit, that is, intentional, fraudulent misrepresentation, the common law generally requires that the following elements be pleaded and proved: **(1) a false representation of material fact made by the defendant; (2) with knowledge or belief as to its falsity, or with reckless disregard as to its truth or falsity; (3) with an intent to induce the plaintiff to rely on the misrepresentation; (4) justifiable reliance on the misrepresentation by the plaintiff; and (5) damage or injury caused to the plaintiff by the reliance.[37]** A representation, in order to be the predicate for the lawsuit of fraudulent misrepresentation, must be, in fact, false.[38]" **A "false" representation consists of words,**

---

34 https://en.wikipedia.org/wiki/Tortious_interference
35 See generally, W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS §§ 105 & 107 (5th ed. 1984); RESTATEMENT (SECOND) OF TORTS, Scope Notes (1977); and RESTATEMENT (Second) OF CONTRACTS, Ch. 7, Introductory Note (1981).
36 RESTATEMENT (Second) OF TORTS § 525 & § 528 cmt. a (1977).
37 KEETON ET AL., *supra* note 1, § 105, at 728; RESTATEMENT (SECOND) OF TORTS §§ 525 & 531 (1977); *see also* Lazar v. Superior Court, 909 P.2d 981, 984 (Cal. 1996); Patten v. ALFA Mut. Ins. Co., 670 So. 2d 854, 856 (Ala. 1995); *Mueller,* 371 N.W.2d at 739; Whitson v. Oklahoma Farmers Union Mut. Ins. Co., 889 P.2d 285, 287 (Okla. 1995).
38 RESTATEMENT (SECOND) OF TORTS § 525 cmt. b (1977); see also Russ v. TRW, Inc., 570 N.E.2d; Clement-Rowe v. Michigan Health Care Corp., 538 N.W.2d 20, 23-24 (Mich. Ct. App. 1995).

oral or written, or conduct that render a statement or assertion untruthful and thus cause an aggrieved party to reach an erroneous conclusion.[39]  The representation necessary for fraudulent misrepresentation not only must be a false one, but also must be a false representation of "fact."[40] Accordingly, the representation must concern either a past or present event, circumstance, or occurrence.[41]   Even though a defendant has not made an affirmative false representation to the plaintiff, a defendant nonetheless may be liable for fraudulent misrepresentation by engaging in fraudulent concealment.[42]   Fraudulent concealment, at times called fraudulent "suppression"[43] arises when a defendant actively conceals the truth.[44] The concealment can be effectuated by words, actions, or conduct which create a false impression covering up the truth or which prevent the plaintiff from otherwise discovering a material fact.[45]   A key element to a lawsuit for fraudulent misrepresentation is "scienter," or guilty knowledge, that is, the finding of a required intent to deceive, mislead, or to convey a false impression. In order to establish scienter, a plaintiff must establish that the false representation was made by the defendant either knowing or believing it to be false, without knowledge or belief as to its truth or falsity, with reckless disregard as to its truth or falsity, or knowing or believing that there is an insufficient basis for ascertaining the truth or falsity of the representation.[46]   Whether or not scienter is present is an issue for the trier of fact, usually the jury, to decide.[47]

6). The "PPL" state: "The Court Should Reject Plaintiff's Request for a Preliminary Injunction Because, Among Other Reasons, Plaintiff Cannot Prevail on the Merits." They state "This case is now at the summary judgment stage. It is late to consider a preliminary injunction."

The "PPL" make a another false statement.   "Similar to the type of remedy, courts and parties have significant flexibility regarding timing, so long as the party seeking an injunction is not guilty of unreasonable delay in requesting the court's assistance."[48]

---

39 RESTATEMENT (SECOND) OF TORTS § 525 & cmt. b (1977); *see also Russ,* 570 N.E.2d at 1084 ("false representation" is one "designed to mislead").
40 KEETON ET AL., supra note 1, § 109, at 755; RESTATEMENT (SECOND) OF TORTS § 525 cmt. e (1977).
41  RESTATEMENT (SECOND) OF TORTS § 525 cmt. e (1977).
42 KEETON ET AL., *supra* note 1, § 106, at 737.
43 Duck Head Apparel Co., Inc. v. Hoots, 659 So. 2d 897, 904-05 (Ala. 1995); Pegram v. Hebding, 667 So. 2d 696, 701-02 (Ala. 1995); Eisert v. Town of Hempstead, 918 F. Supp. 601, 615 (E.D.N.Y. 1996).
44 KEETON ET AL., supra note 1, § 106, at 737; Berger v. Security Pacific Info. Sys., Inc., 795 P.2d 1380, 1385 (Colo. Ct. App. 1990) (elements of fraudulent concealment).
45KEETON ET AL., supra note 1, § 106, at 737; Eisert, 918 F. Supp. At 615 ("intentional suppression of the truth... may be effected by words, conduct, or the exhibition of documents.").
46 KEETON ET AL., supra note 1, § 107, at 741; RESTATEMENT (SECOND) OF TORTS § 526 cmt. a (1977); Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986) ("intent to defraud"); Zanone v. RJR Nabisco, Inc., 120 N.C. App. 768, 775, 463 S.E.2d 584, 589 (1995) ("intent to deceive"); Weisman v. Connors, 547 A.2d 636, 641 (Md. Ct. Spec. App. 1988) ("purposeful and deliberate intent to deceive"); McNierney v. McGraw-Hill, Inc., 919 F. Supp. 853, 861 (D. Md. 1995) ("intent and purpose to defraud").
47 Ibid.
48 http://www.stevenslee.com/injunctions-a-practical-guide-to-one-of-the-laws-most-powerful-tools/

**The "PPL" state:** "In the event the Court does not grant summary judgment and dismiss all claims with prejudice, the defendants will request an extended discovery period in which they will be able to fully develop the record on all matters in which plaintiff blocked discovery through his objections to subpoenas."

Katz was COMPELLED by this Court in its 05/10/2016 Memorandum of Law to provide authorization to the Defendants' third-party subpoenas for his mental health, vocational and educational records. The defendants were granted 60 days by the Court to send, receive and brief the Court about their findings. **It speaks volumes that after hundreds of pages of documents received from Katz's caregivers, previous employers, and educational institutions that only minimal changes exist ("Plaintiff got a C in a math Course......") between the defendants primary summary judgment motion and their amended summary judgment motion.  This only further validates the legitimacy of Katz's claims.** Prior to Magistrate Judge Joyce Alexander's landmark opinion in Sabree v. United Brotherhood of Carpenters & Joinders of America, Local No. 33,[49] federal courts, including the First Circuit, had previously declined to decide whether a psychotherapist-patient privilege[50] existed under federal common law.[51] Without the recognition of a psychotherapist-patient privilege, a plaintiff alleging an emotional distress claim in federal court[52] was open to having his or her mental health records open to discovery by defendants (EXHIBIT 37).

**Judge Alexander's ground-breaking opinion in Sabree influenced courts throughout the nation, including the United States Supreme Court, in establishing and shaping the recognition of the psychotherapist-patient privilege, providing a measure of protection for plaintiffs in maintaining the confidentiality of their mental health records**.[53]

Following in the footsteps of Judge Alexander's analysis of the applicability of the psychotherapist-patient privilege in federal courts in Sabree, the United States Supreme Court addressed the same issue in Jaffee v. Redmond.[54]   **The opinions of both Jaffee and Sabree were based upon motions to compel a party's psychotherapy records, and both courts determined that those records were confidential and privileged**[55]  The confidentiality of mental health records of a plaintiff alleging

---

49 126 F.R.D. 422 (D. Mass. 1989).

50 "mental health records" include recordings by all medical and nonmedical mental health therapy professionals taken during the course of mental health treatment.

51 See United States v. Barrett, 766 F.2d 609, 616 n.8 (1st Cir. 1985).

52 At the time of Judge Alexander's decision in Sabree, the Massachusetts Legislature had previously enacted a statutory psychotherapist-patient privilege. See MASS. GEN. LAWS ch. 233, § 20B (2002).

53 See Sabree v. United Bhd. of Carpenters & Joinders of Am., Local No. 33, 126 F.R.D. 422, 426 (D. Mass. 1989) [hereinafter Sabree].

54 518 U.S. 1 (1996).

55 Id. at 15; Sabree, 126 F.R.D. at 426.

emotional distress damages in federal court has received greater protection following Judge Alexander's analysis of the interests underlying a federal court's recognition of the psychotherapist-patient privilege in Sabree. **As with all privacy rights, the safeguard of the psychotherapist-patient privilege is only as strong as the courts' willingness to find that a plaintiff has not waived his right to privacy by introducing his mental state in controversy.[56]** Plaintiff ascribes to the opinions expressed in Sabree and Jaffee. However, he has respectfully complied with this Courts decision and in good faith has even aided the defendants in obtaining his records, confident that justice will prevail.

## VI. CONCLUSION:

In conclusion, the matter of Katz v. NBME and FSMB has been "David and Goliath" from the very beginning, denoting the underdog pro se plaintiff, facing-off against the "Philadelphia Power Lawyers" ("PPL") a much bigger adversary. After countless hours parsing the case-law, a *'very accurately slung stone'* (1 Samuel 17:40, 49) has been casted, demonstrating the existence of genuine issues for trial by way of seemingly straightforward principles. The federal doctrines of **equitable tolling, fraudulent concealment,[57] applicable federal law of accrual–the discovery rule, and the continuing violation doctrine** .

The ADA was meant to level the playing field for people with disabilities. Congress intended individuals, like the plaintiff to be protected by the law. High Stakes testing agencies like NBME have chosen to interpret the ADA in a way other than Congress intended. They have interpreted it to severely limit who is covered by the ADA totally disregarding the spirit and intent of the ADA and *scientific evidence* pointing to the absolute need for accommodations for people with disabilities.

If the defendants actions are not redressed as GAO warned Justice in 2011, in years to come the riptide will become a tsunami that engulfs individuals with disabilities. Katz implores this Court to grant him a *"first chance to successfully handle his disability,"* by not only adopting his arguments, but also Congress' intended application of the ADA, a remedial legislation to "break down barriers to the integrated participation of people with disabilities in community life." H.R. Rep. No. 485 (III), 101st Cong., 2d Sess. 49-50 (1990). For the foregoing reasons, the Defendants Motion for Summary Judgment must *fail* as this is a case for trial on all counts of the Second Amended Complaint.

---

56 Sherry L. Ruschioni  CONFIDENTIALITY OF MENTAL HEALTH RECORDS NEW ENGLAND LAW REVIEW [Vol. 38:4 2004]

57 *Fine v. Checcio*, 870 A.2d 850, 860 is the leading Pennsylvania fraudulent concealment case

## CERTIFICATE OF SERVICE

I certify that the foregoing Opposition To Defendants' Amended Motion for Summary Judgment, with Memorandum of Law and Exhibits, is being filed electronically with the Clerk of Court on July 15, 2016 using the electronic case filing system, which will automatically send email notifications of such filing to registered parties.

**Michael E. Sacks**
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA 19103-1443
(215) 255-8590
sacksme@hamburg-golden.com
Attorneys for Defendants,


**RESPECTFULLY SUBMITTED,**


_____
Richard Katz
3364 Parker Lane
East Stroudsburg, PA 18301
*Pro se*

| EXHIBIT NUMBER | PLAINTIFF'S LIST OF EXHIBITS DESCRIPTION AND NOTES |
|---|---|
| 1 | Proof of Ownership of USMLE Program |
| 2 | Medical Error- Third Leading Cause of Death in the U.S. |
| 3 | A Critical Review of Standardized Patient Examinations as Part of the USMLE |
| 4 | The Validity Argument About Using the USMLE |
| 5 | Plaintiffs'  Personal Statement to Defendants dated June 27, 2005 |
| 6 | Plaintiffs' Psychological and Psychiatric Documentation and Reports 2005 - 2006 |
| 7 | SUNY Old Westbury Honor Student Pre-Med Letter dated June 9, 1997 |
| 8 | Letters #1 and #2 from William Lupardo to Defendants 06/24/2005 and 03/31/2014 |
| 9 | First Psychological Report St. John's Psych. Center dated  Jan 12, 2003 |
| 10 | Ubaldo Leli, MD diagnosis of Adjustment Disorder w/ Depressed Mood  12/29/1999 |
| 11 | Proof of Accommodations Received in Medical School |
| 12 | Proof of Defendants Request for Excessive Documentation in 2005-2006 |
| 13 | Catherine Farmer's Resume |
| 14 | PA Department of State Proof of NO Licensure for Catherine Farmer 2006 to Current |
| 15 | Catherine Farmer Case Review Hours -  Assigned 01/23/2006 |
| 16 | J. Abram Doane Denial of Accommodations Letter dated 03/13/2006 |
| 17 | Department of Justice & NBME Settlement DJ# 202-16-181 dated 02/23/2011 |
| 18 | Defendants Response to Amended Complaint Regarding 'Six Attempt Limit' |
| 19 | Plaintiff's Interrogatory Item #8 to Defendants |
| 20 | Affidavit of Richard Katz – An Experimental Field Trial – Material Fact  5/20/2016 |
| 21 | 12/18,/2013, Telephone Conversation - NBME Disability Services Representative |
| 22 | Plaintiff's  First Appeal to Defendants regarding 'Six Attempt Limit' 04/01/2014 |
| 23 | Waiver of 'Six Attempt Limit' State Board of Medicine by Rep. David Parker |
| 24 | Catherine Farmer to J. Abram Doane Denial of Accommodations  2/2/2006 |
| 25 | Plaintiff's Financials from 2006 to 2011 an Attempt to Mitigate Discrimination |
| 26 | Plaintiff's Job Applications in an Attempt to Mitigate Discrimination |
| 27 | The Aaron Center Recent Psychological Report dated 07/21-10/27/2015 |
| 28 | Plaintiff's Medical Reports dating from 10/24- 11/11/2015 |
| 29 | Correspondence Senator Pat Toomey and Department of Justice 07/2014- 10/2015 |
| 30 | Amy Bueno Office of USMLE Secretariat Denial Letter Dated  04/17/2014 |
| 31 | Plaintiff's Second Appeal to Defendants Regarding 'Six Attempt Limit' 04/20/2014 |
| 32 | ADAAA Congressional Record  06/25/2008 |
| 33 | Catherine Farmer's 01/27/2014 Denial of Plaintiff's Request for His Records 2005-06 |

| EXHIBIT NUMBER | PLAINTIFF'S LIST OF EXHIBITS DESCRIPTION AND NOTES |
|---|---|
| 34 | The ADA and Professional Licensure |
| 35 | J. Abran Doane's Current LinkedIn Profile |
| 36 | The Compliance Officer and Misleading Conduct |
| 37 | Sabree v. United Brotherhood of Carpenters & Jonders of America, Local No. 33 |
| 38 | Plaintiff's Psychiatric Reports ReDCo |
| 39 | Defendants' Announcement 'Six Attempt Limit' |
| 40 | Plaintiff' - Attorney's Contacted – Appoinment of Counsel |
| 41 | GAO Report to Congressional Requesters |
| 42 | Brian M. Matayoshi, Ph.D. Bio |
| 43 | ERRATA Corrections |
| 44 | Defendants' Admission Items #20-21 |
| 45 | Catherine Farmer No Publication History on PubMed Database |
| 46 | Rush v. NBME 268 F. Supp. 2D 673 (N.D. Tex 2003) |
| 47 | NBME Guideline for Test Accommodations – Defendants' Website |
| 48 | PA Department of State No License for J. Abram Doane or Gregory E. Baker |
| 49 | Cognitive Problems Associated With Epilepsy |
| 50 | Comorbidity of ADHD and Bipolar Disorder |
| 51 | Rawdin v. The American Board of Pediatrics  11/06/2013 |
| 52 | Attorney David Ferleger Resume |
| 53 | Plaintiff and Maria L. Fuentes' Communications 2005 |
| 54 | Gregory Baker's Communications with Plaintiff's Caregivers |
| 55 | Plaintiff' Example of Compensation Visual Study Aid as a Medical Student |
| 56 | Plaintiffs' Publication - Accolades, Med School Preceptor Evaluations And Letters |
| 57 | Plaintiffs' Pre-Med Transcripts |
| 58 | Anxiety and Depression Can affect Attention and Cause Cognitive Deficits |
| 59 | Inpatient Psychiatric Hospitalization |