**United States Government Accountability Office**

# GAO

Report to Congressional Requesters

November 2011

# HIGHER EDUCATION AND DISABILITY

## Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations



U.S. Government Accountability Office

GAO**90**YEARS 1921-2011
ACCOUNTABILITY ★ INTEGRITY ★ RELIABILITY

GAO-12-40



**G A O**
Accountability * Integrity * Reliability

# Highlights

Highlights of GAO-12-40, a report to congressional requesters

November 2011

## HIGHER EDUCATION AND DISABILITY

### Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations

## Why GAO Did This Study

Standardized tests are often required to gain admission into postsecondary schools or to obtain professional certifications. Federal disability laws, such as the Americans with Disabilities Act (ADA) require entities that administer these tests to provide accommodations, such as extended time or changes in test format, to students with disabilities. GAO examined (1) the types of accommodations individuals apply for and receive and how schools assist them, (2) factors testing companies consider when making decisions about requests for accommodations, (3) challenges individuals and testing companies experience in receiving and granting accommodations, and (4) how federal agencies enforce compliance with relevant disability laws and regulations. To conduct this work, GAO interviewed disability experts; individuals with disabilities; officials from high schools, postsecondary schools, testing companies; and officials from the Departments of Justice (Justice), Education, and Health and Human Services (HHS). GAO also reviewed testing company policies and data, federal complaint and case data for selected testing companies, and relevant laws and regulations.

## What GAO Recommends

GAO recommends that the Department of Justice take steps to develop a strategic approach to enforcement such as by analyzing its data and updating its technical assistance manual. Justice agreed with GAO's recommendation.

View GAO-12-40. For more information, contact George Scott at (202) 512-7215 or scottg@gao.gov.

## What GAO Found

Among accommodations requested and granted in the most recent testing year, approximately three-quarters were for extra time, and about half were for applicants with learning disabilities. High school and postsecondary school officials GAO interviewed reported advising students about which accommodations to request and providing documentation to testing companies, such as a student's accommodations history.

Testing companies included in GAO's study reported that they grant accommodations based on their assessment of an applicant's eligibility under the ADA and whether accommodation requests are appropriate for their tests. Testing companies look for evidence of the functional limitations that prevent the applicant from taking the exam under standard conditions. They also consider what accommodations are appropriate for their tests and may grant accommodations that were different than those requested. For example, one testing company official told GAO that applicants with attention deficit/hyperactivity disorder all might request extra time, but may be granted different accommodations given their limitations—extra time for an applicant unable to maintain focus; extra breaks for an applicant unable to sit still for an extended time period; a separate room for an easily distracted applicant.

Documenting need and determining appropriate accommodations can present challenges to students and testing companies. Some applicants GAO interviewed found testing companies' documentation requirements difficult to understand and unreasonable. Most applicants GAO spoke with said they sought accommodations that they were accustomed to using, and some found it frustrating that the testing company would not provide the same accommodations for the test. Testing companies reported challenges with ensuring fairness to all test takers and maintaining the reliability of their tests when making accommodations decisions. Testing company officials said that reviewing requests that contain limited information can make it difficult to make an informed decision. Some testing company officials also expressed concern with being required to provide accommodations that best ensure an applicant's test results reflect the applicant's aptitude rather than providing what they consider to be reasonable accommodations.

Federal enforcement of laws and regulations governing testing accommodations is largely complaint-driven and involves multiple agencies. While Justice has overall responsibility for enforcing compliance under the ADA, Education and HHS have enforcement responsibilities under the Rehabilitation Act for testing companies that receive federal financial assistance from them. Education and HHS officials said that they investigate each eligible complaint. Justice officials said they review each complaint at in-take, but they do not make a determination on every complaint because of the large volume of complaints it receives. Justice has clarified ADA requirements for testing accommodations primarily by revising its regulations, but it lacks a strategic approach to targeting enforcement. Specifically, Justice has not fully utilized complaint data—either its own or that of other agencies—to inform its efforts. Justice officials said that they reviewed complaints on a case-by-case basis but did not conduct systematic searches of their data to inform their overall approach to enforcement. Additionally, Justice has not initiated compliance reviews of testing companies, and its technical assistance on this subject has been limited.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 3 |
| | Additional Time Was the Most Frequently Requested and Granted Accommodation | 7 |
| | Testing Companies Determine Whether Applicants Qualify for Accommodations under the ADA and Whether Requests Are Appropriate | 14 |
| | Documenting Need and Determining Appropriate Accommodations Can Present Challenges to Applicants and Testing Companies | 18 |
| | Federal Enforcement Is Largely Complaint-Driven, and Justice Lacks a Strategic Approach to Ensure Testing Company Compliance | 22 |
| | Conclusions | 29 |
| | Recommendation for Executive Action | 30 |
| | Agency Comments and Our Evaluation | 30 |
| Appendix I | Objectives, Scope, and Methodology | 32 |
| Appendix II | Comments from the Department of Justice | 38 |
| Appendix III | Comments from the Department of Education | 43 |
| Appendix IV | GAO Contact and Staff Acknowledgments | 44 |
| Tables | | |
| | Table 1: Tests Included in Our Study | 33 |
| | Table 2: Schools Interviewed | 35 |
| Figures | | |
| | Figure 1: Percentage of Accommodations Requested and Granted by Accommodation Type in Most Recent Testing Year for Selected Testing Companies | 8 |

Figure 2: Percentage of Accommodations Requested and Granted
by Disability Type in the Most Recent Testing Year for
Selected Testing Companies                                      10

## Abbreviations

| | |
|---|---|
| AAMC | Association of American Medical Colleges |
| ADA | Americans with Disabilities Act of 1990 |
| ADAAA | ADA Amendments Act of 2008 |
| ADD | attention deficit disorder |
| ADHD | attention deficit/hyperactivity disorder |
| Education | Department of Education |
| EEOC | Equal Employment Opportunity Commission |
| ETS | Educational Testing Service |
| FSMB | Federation of State Medical Boards |
| GMAC | Graduate Management Admission Council |
| GMAT | Graduate Management Admission Test |
| HHS | Department of Health and Human Services |
| IDEA | Individuals with Disabilities Education Act |
| IPEDS | Integrated Postsecondary Education Data System |
| IEP | Individualized Education Program |
| Justice | Department of Justice |
| LSAC | Law School Admission Council |
| LSAT | Law School Admission Test |
| MCAT | Medical College Admission Test |
| MPRE | Multistate Professional Responsibility Examination |
| NABP | National Association of Boards of Pharmacy |
| NAPLEX | North American Pharmacist Licensure Examination |
| NBME | National Board of Medical Examiners |
| NCBE | National Conference of Bar Examiners |
| PCAT | Pharmacy College Admission Test |
| Rehabilitation Act | Section 504 of the Rehabilitation Act of 1973 |
| USMLE | United States Medical Licensing Examination |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

November 29, 2011

The Honorable George Miller
Ranking Member
Committee on Education and the Workforce
House of Representatives

The Honorable Pete Stark
Ranking Member
Subcommittee on Health
Committee on Ways and Means
House of Representatives

The Honorable Cathy McMorris Rodgers
House of Representatives

Each year, millions of people take standardized tests to gain admission to postsecondary education or to receive a professional license for certain professions. These tests, which are typically administered under uniform conditions and time limits, are designed to predict future academic success or measure a person's knowledge in the area tested. While standardization is intended to ensure comparability of test scores across examinees, it may make it challenging for some individuals with disabilities to accurately demonstrate their ability. Federal disability laws, such as the Americans with Disabilities Act of 1990[1] (ADA), protect individuals with disabilities from discrimination and a specific provision of that act requires private companies offering standardized tests to provide accommodations, such as extended time or extra breaks, in order to make tests accessible to individuals with disabilities. However, disability advocates and experts have raised questions about how testing companies make decisions about accommodations and whether or not they are complying with federal disability laws and regulations. Similarly, testing companies have raised questions about protecting the integrity of their tests by ensuring that accommodations are given only to those individuals who require them. Given the importance of testing accommodations in helping students with disabilities access higher education and professional licensure, we examined: (1) what types of

---

[1]42 U.S.C. § 12101 et seq.

accommodations individuals apply for and receive and how schools assist them, (2) what factors testing companies consider when making decisions about requests for testing accommodations, (3) what challenges applicants and testing companies experience in receiving and granting testing accommodations, and (4) how federal agencies enforce compliance with relevant federal disability laws and regulations.

In conducting this work, we focused our review on a nongeneralizeable sample of 11 tests offered by 10 testing companies for admission into undergraduate, graduate, and professional programs and to obtain professional certification. We included the 2 most common undergraduate admissions tests and, for the graduate and professional level, we included 5 admissions and 4 professional certification tests used in the fields of study with the largest numbers of graduates and the top three fields of study in which students with disabilities are enrolled.[2] We interviewed disability experts, representatives from a nongeneralizable sample of 8 high schools and 13 postsecondary schools, and eight individuals with disabilities who were referred to us by those experts and school officials and were applicants for accommodations on one or more tests included in our study. We selected schools based on characteristics such as size, geographic diversity, public or private funding and, in the case of postsecondary schools, academic programs. We also conducted interviews with 7 testing companies and reviewed written responses to our questions from 2 companies that declined our requests for an interview. One company declined to participate in our study. We also reviewed data provided by testing companies on the types of accommodations requested and granted. Based on their responses to questions about data reliability, we believe the information they provided is sufficiently reliable for the purposes of this report. We reviewed policies and procedures for requesting accommodations found on testing companies' Web sites. However, we did not evaluate whether these policies and procedures, or the procedures described to us in interviews, were in compliance with relevant laws or regulations. Testing companies that participated in our study reviewed draft statements in this report, and

---

[2]Undergraduate admissions tests include the ACT and SAT. Graduate and professional admissions tests include: the GRE, Graduate Management Admission Test (GMAT), Law School Admission Test (LSAT), Medical College Admission Test (MCAT), and the Pharmacy College Admission Test (PCAT). Professional certification tests include: the Multistate Professional Responsibility Examination (MPRE), the North American Pharmacist Licensure Examination (NAPLEX), the PRAXIS Series (PRAXIS), and the United States Medical Licensing Examination (USMLE).

their comments were incorporated where appropriate. We reviewed relevant federal laws and regulations; reviewed selected court cases regarding testing accommodations; interviewed officials from the Departments of Justice (Justice), Education (Education), and Health and Human Services (HHS); and reviewed available information on complaints each agency received from fiscal years 2007 through 2010 regarding the 10 testing companies included in our study. However due to data limitations described in the report, we cannot generalize the results of our file review. A more detailed explanation of our objectives, scope, and methodology can be found in appendix I.

We conducted this performance audit from October 2010 to November 2011 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

In determining whether to provide testing accommodations, testing companies are required to adhere to Section 309 of the ADA and, in some circumstances, Section 504 of the Rehabilitation Act of 1973, as amended[3] (the Rehabilitation Act), as well as regulations implementing those laws. Section 309 of the ADA provides that "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes" must offer them "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements…[.]"[4] Section 504 prohibits discrimination against individuals with disabilities by entities receiving federal financial

---

[3]29 U.S.C. § 794.

[4]42 U.S.C. § 12189. Section 309 is found in Title III of the ADA, which prohibits discrimination by private entities owning, leasing, or operating places of public accommodation. Justice has stated, however, that section 309, with its reference to "any person" that offers examinations, applies to both public and private entities. See Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164, 56,236 (Sept. 15, 2010) (codified at 28 C.F.R. pt. 35, app. A). Public entities are also subject to Title II of the ADA, which prohibits discrimination by state and local government in services, programs, or activities, including examinations offered by public entities. However, our review focused on private testing companies.

assistance.[5] Persons requesting accommodations are entitled to them only if they have a disability as defined by those statutes. Both the ADA and the Rehabilitation Act define individuals with disabilities as those who have a physical or mental impairment that substantially limits one or more major life activities, have a record of such impairment, or are regarded as having such an impairment.[6] Justice is charged with enforcing testing company compliance within Section 309 of the ADA, and the Departments of Education and HHS are responsible for enforcing compliance with Section 504 of the Rehabilitation Act for any testing companies that receive federal financial assistance from them.[7]

In 2008, concerned that judicial interpretations had limited the scope of protection it had intended under the ADA, Congress enacted the ADA Amendments Act of 2008 (ADAAA),[8] rejecting several Supreme Court interpretations that had narrowed the definition of an individual with disabilities. The ADA Amendments Act set out guidelines for determining who qualifies as an individual with disabilities and provided a nonexhaustive list of "major life activities," which includes learning, reading, concentrating, and thinking. In the ADAAA, Congress also stated that it found the U.S. Equal Employment Opportunity Commission (EEOC) regulation regarding the definition of an individual with a disability inconsistent with congressional intent and directed the EEOC to revise that regulation.[9] On March 25, 2011, the EEOC issued final regulations, implementing Title I of the ADAAA.[10] Those regulations, which went into effect on May 24, 2011, provide that the term "substantially limits" should be construed broadly in favor of expansive coverage to the maximum

---

[5]Nonfederal entities, including testing companies, can receive federal financial assistance through a variety of arrangements such as grants, loans, and cooperative agreements. Federal financial assistance does not include procurement contracts.

[6]42 U.S.C. § 12102 and 29 U.S.C. § 705(20)(B).

[7]Education's Section 504 regulations are codified at 34 C.F.R. part 104, and HHS's Section 504 regulations are codified at 45 C.F.R. part 84.

[8]Pub. L. No. 110-325, 122 Stat. 3553 (2008).

[9]The EEOC enforces Title I of the ADA, which prohibits discrimination in employment.

[10]76 Fed. Reg. 16,978. While Section 6 of the ADAAA made clear that the authority to issue regulations granted to agencies implementing the ADA includes authority to issue regulations regarding the definition of disability, Justice has not addressed the term "substantially limits" in regulations since the enactment of the ADAAA although it has stated that it intends to do so. 75 Fed. Reg. 56,236, 56,237 (Sept.15, 2010).

extent permitted by the ADA and is not meant to be a demanding standard; that when determining if an individual is substantially limited in performing a major life activity, the determination of disability should not require extensive analysis and should be compared with that of "most people in the general population;" and that the comparison to most people will not usually require scientific, medical, or statistical analysis.[11] The regulations provide that, in applying these principles, it may be useful to consider, as compared with most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity."[12]

In 1991, Justice issued regulations implementing Section 309 which, among other things, provide that any private entity offering an examination must assure that "[t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skill, the examination results accurately reflect the individual's aptitude, achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills…..[.]"[13] Under the regulations, such entities are also required to provide individuals with disabilities appropriate auxiliary aids unless the entity can demonstrate that a particular auxiliary aid would fundamentally alter what the examination is intended to measure or would result in an undue burden.[14] On September 15, 2010, Justice issued a final rule adding three new

---

[11]29 C.F.R. § 1630.2(j).

[12]In the appendix to Part 1630, the EEOC discussed condition, manner, or duration and stated that "[t]hus, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write or learn compared to most people in the general population. As Congress emphasized in passing the Amendments Act, '[w]hen considering the condition, manner, or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who has performed well academically cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking.' 2008 Senate Statement of Managers at 8." 76 Fed. Reg. 16,978 at 17,012–17,013.

[13]56 Fed. Reg. 35,544, 35,572 (July 26, 1991) (codified at 28 C.F.R. § 36.309).

[14]28 C.F.R. § 36.309(b)(3).

provisions to its regulations, stating that, through its enforcement efforts, it had addressed concerns that requests by testing entities for documentation regarding the existence of an individual's disability and need for accommodations were often inappropriate and burdensome. The first new provision requires that documentation requested by a testing entity must be reasonable and limited to the need for the accommodation. The second new provision states that a testing entity should give considerable weight to documentation of past accommodations received in similar testing situations, as well as those provided under an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act (IDEA), or a plan providing services pursuant to Section 504 of the Rehabilitation Act (a Section 504 plan). The third new provision provides that a testing entity must respond to requests for accommodation in a timely manner.[15]

Since the ADAAA and EEOC regulations have broadened the definition of an individual with disabilities, it is possible that the focus for determining eligibility for testing accommodations will shift from determining whether a person requesting testing accommodations is an individual with a disability for purposes of the ADA to what accommodations must be provided to meet the requirements of Section 309 and its implementing regulations. Several recent cases that address the type of accommodations that must be provided under Section 309 will likely impact the latter determination. In *Enyart v. National Conference of Bar Examiners*, the U.S. Court of Appeals for the Ninth Circuit rejected the argument that Section 309 requires only "reasonable accommodations" and adopted the higher "best ensure" standard for determining accessibility that Justice included in its regulations.[16] The court found that the requirement in Section 309, that testing entities offer examinations in a manner accessible to individuals with disabilities, was ambiguous. As a result, it deferred to the requirement in Justice's regulations providing that

---

[15]75 Fed. Reg. 56,236, 56,255 (Sept. 15, 2010). These provisions, which became effective on March 15, 2011, are codified at 28 C.F.R. §§ 36.309(b)(1)(iv), (b)(1)(v) and (b)(1)(vi).

[16]*Enyart v. National Conference of Bar Examiners, Inc.*, 630 F.3d 1153 (2011). On October 3 the U.S. Supreme Court denied NCBE's request that it review the Court of Appeals decision. On October 24, 2011 the U.S. District Court for the Northern District of California ordered NCBE to provide Ms. Enyart with the screen reading and screen magnification software which the court found met the best ensure standard. 2011 WL 5037977.

testing entities must offer examinations "so as to best ensure" that the exam results accurately reflect the test takers aptitude rather than disabilities. Applying that standard, the court found that NCBE was required to provide Enyart, a blind law school graduate, with the accommodations she had requested rather than the ones offered by NCBE based on evidence that her requested accommodations were necessary to make the test accessible to her given her specific impairment and the specific nature of the exam.[17]

# Additional Time Was the Most Frequently Requested and Granted Accommodation

## Students Most Often Requested and Received Additional Time According to Testing Company Data

Extra time represented approximately three-quarters of all accommodations requested and granted in the most recent testing year, with 50 percent extra time representing the majority of this category (see fig. 1).[18] According to researchers, one explanation for the high incidence of this accommodation is that students with the most commonly reported disabilities—learning disabilities, such as dyslexia; attention deficit disorder (ADD); or attention deficit/hyperactivity disorder (ADHD)—may need extra time to compensate for slower processing or reading speeds. In addition, extra time may be needed to support other accommodations,

---

[17]A number of federal district courts have followed the Ninth Circuit's approach. See *Elder v. National Conference of Bar Examiners*, 2011 WL 672662 (N.D. Cal., Feb. 16, 2011); *Bonnette v. District of Columbia Court of Appeals, et al.*, 2011 WL 2714896 (D.D.C., July 13, 2011) and *Jones v. National Conference of Bar Examiners*, 2011 WL 3321507 (D.Vt., Aug. 2, 2011). Justice filed a statement of interest in the Elder and Jones cases, endorsing the Enyart decision and stating that the appropriate standard under which to evaluate accommodations is the "best ensure" standard rather than a "reasonableness" standard.

[18]Data on accommodations requested pertain to 7 of the 10 tests for which we received data: GRE, MCAT, MPRE, NAPLEX, PRAXIS, SAT, and USMLE. Data on accommodations granted pertain to 9 of the 10 tests for which we received data: ACT, GMAT, GRE, MCAT, MPRE, NAPLEX, PRAXIS, SAT, and USMLE. Accommodations may have been requested in a different year from which they were granted.

such as having a person read the test to a test taker or write down the responses.

**Figure 1: Percentage of Accommodations Requested and Granted by Accommodation Type in Most Recent Testing Year for Selected Testing Companies**

Accommodations requested by accommodation type

Accommodations granted by accommodation type



Other

Adjustments in testing environment

Auditory or visual assistance

Alternate text format

Extra/extended breaks

More than 50% extra time

50% extra time

Source: GAO analysis of data provided by testing companies.

Notes:

Testing companies provided data on the most recent testing year for which they had data; however, this time period may vary across testing companies. Some accommodations may have been requested in a different year from when they were granted. Additionally, data on accommodations requested and granted include different tests. Data on accommodations requested by accommodation type pertain to the following tests: GRE, MCAT, MPRE, NAPLEX, PRAXIS, SAT, and USMLE. Data on accommodations granted by accommodation type pertain to the following tests: ACT, GMAT, GRE, MCAT, MPRE, NAPLEX, PRAXIS, SAT, and USMLE. Due to these limitations, the percentages do not necessarily represent a one-to-one comparison between accommodations requested and those that were granted.

The "Other" category includes accommodations such as being allowed to bring in a snack or using various types of assistive technology to take the test, such as computer software to magnify text or convert it into spoken language.

The remaining quarter of accommodations that students requested and testing companies granted in the most recent testing year include changes in the testing environment, extra breaks, alternate test formats, and auditory or visual assistance. Changes to the testing environment might involve preferential seating or testing in a separate room to minimize distractions. The accommodation of extra breaks could be an extension of the scheduled break time between test sections or breaks when needed, depending on students' individual circumstances. For

example, students might need more than the allotted break time if they have a medical condition that requires them to test their blood sugar or use the restroom. Requests for auditory or visual assistance might entail having a "reader" to read the test aloud, whereas alternate test formats include large type, Braille, or audio versions. Additionally, students requested some other types of accommodations, including being allowed to have snacks as needed or using various types of assistive technology to take the test, such as computer software to magnify text or convert it into spoken language. For example, one blind individual we interviewed described using Braille to take tests and screen reading software to complete assignments when she was an undergraduate student. When it came time to request accommodations for a graduate school admissions test, she requested use of screen reading software because it helps her read long passages more quickly than with Braille alone. However, she also requested use of Braille because it allows her to more closely study a passage she did not initially comprehend. Students and disability experts we spoke with also told us that students may need multiple accommodations to help them overcome their disabilities, and that their requests reflect the accommodations that have previously worked for them. For example, in addition to using screen reading software and Braille, the blind student mentioned above was also allowed extra time, use of a computer, breaks in between test sections, a scribe, and a few other accommodations.

An estimated 179,000 individuals with disabilities—approximately 2 percent—of about 7.7 million test takers took an exam with an accommodation in the most recent testing year, according to data provided to us.[19] Approximately half of all accommodations requested and granted were for applicants with learning disabilities, and one-quarter was for those with ADD or ADHD. The remainder of accommodations requested and granted was for applicants with physical or sensory disabilities, such as an orthopedic or vision impairment; or psychiatric

---

[19]We received data about the number of test takers that took the exam with an accommodation for nine tests: ACT, GMAT, GRE, MPRE, NAPLEX, PCAT, PRAXIS, SAT, and USMLE. We did not receive data on the number of test takers that took the MCAT with an accommodation. Some testing companies provided data on individuals who registered for the exam or applied for accommodations, not the number of individuals who took the exam, so these figures are estimates. Testing companies provided data on the most recent testing year for which they had data; however, this time period may vary across testing companies.

disabilities, such as depression; and other disabilities, such as diabetes and autism spectrum disorders (see fig. 2).[20]

**Figure 2: Percentage of Accommodations Requested and Granted by Disability Type in the Most Recent Testing Year for Selected Testing Companies**

Accommodations requested by disability type

Accommodations granted by disability type



Source: GAO analysis of data provided by testing companies.

Notes:

Testing companies provided data on the most recent testing year for which they had data; however, this time period may vary across testing companies. Some accommodations may have been requested in a different year from when they were granted. Additionally, data on accommodations requested and granted include different tests. Data on accommodations requested by disability pertain to the following tests: GRE, MPRE, NAPLEX, PRAXIS, and SAT. Data on accommodations granted by disability pertain to the following tests: GMAT, GRE, MPRE, NAPLEX, PRAXIS, and SAT. Due to these limitations, the percentages do not necessarily represent a one-to-one comparison between accommodations requested and those that were granted.

The "Other" category includes disabilities that could not be included in any existing category, such as diabetes, autism-spectrum disorders, and Tourette's syndrome, when GAO aggregated testing company data.

[20]Data on accommodations requested by disability pertain to 5 of the 10 tests for which we received data: GRE, MPRE, NAPLEX, PRAXIS, and SAT. Data on accommodations granted by disability pertain to 6 of the 10 tests for which we received data: GMAT, GRE, MPRE, NAPLEX, PRAXIS, and SAT. Accommodations may have been requested in a different year from which they were granted. These numbers may not include individuals who identified as having multiple disabilities.

## High Schools and Postsecondary Schools Assist Students Who Apply for Testing Accommodations in a Variety of Ways

> **High School Services for Students with Disabilities**
> Under the Individuals with Disabilities Education Act and Section 504 of the Rehabilitation Act, children with disabilities must be identified, located and evaluated and, as appropriate, provided with special education and related services through an IEP or 504 plan. Pursuant to these requirements, schools maintain records that describe the student's disability and accommodations history, which can include the disability diagnosis, psychoeducational test results, and relevant developmental and educational history. This type of documentation is key to helping students obtain accommodations on admissions tests and in postsecondary school.

High schools help students apply for accommodations on undergraduate admissions tests in several ways. According to disability experts and a few high schools we interviewed, school counselors alert students to the need to apply for accommodations and advise them about what to request. Additionally, school officials play an important role in helping students with the application. For certain types of requests, school officials can submit the application on the student's behalf, requiring minimal student involvement.[21] One testing company reported that 98.5 percent of new accommodation requests for a postsecondary admissions test were submitted this way in the most recent testing year. Alternatively, when students submit the application themselves, school officials can provide copies of the disability documentation on file with the school. In addition to helping students with the application process itself, high school officials can also facilitate communications between the student and testing company after the application has been submitted. For example, one high school administrator we interviewed reported contacting a testing company about an accommodation application that had been submitted past the deadline for a specific test date. In this case, the student's recent health diagnosis and treatment necessitated accommodations, and the administrator helped explain why it was important for the student to take the test when originally scheduled.

---

[21]More specifically, officials can either use a school verification process to verify that the student's disability and accompanying documentation meet the testing company's guidelines for the requested accommodation or submit a copy of the documentation as well.

---

> **Postsecondary Schools' Services for Students with Disabilities**
>
> Postsecondary schools provide an array of services to help ensure that students have equal access to education. School officials we interviewed work closely with students who self-identify as having a disability and request services to provide accommodations, coordinate with faculty and campus services, meet periodically with students to monitor their progress, and adjust accommodations as necessary. Schools are required to identify an individual who coordinates the school's compliance with the Rehabilitation Act and the ADA. Some schools also have a centralized disability services office to coordinate these services.

The transition from high school to postsecondary school can present challenges for all students, and especially for students with disabilities because they must assume more responsibility for their education by identifying themselves as having a disability, providing documentation of their disability, and requesting accommodations and services.[22] For example, students must decide whether or not to use accommodations in their postsecondary courses and, if needed, obtain any new documentation required to support a request for accommodations. Consequently, postsecondary schools play an important role in advising students with disabilities to help them achieve success both in school and when applying for testing accommodations. Generally, when postsecondary students apply for testing accommodations, school officials provide a letter documenting the accommodations students have used in school.[23] In addition to providing these letters, postsecondary officials we interviewed described several ways they advise students who apply for testing accommodations, including the following:

- *Counseling students about what accommodations best meet their needs*—Postsecondary school officials play an important role in helping students adapt to the new academic environment and in determining the best accommodations to use in school and for standardized tests to achieve success at this level. For example, at one postsecondary school, a committee consisting of two learning specialists, a psychologist, two administrative staff, and the director of the disability services office meet to review each student's request for

---

[22]GAO, *Higher Education and Disability: Education Needs a Coordinated Approach to Improve its Assistance to Schools in Supporting Students*, GAO-10-33 (Washington, D.C.: Oct. 28, 2009).

[23]Only one testing company participating in our study employs a school verification process similar to the one high school officials can use to help students apply for accommodations.

accommodations and discuss the appropriate services to provide for his or her courses. With technological advances, an official at another school has advised some students to reconsider requesting the accommodation of extra time as they may be better served by other accommodations, such as screen readers, to address their disability. According to the official, using certain technologies has decreased the need for extra time for some students as they have been able to complete more of their work on time.

- *Explaining application requirements*—Postsecondary school officials advise students about the need to apply for testing accommodations and help them understand application requirements, which can be extensive. For example, several postsecondary officials we interviewed said they alerted students to the need to apply for testing accommodations and to allow sufficient time for the application process. One official reported sending reminders to students about the need to apply for accommodations if they are considering graduate school, and another official reported advising students to begin the process 4 to 6 months in advance, in case the testing company requests additional information. Another school official described helping a student interpret the testing company's instructions for the accommodation application, including what documentation is required. One school official said that she helps students understand more subtle aspects of preparing a successful application by, for example, recommending the use of consistent terminology to describe the disability throughout the application to make it easier for reviewers to understand. Several postsecondary officials we interviewed reported advising students about the likelihood of a testing company granting accommodations based on a review of their existing documentation. For example, a psychoeducational evaluation that was current when a student enrolled in postsecondary study might need to be updated by the time a student applies for testing accommodations. At one school, an official estimated that about 30 percent of the students served by the school's disability service office would need to update their documentation if they decide to apply for testing accommodations.

- *Providing resources to obtain evaluations*—A few postsecondary officials we interviewed reported referring students to a variety of resources when they need an updated or new evaluation, sometimes at substantial savings to the student. Two schools we interviewed make campus resources available to students, such as providing grants or scholarships to help students who demonstrate financial need to offset the cost of evaluations. Schools also reported helping

students by providing a mechanism for them to obtain the necessary evaluations on campus. For example, students can obtain an evaluation from the campus health and counseling center at one school for about $700, while the psychology clinic and the Department of Neuropsychology at another school provide these evaluations on a sliding fee basis. Additionally, officials said that they provide students with a list of area professionals who conduct evaluations, although such outside sources could cost several thousand dollars and may not be covered by health insurance.

## Testing Companies Determine Whether Applicants Qualify for Accommodations under the ADA and Whether Requests Are Appropriate

In reviewing requests for accommodations, testing companies included in our study reported considering a number of factors to determine whether applicants have a disability that entitles them to accommodations under the ADA. As part of their review process, the testing companies included in our study typically look for a current disability diagnosis made by a qualified professional. However, seven testing companies included in our study either state in their guidance for requesting accommodations or told us that the presence of a disability diagnosis does not guarantee an accommodation will be granted because they also need to consider the impact of the disability. Testing companies included in our study reported reviewing applications to understand how an applicant's current functional limitations pose a barrier to taking the exam under standard conditions. As an example, one testing company official stated that someone with limited mobility might meet the ADA definition of a disability but not need an accommodation if the testing center is wheelchair accessible.

To understand an applicant's current functional limitations, testing companies may request documentation that provides evidence of how an applicant's disability currently manifests itself, such as the results of diagnostic tests. For example, several testing companies included in our study request that applications for accommodations include the results of a psychoeducational test to support a learning disability diagnosis. As another example, applicants who have a hearing impairment would be asked to provide the results of a hearing test to document their current condition. Officials from most testing companies included in our review said that, for some types of disabilities, it is important to have documentation that is current to help them understand the functional limitations of an applicant's disability. For example, one testing company official told us that disabilities of an unchanging nature, such as blindness or deafness, could be documented with evaluations from many years ago, whereas psychiatric conditions, learning disabilities, and ADHD would need more current evaluations. For applicants who may not have a formal

disability diagnosis or recent medical evaluations, some testing company officials told us that they will look at whatever information applicants can provide to show how they are limited. For example, testing company officials said they will consider report cards or letters from teachers to obtain information about an applicant's condition.

Another factor that several testing companies consider is how an applicant's functional ability compares to that of most people.[24] For example, officials from one testing company told us that before granting an accommodation on the basis of a reading-related disability, they would review the applicant's reading scores to make sure they were lower than those of the average person. Several testing company officials also told us that while reviewing information within an application for accommodations, they may reach a different conclusion about an applicant's limitations and necessary accommodations than what the applicant requested. For example, one testing company initially denied an applicant's request, in part, because the testing company's comparison of the applicant's diagnostic test scores with the average person his age led them to different conclusions about the applicant's ability to function than those of the medical evaluator who performed the tests.

As described previously, Justice recently added new requirements to its Section 309 regulations to further define the parameters of appropriate documentation requests made by testing companies in reviewing requests for accommodations.[25] One of those amendments provides that a testing entity should give considerable weight to documentation of past accommodations received in similar testing situations, as well as those provided under an IEP or Section 504 plan. In discussing the regulations, most testing company officials we spoke with told us that they consider an

---

[24]EEOC's regulations implementing the equal employment provisions of the ADAAA state that an impairment is a disability within the meaning of the ADA if the impairment substantially limits the ability of an individual to perform a major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). The previous version of the regulations referred to the "average person in the general population."

[25]Justice added three new provisions. The first states that documentation requested by a testing entity must be reasonable and limited to the need for the accommodation. The second states that a testing entity should give considerable weight to documentation of past accommodations received in similar testing situations, as well as those provided under an IEP or Section 504 plan. The third provides that a testing entity must respond to requests for accommodation in a timely manner. 75 Fed. Reg. 56,236, 56,255 (Sept. 15, 2010).

applicant's history of accommodations; however, they also told us they may require more information to make a decision. For example, officials from one testing company said they may want information, such as documentation from a medical professional and a personal statement from the applicant, to explain the need for the accommodation if it had not been used previously or in recent years. In guidance on its revised regulations, Justice states that when applicants demonstrate a consistent history of a diagnosis of a disability, testing companies generally should accept without further inquiry documentation provided by a qualified professional who has made an individualized assessment of the applicant and generally should grant the requested accommodation. [26] Testing company officials also told us they sometimes ask for more information than provided by a licensed professional in order to understand an applicant's disability and limitations. For example, for certain disabilities, such as learning disabilities or ADHD, officials from two testing companies told us they may request evidence dating back to childhood since these disabilities are considered developmental. While Justice states in its guidance that the amendments to the regulation were necessary because its position on the bounds of appropriate documentation had not been implemented consistently and fully by testing entities,[27] officials from almost all of the testing companies included in our study stated that they did not need to change any of their practices for granting accommodations to be in compliance.

Testing companies included in our study also consider what accommodations are appropriate for their tests. In doing so, some testing company officials told us that they may grant an accommodation that is different from what an applicant requested. Based on their assessment of how an applicant is limited with respect to the exam, testing company officials told us they make a determination as to which accommodations they believe will address the applicant's limitations. For example, one testing company official told us that three applicants with ADHD all might apply for extra time to complete the exam, but the testing company may decide different accommodations are warranted given each applicant's limitations—extra time for an applicant unable to maintain focus; extra breaks for an applicant who has difficulty sitting still for an extended time period; preferential seating for the applicant who is easily distracted. Even

---

[26]75 Fed. Reg. 56,236 at 56,297-56,298 (28 C.F.R. pt. 36, app. A).

[27]75 Fed. Reg. 56,236 at 56,298.

though one testing company official told us that evidence of a prior history of accommodations can be helpful in understanding how accommodations have been used in the past, having a history of prior accommodations in school does not guarantee that those accommodations will be appropriate for the test. For example, according to one testing company, some students with hearing impairments who need accommodations such as a note taker in school may not need accommodations on a written standardized test.

In reviewing requests for accommodations, several testing company officials told us they try to work with applicants when they do not grant the specific accommodations requested. For example, one testing company official told us that if an applicant has a qualifying disability and she could not grant the requested accommodation because it would alter the test, she will try to work with an applicant to determine an appropriate accommodation.  In addition, all of the testing companies included in our study have a process by which applicants can appeal the decision if they disagree with the outcome. Based on their reviews, testing companies reported granting between 72 and 100 percent of accommodations that were requested in the most recent testing year for 6 of the 10 tests for which we received data.[28] However, these testing companies counted an accommodation as granted even if it was different from what was requested. For example, testing companies told us that they would have counted an accommodation request for extra time as granted, even if the applicant requested more than what was granted.

---

[28]The six tests for which we received data included the GRE, PRAXIS, PCAT, SAT, MPRE, and NAPLEX. Testing companies reported the total number of accommodations requested in the most recent testing year and, of that number, the total granted.

## Documenting Need and Determining Appropriate Accommodations Can Present Challenges to Applicants and Testing Companies

### Applicant Challenges

Some disability experts and applicants told us that one of the challenges in applying for accommodations was understanding how testing companies made their decisions, especially with relation to how much weight certain aspects of the application appeared to carry. Most of the applicants we spoke with told us that they requested accommodations that they were accustomed to using and were often frustrated that testing companies did not readily provide those accommodations. These applicants had gone through a process for requesting classroom accommodations and had documentation supporting those accommodations, and two applicants told us that they did not believe testing companies deferred to those documents in the way they would expect. Some disability experts expressed concern that testing companies rely heavily on scores that are perceived to be more objective measures, such as psychometric assessments, and two of these experts said they believe that, in addition to scores, testing companies should also consider the clinical or behavioral observations conducted by qualified professionals or school counselors.

While testing companies provide guidance outlining their documentation requirements, some applicants and disability experts we spoke with told us that knowing what documentation to provide to a testing company can be a challenge in applying for accommodations. Two applicants told us it was unclear what and how much information to submit to support their requests. According to one of the applicants, the testing company asked for additional information to substantiate his request for additional time and a separate room to accommodate a learning disability, but was not specific about which documents it wanted or why. Four applicants told us they hired an attorney to help them determine what to submit in response to testing companies' requests for additional information or to appeal a denial. According to one of the applicants, the attorney helped him find the right balance of documentation to submit to successfully obtain

accommodations, something he was not able to do when he first applied without legal assistance. School officials we spoke with said documenting the need for an accommodation can be particularly challenging for gifted students —those who demonstrate high levels of aptitude or competence—because they may not have a history of academic difficulty or accommodations. As a result, it can be more difficult to know what documentation to provide to support their requests.

Disability experts and applicants also told us that, in some instances, they found testing companies' documentation requirements on providing a history of the disability to be unreasonable. Two applicants told us that they found it unreasonable to be asked to provide a lengthy history of their disability. For example, one student we spoke with who was diagnosed with a learning disability in college provided the testing company with the results of cognitive testing and documentation of the accommodations he received in college, but the testing company also requested records of his academic performance going back to elementary school. He did not understand how such information was relevant to document his current functioning and found the request to be unreasonable since he was 30 years removed from elementary school. Some applicants also found it frustrating to have to update medical assessments for conditions that had not changed. For example, one applicant was asked to obtain a new evaluation of her disability even though school evaluations conducted every 3 years consistently showed that she has dyslexia. Applicants and disability experts we spoke with told us that obtaining these assessments can be cost prohibitive, and applicants reported costs for updating these assessments ranging from $500 to $9,000.

For blind applicants, access to familiar assistive technology, such as screen-reading or screen-magnification software, was particularly challenging, according to applicants and disability experts. Two blind applicants told us they faced difficulty with being allowed to use the specific technology they requested for the test. One of the applicants told us the testing company required him to use its screen-reading software rather than the one he used regularly, resulting in greater anxiety on the day of the test since he had to learn how to use a new tool. Similarly, this applicant told us he faced similar challenges in working with readers provided by different testing companies rather than readers of his own choosing, since he was not comfortable with the reader's style.

While most of the applicants we spoke with eventually received one or more of their requested accommodations, several of them reported

having to postpone their test date as a result of the amount of time the accommodations approval process took. Some applicants told us that they also experienced delays in achieving their educational or professional goals. Additionally, some applicants who were denied their accommodations told us that when they elected to take the test without accommodations, they felt that their exam results did not fully demonstrate their capabilities. For example, one applicant told us that he took a licensing exam a few times without the accommodations he requested over a two-year period while appealing the testing company's decision, but each time his scores were not high enough for licensure nor did they reflect his academic performance. As a result, the applicant was two years behind his peers. Another applicant told us that she did not receive the requested accommodations for one of the licensing exams she applied for and decided not to take the exam for the time being because it wasn't necessary for her to practice in the state she was living in. However, she anticipates needing to take the test as she furthers her career because the license will be needed for her to practice in surrounding states.

## Testing Company Challenges

Testing companies we interviewed reported challenges with ensuring fairness to all test takers when reviewing applications for accommodations. Officials from three testing companies expressed concern that some applicants may try to seek an unfair advantage by requesting accommodations they do not need. For example, officials from two of the companies said some applicants may see an advantage to getting an accommodation, such as extra time, and will request it without having a legitimate need. Officials from the other testing company told us that they do not want to provide accommodations to applicants who do not need them because doing so could compromise the predictive value of their tests and unfairly disadvantage other test takers.[29] Officials from several testing companies told us that ensuring the reliability of their test scores was especially important since so many colleges, universities, and licensing bodies rely on them to make admissions and licensing decisions.

---

[29]Numerous studies have addressed the effect of testing accommodations on the performance of students with disabilities, and results have varied. See S. G. Sireci, S. Li, and S. Scarpati. *The Effects of Test Accommodation on Test Performance: A Review of the Literature* (Research Report 485) (Amherst, MA: Center for Educational Assessment: 2003).

Testing company officials told us that reviewing requests that contain limited information can be challenging because they do not have sufficient information to make an informed decision. One testing company official told us she received an accommodation request accompanied by a note on a doctor's prescription pad that indicated the applicant had ADHD without any other information to document the applicant's limitations on the test, thereby making it difficult to grant an accommodation. Officials from three testing companies also told us that an applicant's professional evaluator may not have provided enough information to explain why the applicant needs an accommodation. They reported receiving evaluations without a formal disability diagnosis or evaluations with a diagnosis, but no information as to how the diagnosis was reached, leaving them with additional questions about the applicant's condition. In addition, some testing company officials said it can be difficult to explain to applicants that having a diagnosis does not mean they have a qualifying disability that entitles them to testing accommodations under the ADA. One testing company official said she spends a great deal of time explaining to applicants that she needs information on their functional limitations in addition to a disability diagnosis.

Testing company officials also told us that evaluating requests for certain types of disabilities or accommodations can be difficult. Some testing company officials told us that evaluating requests from gifted applicants or those with learning disabilities are among the most challenging. Such applicants may not have a documented history of their disability or of receiving accommodations, making it more difficult to determine their current needs. One testing company official told us that greater scrutiny is applied to requests from applicants without a history of accommodations because they question why the applicant was not previously diagnosed and suddenly requests accommodations for the test. Officials from two testing companies stated that determining whether to provide for the use of assistive technologies or certain formats of the test can be difficult. One testing company official stated that allowing test takers to use their own software or laptop might result in information, such as test questions, being left on a test taker's computer, which could compromise future administrations of the test since some questions may be reused. The official from the other company stated that providing the exam in a nonstandard format may change the exam itself and make the comparability of scores more difficult.

Officials from two testing companies and an attorney representing some of the testing companies included in our study also told us they have concerns about testing companies being required to provide

accommodations that best ensure that applicants' test results reflect the applicants' aptitudes rather than their disabilities since they believe the ADA only requires testing companies to provide reasonable accommodations. In a brief filed by several testing companies and professional licensing boards supporting NCBE's request that the Supreme Court review the Court of Appeals decision in the *Enyart* case, they stated that a "best ensure" standard would fundamentally alter how standardized tests are administered since they would have to provide whatever accommodation the test taker believes will best ensure his or her success on the test. They stated this would skew nationwide standardized test results, call into question the fairness and validity of the tests, and impose new costs on testing organizations.

# Federal Enforcement Is Largely Complaint-Driven, and Justice Lacks a Strategic Approach to Ensure Testing Company Compliance

## Enforcement of Testing Company Compliance Generally Occurs in Response to Complaints, and Involves Multiple Agencies

Federal enforcement of laws and regulations governing testing accommodations primarily occurs in response to citizen complaints[30] that are submitted to federal agencies. While Justice has overall responsibility for enforcement of Title III of the ADA,[31] which includes Section 309 that is specifically related to examinations offered by private testing companies, other federal agencies such as Education and HHS have enforcement responsibilities under the Rehabilitation Act for testing companies that receive federal financial assistance from them. Justice can pursue any complaints it receives alleging discrimination under the ADA, regardless of the funding status of the respondent, but Education and HHS can only pursue complaints filed against entities receiving

---

[30]In this report, we will refer to what Justice considers "citizen complaints" as "complaints."

[31]42 U.S.C. § 12188.

financial assistance from them at the time the alleged discrimination occurred. Education and HHS provided financial assistance to 4 of the 10 testing companies included in our study in at least 1 of the 4 fiscal years included in our analysis, fiscal years 2007 to 2010.

When Justice receives a complaint that alleges discrimination involving testing accommodations it may investigate the complaint, refer it to another federal agency that has jurisdiction, or close it with no further action. After Justice reviews the complaint at in-take, it advises complainants that it might not make a determination about whether or not a violation has occurred in each instance. Justice officials explained that the department does not have the resources to make a determination regarding each complaint given the large volume and broad range of ADA complaints the agency receives. Specifically, Justice's Disability Rights Section of the Civil Rights Division reported receiving 13,140 complaints, opening 3,141 matters for investigation, and opening 41 cases for litigation[32] related to the ADA in fiscal years 2007 to 2010. Due to the limitations of Justice's data systems, it is not possible to systematically analyze Justice's complaint data to determine the total related to testing accommodations. However, using a key word search, Justice identified 59 closed complaints related to testing accommodations involving 8 of the 10 testing companies included in our study for fiscal years 2007 to 2010.[33] Based on our review of available complaint information, we found that Justice closed 29 complaints without action, 2 were withdrawn by the complainant, and 1 was referred to a U.S. Attorney. However, we were

---

[32]A "citizen complaint" (or "citizen mail") is defined as a correspondence containing allegations that has been: (1) submitted to Justice by an individual or entity on behalf of an individual and (2) assigned an identification number in the Correspondence Tracking System. A matter is defined as an activity that has been assigned an identification number in the Interactive Case Management system but has not resulted in the filing of a complaint, indictment, or information in court—for example, the investigation of a complaint or an allegation of discrimination. Justice has closed matters related to testing accommodations through settlement agreements. A case is defined as an activity that has been assigned an identification number that has resulted in the filing of a complaint, indictment, or information in court. To date, Justice has not fully litigated any testing accommodations cases, but Justice reported that it has obtained consent decrees from federal courts on this subject.

[33]Justice identified 24 additional closed complaints that are not included in the total. We determined that 12 of these complaints were not relevant to the scope of our study based on a review of the complaint files, and we were unable to determine whether 12 complaints were relevant to our scope because Justice could not locate the complaint files.

unable to determine the final disposition of 27 complaints given information gaps in Justice's data systems and paper files. In addition to identifying closed complaints, Justice identified five closed matters related to testing accommodations for three of the testing companies included in our study for fiscal years 2007 to 2010. One of these resulted in a settlement[34] with the testing company that would allow the complainant to take the exam with accommodations, two were closed based on insufficient evidence provided by the complainant, and the outcome of the remaining two could not be determined based on limited information in Justice's files.

Education and HHS officials told us they review each incoming complaint to determine whether it should be investigated further. For Education and HHS to conduct further investigations, the complaint must involve an issue over which the agencies have jurisdiction and be filed in a timely manner.[35] Eligible complaints are then investigated to determine whether a testing company violated the Rehabilitation Act. Similar to Justice, Education did not track complaints specifically involving testing accommodations. However, Education was able to identify a subset of complaints related to testing accommodations for the testing companies included in our sample by comparing our list of testing companies against all of their complaints. For fiscal years 2007 to 2010, Education identified 41 complaints related to testing accommodations involving six of the testing companies included in our study. Based on a review of closure letters sent to complainants, we found that Education did not consider testing company compliance for most complaints. Specifically, Education determined that it did not have the authority to investigate 14 complaints involving testing companies that were not receiving federal financial assistance at the time of the alleged violation.[36] Education closed 14 other complaints without making a determination about compliance because the complaint was not filed on time, was withdrawn, or involved

---

[34]Justice identified an additional matter regarding one of the testing companies included in our study. However, we were unable to review the paper files associated with this matter because it was not closed at the time of our review. The matter resulted in a settlement in September 2011.

[35]Complaints must generally be filed within filed within 180 days of the date the alleged discrimination occurred.

[36]For each of these complaints, Education referred the complaint directly to Justice or advised the complainant to contact Justice regarding the complaint.

an allegation pending with the testing company or the courts. Based on its investigation of the remaining 13 complaints, Education did not identify any instances in which testing companies were not in compliance with the Rehabilitation Act. HHS identified one complaint against a testing company included in our study, but it was withdrawn by the complainant prior to a determination being made.

## Justice Has Clarified ADA Requirements for Testing Accommodations but Lacks a Strategic Approach to Enforcement

Justice's regulations implementing Section 309 of the ADA provide the criteria for its enforcement efforts,[37] and it has recently taken steps to clarify ADA requirements pertaining to testing accommodations by adding new provisions to regulations. In June 2008—prior to passage of the ADA Amendments Act, Justice issued a notice of proposed rulemaking,[38] and issued final regulations in September 2010 following a public hearing and comment period.[39] In issuing those regulations, Justice stated that it relied on its history of enforcement efforts, research, and body of knowledge regarding testing accommodations. Justice officials told us they added new provisions to the regulations based on reports—detailed in complaints and anecdotal information from lawyers and others in the disability rights community—that raised questions about what documentation is reasonable and appropriate for testing companies to request. The final regulations, which took effect in March 2011, added provisions clarifying that testing companies' requests for documentation should be reasonable and limited to the need for the accommodation, that testing companies should give considerable weight to documentation showing prior accommodations, and they should respond in a timely manner to accommodations requests. Justice provided further clarification of these provisions in the guidance that accompanied the final rule.[40] Since the final regulations took effect, Justice has also filed statements of interest in two recent court cases to clarify and enforce its regulations.[41] In both of these cases, test takers with visual disabilities filed lawsuits

---

[37]42 U.S.C. § 12186(b) requires Justice to issues regulations for Title III of the ADA.

[38]73 Fed. Reg. 34,508 (June 17, 2008).

[39]75 Fed. Reg. 56,236.

[40]28 C.F.R. pt. 36, app. A.

[41]See *Elder v. National Conference of Bar Examiners*, 2011 WL 672662 (N.D. Cal., Feb. 16, 2011) and *Jones v. National Conference of Bar Examiners*, 2011 WL 3321507 (D.Vt., Aug. 2, 2011).

seeking to use computer assistive technology to take a standardized test, rather than other accommodations that the testing company thought were reasonable, including Braille, large print, and audio formats. In these statements of interest, Justice discussed the background of the ADA and its regulations and stated that the accommodations offered to those test takers should be analyzed under the "best ensure" standard. Justice also pointed out that Congress intended for the interpretation of the ADA to evolve over time as new technology was developed that could enhance options for students with disabilities. In addition, Justice stated that it had made clear in regulatory guidance that appropriate auxiliary aids should keep pace with emerging technology.

While these actions may help clarify what is required under the ADA, we found that Justice is not making full use of available data and other information to target its enforcement activity. For example, incoming complaints are the primary mechanism Justice relies on to focus its enforcement efforts, and it makes decisions on which complaints to pursue primarily on a case-by-case basis. However, Justice does not utilize information gathered on all its complaints to develop a systematic approach to enforcement that would extend beyond one case. Officials told us that the facts and circumstances of every complaint are unique, but that in determining whether to pursue a particular complaint, they consider a number of factors, including available resources and the merits of the complaint. Officials also said they may group complaints, for example, waiting until they receive a number of complaints related to the same testing company before deciding whether to pursue them. They also told us they may pursue a complaint if it highlights an aspect of the ADA that has not yet been addressed. For example, Justice officials told us the department investigated one recent complaint because it demonstrated how someone who was diagnosed with a disability later in life and did not have a long history of receiving classroom accommodations was eligible for testing accommodations under the ADA. While these may be the appropriate factors for Justice to consider in determining whether to pursue each individual complaint, we found that the agency has not given sufficient consideration to whether its enforcement activities related to all complaints, when taken in the aggregate, make the most strategic use of its limited resources.

In addition, although Justice collects some data on the ADA complaints it receives, it does not systematically utilize these data to inform its overall enforcement activities in this area. Information on incoming complaints are entered into the Justice's Correspondence Tracking System, and data on complaints that it pursues, also known as matters, are entered into its

Interactive Case Management system. Justice officials told us that they do not systematically review information from these data systems given system limitations. For example, Justice is able to generate reports on complaints and matters associated with a specific statute (e.g., Title II or III of the ADA), but because no additional data on the type of complaint are entered into their systems it is not possible to generate a list of complaints and matters related to specific issues, such as testing accommodations. Additionally, because the two systems do not interface, Justice is unable to determine the disposition of all complaints. Of the five closed matters we reviewed, we were only able to track one back to the original complaint in the Correspondence Tracking System. In the absence of data that can be systematically analyzed, Justice relies on its institutional knowledge of complaints and matters to inform its enforcement efforts. For example, Justice officials told us they know which testing companies are more frequently cited in complaints. While institutional knowledge can be a useful tool to inform decisions, it may leave the agency at risk of losing critical knowledge. For example, with the recent retirement of two key officials from the Civil Rights Division's Disability Rights Section, Justice has lost a major component of its institutional knowledge related to testing accommodations. We provided Justice with the names of testing companies included in our review to identify complaints and matters in their systems related to these companies. While Justice officials said they have conducted similar searches in reference to a specific complaint, they have not conducted systematic searches of their data systems to inform their overall enforcement efforts. In the absence of systematic reviews of information on complaints within their data systems, Justice may be missing out on opportunities to be strategic in identifying enforcement actions that would extend beyond one complaint or that would address widespread issues related to how testing accommodations decisions are made by testing companies.

In addition to not making full use of its complaint data, Justice has not effectively coordinated with other agencies to inform its enforcement efforts. While Justice has broad responsibility for enforcing compliance with the ADA, Justice officials told us that they were not aware that Education and HHS were receiving and pursuing testing accommodations complaints for testing companies that were recipients of federal funding. Justice officials stated that they have not had regular meetings or exchanges related to testing accommodations with officials from Education or HHS. Officials from HHS also told us that relevant federal agencies provide expertise to one another when necessary, but that no formal or regular coordination meetings related to testing

accommodations have been held with Justice or Education. By not coordinating with other federal agencies, Justice is limiting its ability to assess the full range of potential compliance issues related to testing accommodations.

As part of its enforcement authority, the ADA authorizes Justice to conduct periodic compliance reviews.[42] Justice reviews testing company compliance with the ADA in the course of investigating complaints, and officials said they could conduct a compliance review if they received a series of complaints against a particular company. However, Justice officials told us they have not initiated any compliance reviews that include a thorough examination of a testing company's policies, practices, and records related to testing accommodations. Justice officials said it would be difficult to undertake a thorough compliance review because testing companies are not required to cooperate with such a review, and the agency lacks the authority to subpoena testing companies. However, in the absence of attempting to conduct such a compliance review, Justice is not in a position to fully assess whether this enforcement mechanism could prove beneficial to them.

In its 2007-2012 Strategic Plan, Justice states that "outreach and technical assistance will continue to play a vital role to ensure compliance with the civil rights statutes."[43] However, Justice's efforts to provide technical assistance related to testing accommodations have been limited. Justice officials told us they provide technical assistance by responding to calls that come into the ADA hotline or directly to the Disability Rights Section. For example, a disability advocate may reach out to an attorney to discuss a particular student's situation. Justice officials told us they have discussed testing accommodations at meetings and conferences when invited to attend, although they have not made any presentations in recent years. Justice provides some guidance regarding testing accommodations in its ADA Title III Technical Assistance Guide. However, since the guide was last updated in 1993, it does not reflect recent ADA amendments, regulatory changes, or changes in accommodations available to test takers based on advances in technology. Justice officials also told us that they have not recently

---

[42]42 U.S.C. § 12188(b).

[43]42 U.S.C. § 12206 authorizes Justice to issue technical assistance under Title III of the ADA.

conducted outreach with testing companies. They reported that their resources have been focused on issuing regulations related to both testing accommodations and other topic areas. Testing company officials we interviewed reported that they had limited or no interaction with Justice, and one official said she would welcome more interaction with Justice to ensure the company was interpreting the laws correctly. An attorney who works with multiple testing companies included in our study told us that, because Justice only reviews complaints, which represent a small fraction of all testing accommodations requested, it may not have an accurate view of how often testing companies grant accommodations. Similarly, Justice has not leveraged its complaint and case data to target outreach and technical assistance based on the types of complaints most frequently filed. For example, Justice has not analyzed its complaint files to determine if multiple complaints filed had similar themes so that they could target their outreach to testing companies to clarify how to apply the regulations in these cases. Without targeted outreach, Justice misses opportunities to limit or prevent testing company noncompliance with the ADA.

## Conclusions

Given the critical role that standardized tests play in making decisions on higher education admissions, licensure, and job placement, federal laws require that individuals with disabilities are able to access these tests in a manner that allows them to accurately demonstrate their skill level. While testing companies reported providing thousands of test takers with accommodations in the most recent testing year, test takers and disability advocates continue to raise questions about whether testing companies are complying with the law in making their determinations. Justice, as the primary enforcement agency under the ADA, has taken steps to clarify how testing companies should make their determinations, but its enforcement lacks the strategic and coordinated approach necessary to ensure compliance. Without a systematic approach to reviewing complaints that it receives, Justice cannot assure that all complaints are consistently considered and that it is effectively targeting its limited resources to the highest priority enforcement activities. Continuing to target enforcement on a case-by-case basis does not allow Justice to consider what enforcement activities could extend beyond one case. Additionally, in the absence of coordination with other federal agencies, Justice is missing opportunities to strengthen enforcement by assessing the full range of potential compliance issues related to testing accommodations. Justice's largely reactive approach to enforcement in this area may also limit its ability to address problems before trends of noncompliance are well established. After revising its testing

accommodations regulations, Justice did not conduct outreach to testing companies or update its technical assistance materials to ensure the requirements were being applied consistently. Since we found testing companies believe their practices are already in compliance with the new regulatory requirements, it is unclear whether these changes will better protect the rights of students with disabilities. In order to ensure individuals with disabilities have equal opportunity to pursue their education and career goals, it is imperative for Justice to establish a credible enforcement presence to detect, correct, and prevent violations.

## Recommendation for Executive Action

We recommend to the Attorney General that Justice take steps to develop a strategic approach to target its enforcement efforts related to testing accommodations. For example, the strategic approach could include (1) analyzing its complaint and case data to prioritize enforcement and technical assistance, (2) working with the Secretaries of Education and HHS to develop a formal coordination strategy, and (3) updating technical assistance materials to reflect current requirements.

## Agency Comments and Our Evaluation

We provided a draft of this report to Justice, Education, and HHS for review and comment. In written comments, Justice agreed with our recommendation, stating that its efforts to ensure the rights of individuals with disabilities are best served through a strategic use of its authority to enforce the ADA's testing provisions. Justice highlighted some actions the agency will pursue to enhance enforcement in this area. With regard to analyzing its data, Justice stated that it utilizes complaint and case data through all stages of its work and makes decisions about which complaints to pursue based on ongoing and prior work. Also, Justice stated that it is looking for ways to improve its recordkeeping with respect to completed investigations and cases. While improving its recordkeeping is a positive action, we believe it is important for Justice to systematically review its data to strategically enforce the law. As we stated in our report, Justice has not utilized its data to develop a systematic approach to enforcement that would extend beyond one case, nor has it given sufficient consideration to whether its enforcement activities, when taken in the aggregate, make the most strategic use of its limited resources. Justice agreed to pursue discussions with both Education and HHS on the investigation and resolution of complaints about testing accommodations, and agreed to develop additional technical assistance materials on testing accommodations in the near future. Justice's written comments appear in appendix II.

In written comments, Education committed to working with Justice to coordinate efforts to ensure equity in testing for all students, including students with disabilities, consistent with the laws they enforce. Education's written comments appear in appendix III.

Justice and Education also provided technical comments, which were incorporated into the report as appropriate.

HHS had no comments on the draft report.

As arranged with your offices, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days from its issue date. At that time, we will send copies of this report to relevant congressional committees, the Attorney General, the Secretary of Education, the Secretary of Health and Human Services, and other interested parties. In addition, this report will be available at no charge on GAO's website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-7215 or scottg@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

George A. Scott

George A. Scott
Director, Education, Workforce,
    and Income Security Issues

# Appendix I: Objectives, Scope, and Methodology

The objectives of this report were to determine (1) what types of accommodations individuals with disabilities apply for and receive, and how schools assist them; (2) what factors testing companies consider when making decisions about requests for testing accommodations; (3) what challenges students and testing companies experience in receiving and granting testing accommodations; and (4) how federal agencies enforce compliance with relevant federal disability laws and regulations.

For our study, we focused our review on a nongeneralizeable sample of 11 tests administered by 10 testing companies. We chose tests that are commonly used to gain admission into undergraduate, graduate, and professional programs and to obtain professional certification or licensure. We included the SAT and ACT in our study as these are the 2 most commonly used standardized tests for admission into undergraduate programs. To determine which graduate level and certification or licensure tests to include in our study, we reviewed data from the Integrated Postsecondary Education Data System (IPEDS) to establish the fields of study with the largest populations of students graduating with a masters or first professional degree. We also reviewed IPEDS data to determine the top three fields of study in which students with disabilities are enrolled. Based on these data, we identified 5 graduate and professional admissions tests, and 4 corresponding professional certification tests that could be required of students graduating with degrees in these fields. The fields of study included business, education, law, medicine, and pharmacy. To inform our findings, we interviewed officials from seven of the testing companies included in our study, and two companies submitted written responses to questions we provided. One testing company declined to participate in our study. (See table 1 for a list of the testing companies and tests included in our study.) The views of the testing company officials we spoke with or received responses from cannot be generalized to all testing companies that provide accommodations to applicants with disabilities.

**Table 1: Tests Included in Our Study**

| Test | Testing company | Participated in study | Provided data | Declined to participate |
|---|---|---|---|---|
| Undergraduate admission | | | | |
| ACT | ACT, Inc. | X | X | |
| SAT | The College Board | X | X | |
| Graduate and professional admission | | | | |
| GRE | Educational Testing Service (ETS) | X | X | |
| Graduate Management Admission Test (GMAT) | Graduate Management Admission Council (GMAC) | X | X | |
| Medical College Admission Test (MCAT) | Association of American Medical Colleges (AAMC) | X | X | |
| Law School Admission Test (LSAT) | Law School Admission Council (LSAC) | | | X |
| Pharmacy College Admission Test (PCAT) | Pearson, Inc. | X | X | |
| Professional certification | | | | |
| Multistate Professional Responsibility Examination (MPRE) | National Conference of Bar Examiners (NCBE) and ACT, Inc[a] | X | X | |
| North American Pharmacist Licensure Examination (NAPLEX) | National Association of Boards of Pharmacy (NABP) | X | X | |
| The PRAXIS Series | ETS | X | X | |
| United States Medical Licensing Examination (USMLE) | National Board of Medical Examiners (NBME)[b] | X | X | |

Source: GAO.

[a]NCBE contracts ACT to review and make determinations regarding testing accommodations for the MPRE; however, NCBE provides input as necessary and has oversight responsibility.

[b]We also met with the Federation of State Medical Boards of the United States, Inc. (FSMB) in discussing the USMLE. However, FSMB is not included in this table since NBME is responsible for making all decisions related to testing accommodations.

To determine the types of accommodations requested by individuals with disabilities and granted by testing companies, we reviewed data provided by testing companies on accommodations requested and granted, interviewed testing company officials, interviewed disability experts, and reviewed literature to understand the types of accommodations applicants with disabilities might require. GAO provided testing companies with a standardized data collection instrument that covered a range of topics including the types of disabilities students have and the types of accommodations they requested and were granted in the most recent

testing year. We asked for data on the number of accommodations
requested and granted by type of accommodation and type of disability.
In some cases, testing companies did not collect data in the manner
requested by GAO and instead provided alternate data to help inform our
study.[1] Because of the variance in how testing companies collect data on
disability type, we aggregated data into broad disability categories. We
identified the following limitations with data provided by the testing
companies, in addition to those noted throughout the report. We excluded
data testing companies provided on applicants with multiple disabilities
because these data were reported differently across testing companies.
For example, one testing company provided a disability category called
multiple disabilities while another told us that, in cases where an applicant
has more than one disability, they capture in their data the disability most
relevant to the accommodation. In general, testing companies' data
reflect those requests that were complete, not those for which a decision
was pending in the testing year for which data were provided. In our data
request, we asked questions about the reliability of the data, such as
whether there are audits of the data or routine quality control procedures
in place. Based on their responses to these questions, we believe the
data provided by the testing companies were sufficiently reliable for the
purposes of this report.

To understand how schools assist individuals in applying for
accommodations, we interviewed officials from a nongeneralizable
sample of 8 high schools and 13 postsecondary schools and eight
individuals with disabilities who had applied for testing accommodations.
(See table 2 for a complete list of schools.) To select schools, we
reviewed data from Education's Common Core of Data and IPEDS
databases and chose a nongeneralizable sample based on
characteristics such as sector (public and private, including nonprofit and
for-profit postsecondary), geographic diversity (including urban, suburban,
and rural settings for high schools), total enrollment, and size of
population of students with disabilities. We also reviewed publicly
available lists of colleges and universities to identify postsecondary

---

[1]For example, in responding to our data request, the College Board noted that there may
be up to a 2 percent variance in the numbers reported compared with actual numbers due
to the data systems used to respond to the request. NBME's data on the types of
accommodations requested and granted include some data on personal item exceptions,
such as food and medical devices, which NBME does not consider to be
accommodations. In addition, NBME did not provide data on all types of accommodations
for which requests were made and granted.

schools that offered academic programs in the fields corresponding to the
tests we chose. We identified individuals with disabilities to interview
based on referrals from experts and school officials and selected them
based on their representation of a range of disabilities and tests for which
they sought accommodations.

**Table 2: Schools Interviewed**

| School name | Location |
| --- | --- |
| High schools | |
| Frenchtown High School | Frenchtown, Montana |
| Kelly High School | Chicago, Illinois |
| The Lab School | Washington, D.C. |
| Notre Dame Preparatory School | Scottsdale, Arizona |
| Oakdale High School | Oakdale, California |
| Palisades Charter High School | Pacific Palisades, California |
| Vidor High School | Vidor, Texas |
| Walter Johnson High School | Bethesda, Maryland |
| Postsecondary schools | |
| American University Washington College of Law | Washington, D.C. |
| Carleton College | Northfield, Minnesota |
| DeVry University | Various locations |
| Edinboro University of Pennsylvania | Edinboro, Pennsylvania |
| Golden Gate University School of Law | San Francisco, California |
| Harvard Graduate School of Education | Cambridge, Massachusetts |
| Northwestern University | Evanston, Illinois |
| University of Arizona and College of Pharmacy | Tucson, Arizona |
| University of Connecticut and School of Law | Storrs, Connecticut |
| University of Denver | Denver, Colorado |
| University of Maryland | College Park, Maryland |
| University of Michigan | Ann Arbor, Michigan |
| University of North Carolina | Chapel Hill, North Carolina |

Source: GAO.

To determine the factors testing companies consider when making their
decisions, we reviewed policies and procedures for requesting
accommodations found on testing companies' Web sites and reviewed
relevant federal laws and regulations pertaining to testing companies.
However, we did not evaluate whether these policies and procedures as
written or described to us in interviews—either on their face or as applied

in the context of responding to individual requests for accommodations—
were in compliance with relevant laws or regulations.  Accordingly,
statements in this report that describe the policies and procedures used
by testing companies to review and respond to requests for
accommodations, should not be read as indicating that testing companies
are either in or out of compliance with applicable federal laws. We also
conducted interviews with seven testing companies and reviewed written
responses to our questions from two companies that declined our request
for an interview. One company declined to participate in our study.

To identify the challenges that applicants and testing companies may
experience in receiving and granting accommodations, we interviewed
eight individuals with disabilities to learn about their experiences in
obtaining accommodations, interviewed testing company officials and
reviewed written responses from testing companies about the challenges
they face in granting accommodations, interviewed disability advocacy
groups and researchers with expertise in various types of disabilities, and
reviewed literature. The testing companies that participated in our study
reviewed draft statements in this report, and their comments were
incorporated as appropriate.

To determine how federal agencies enforce compliance with relevant
federal laws and regulations, we reviewed pertinent laws and regulations
to identify the responsibilities of federal agencies and interviewed officials
from Justice, Education, and HHS to learn about the actions these
agencies take to enforce compliance. In addition, we obtained data from
Justice, Education, and HHS on the number of closed complaints they
received between fiscal years 2007 and 2010 related to testing
accommodations for the 10 testing companies included in our study. We
also reviewed selected court cases regarding testing accommodations.
Since Justice receives the majority of complaints, we reviewed all of
Justice's available paper files associated with complaints and matters
pertaining to the testing companies in our study. We reviewed the paper
files to better understand what action Justice takes in responding to
complaints and enforcing testing company compliance. We also reviewed
all of Education's closure letters and HHS' complaint and closure letters,
pertaining to testing companies in our study from fiscal years 2007 to
2010, to better understand what action these agencies take. We reviewed
existing information about the data and interviewed agency officials
knowledgeable at Justice, Education, and HHS. We identified some
limitations with the data as we described in our report. Justice reported
receiving 13,140 ADA-related complaints between fiscal years 2007 and
2010. Justice used key word searches of the data to identify 59 closed

complaints related to testing accommodations involving 8 of the 10 testing companies included in our study. Justice also identified five closed matters. We were unable to determine the final disposition of 27 complaints due to gaps in Justice's data systems and paper files. By comparing our list of testing companies against their complaints, Education was able to identify 41 complaints. HHS was able to identify only 1 complaint that was later withdrawn. Due to limitations with the data, we cannot generalize the results of our file review.

We conducted this performance audit from October 2010 to November 2011, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Comments from the Department of Justice



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

Mr. George Scott                                        NOV 1 5 2011
Director
Education, Workforce, and Income Security
U.S. Government Accountability Office
441 G Street, N.W., # 5970
Washington, D.C. 20548

Dear Mr. Scott:

Thank you for the opportunity to review the draft of the Government Accountability Office (GAO) report entitled "HIGHER EDUCATION AND DISABILITY, Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations." This draft report was reviewed by the Disability Rights Section within the Civil Rights Division of the Justice Department, which also participated in the GAO review.

The Department greatly appreciates GAO's and the requesting members' interest in this important subject. We also appreciated the opportunity to work and correspond with GAO's investigative team to provide a variety of materials and responses to questions raised during the investigation. Ensuring the rights of persons with disabilities to testing accommodations is a Departmental priority. We agree that such efforts are best served through a comprehensive and strategic use of the Department's statutory authority to enforce the ADA's testing provisions, promulgating relevant regulations to guide testing entities, and providing technical assistance and outreach to stakeholders, including testing entities, schools, and students with disabilities and their families.

It is the Department's goal to assure that individuals with disabilities have a full and equal opportunity to access and benefit from educational and employment opportunities available to others. In many instances, the gateway to such opportunities is an admission, certification, or licensing examination. The ADA requires entities administering such exams to ensure that they are offered in a manner accessible to persons with disabilities. In the words of the regulation, at 28 C.F.R. § 36.309, the entity must assure that --

> [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs

2

sensory, manual, or speaking skills, the examination results accurately reflect the
individual´s aptitude or achievement level or whatever other factor the
examination purports to measure, rather than reflecting the individual´s impaired
sensory, manual, or speaking skills (except where those skills are the factors that
the examination purports to measure).

The Department endeavors to responsibly and forcefully steward its enforcement
resources so that the civil rights of persons with disabilities are protected, and to ensure that
covered entities comply with the law.  In some cases, requiring an entity to develop a standard
policy or to modify an existing policy will assure accessibility for classes of persons with
disabilities.  For example, an entity administering a licensing exam in a public or private facility
would have to modify an otherwise permissible no-pets policy to grant individuals with
disabilities who use service animals full access to the facility.  In other cases, determining what
is a required testing accommodation may call for an individualized assessment and consideration
of the particular request for an accommodation.  The Department's enforcement practices in this
area reflect the broad scope of protections and protected persons under the ADA.

The Department's recent revisions to the regulations on testing accommodations reflect
the experience and past enforcement history in this area and will guide future enforcement.  In
guidance to the regulation, at 28 C.F.R. Part 36, Appendix A, the Department explained that,
through its enforcement work, it had determined that testing entities were routinely making
common errors in reviewing accommodations requests.  The revised regulation and
accompanying guidance clarified the requirements in ways that should lead to fewer
misinterpretations of the requirements, more compliance with the ADA, and less discrimination
in testing.

First, the revised rule requires that documentation requests by testing entities must be
reasonable and limited to the need for the modification, accommodation, or auxiliary aid or
service requested. Generally, a testing entity should accept without further inquiry
documentation provided by a qualified professional who has made an individualized assessment
of the applicant.  Second, the Department added regulatory language at 28 C.F.R.
§ 36.309(b)(1)(v) that provides that testing entities shall give considerable weight to
documentation of past modifications, accommodations, or auxiliary aids or services received in
similar testing situations as well as such modifications, accommodations, or related aids and
services provided in response to an Individualized Education Program (IEP) provided under the
Individuals with Disabilities Education Act (IDEA) or a plan providing services pursuant to
section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504
Plan). The guidance to the revised regulation clarifies that an applicant's past use of a particular
modification, accommodation, or auxiliary aid or service in a similar testing setting or pursuant
to an educational plan provides critical information in determining those examination
modifications that would be applicable in a given circumstance.  And third, the revised

3

regulation adds language at 28 C.F.R. § 36.309(b)(1)(vi) that requires testing entities to respond in a timely manner to requests for testing accommodations.

GAO's report recommends to the Attorney General that the Department take steps to develop a strategic approach to target its enforcement efforts related to testing accommodations, such as: (1) analyzing its complaint and case data to prioritize enforcement and technical assistance, (2) working with the Secretaries of Education and HHS to develop a formal coordination strategy; and (3) updating technical assistance materials to reflect current requirements.  We will address each point of the recommendation separately.

### (1) Analyzing complaint and case data to prioritize enforcement and technical assistance

The Department agrees that analysis of complaints and data is important in determining priorities for enforcement and technical assistance, especially in an era of diminishing enforcement budgets.  The Department utilizes complaint and case data at all stages of our work, and the decision about pursuing a particular complaint is always made in the context of an evaluation of ongoing and prior work and dedicated resources.  In addition, we evaluate the volume and nature of complaints submitted to the Department, obtain advice from experts about the nature of testing and discrimination, and review evidence gathered independently through compliance reviews or investigations.  We also recognize the need for a record of the data from investigations and cases that have been completed and we are looking at ways to improve recordkeeping related to enforcement in this area.

We will continue to analyze all available sources of data to educate our decisions about enforcement in this important area of the law.  The most reliable way to evaluate whether a testing entity is complying with the law is to study the entity's decisions on requests for testing accommodations and determinations regarding the existence of disability.  Testing entities often have policies that on their face appear consistent with the ADA.  It is in the application of policies, and decisions about particular requests for testing accommodations that non-compliance with the law is most likely to be found.  To date, such review has been largely conducted through individual complaint review or monitoring of settlement agreements with particular testing entities.  As noted in the GAO Report, the ADA also grants the Attorney General authority under the ADA to conduct compliance reviews of covered entities.  This authority provides a statutory platform for systemic review of testing entities' policies and practices; however, the efficacy and impact of such reviews would be greatly enhanced if the Department's ADA enforcement activities were supported by administrative subpoena authority granted by Congress.  Such authority would increase both the quantity and validity of data provided by testing entities for review by the Department.  As a consequence, targeted enforcement, technical assistance, and outreach strategies recommended in this Report would likely result.

4

### (2) Working with the Secretaries of Education and Health and Human Services to develop a formal coordination strategy

The Department agrees with this recommendation and will pursue discussions with both the Department of Education and the Department of Health and Human Services on the investigation and resolution of complaints about testing accommodations. This will further advance our ability to identify trends in types of issues being encountered by individuals with disabilities in testing.

### (3) Updating technical assistance materials to reflect current requirements

The Department issued revised regulations on testing accommodations and guidance explaining the regulations in July 2010. The Department has also recently submitted a Statement of Interest in federal court setting out its views in the area. *See Jones v. National Conference of Bar Examiners*, No. 5-11-cv-174 (D. Vt. July 20, 2011). In addition to its recent enforcement efforts and guidance, the Department places a high priority on providing technical assistance and provides individual responses to anyone seeking information through the ADA Information Line that is staffed with ADA Specialists during business hours, Monday through Friday. In addition, the Department routinely provides attorneys and other Department representatives to appear at meetings, conferences and events. Finally, the Department provides all varieties of technical assistance on its web page, www.ada.gov, which serves over 11million visitors per year. Even with the variety of resources already available, the Department agrees with this recommendation and will develop additional technical assistance on testing accommodations in the near future to be provided on our website in an accessible format. Among areas of technical assistance the Department is considering are test takers' use of emerging technologies, test score flagging, and requirements by testing entities regarding recency of expert evaluation material and documentation.

The Civil Rights Division continues to make ADA enforcement in the area of testing accommodations a high priority and we continue to open new matters. Our work in this area has expanded in the past two years with dedicated staff working closely with highly trained experts to expand ADA compliance and to ensure that persons with disabilities are provided the opportunity to demonstrate their abilities on each examination or test.

The data collected from testing entities for the GAO Report suggests that testing entities are providing accommodations in many cases. The task before the Department is to assure that the accommodations being provided best ensure the ability of the test takers to demonstrate their aptitude and achievement in a particular area rather than their disabilities. It is extremely important that testing entities provide testing accommodations that meet the requirements of the law, that such entities do not make burdensome demands for documentation beyond what is necessary to establish a disability or the need for the requested accommodation, that testing

**Appendix II: Comments from the Department of Justice**

5

entities give considerable weight to an individual's past history of testing accommodations in similar examination contexts or as set out in IEPs or 504 plans, and that decisions on accommodations requests are made on a timely basis so as not to discriminate by delaying an opportunity for a person with a disability to take an examination with her peers or classmates.

Thank you again for the opportunity to participate in your review of this important area of law.   We share with you the goal of protecting the rights of students with disabilities to testing accommodations and look forward to further successful enforcement in this area.

Sincerely,

Eve L. Hill
Senior Counselor to the
Assistant Attorney General

# Appendix III: Comments from the Department of Education



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

THE ASSISTANT SECRETARY

November 7, 2011

Mr. George Scott
Director, Education, Workforce
  and Income Security Issues
Government Accountability Office
441 G Street NW
Washington, DC  20548

Dear Mr. Scott:

I am writing in response to your request for comments on the draft Government Accountability Office (GAO) report titled, "Higher Education and Disability:  Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations" (GAO-12-40).  I appreciate the opportunity to comment on the draft report on behalf of the U.S. Department of Education (the Department).  The subject matter of the report spans the programmatic interests and responsibilities of several offices of the Department and our response reflects input from those offices.

An important goal for the Department is the facilitation of programming that enables students with disabilities to transition successfully from secondary education to postsecondary education.  Equitable access to tests, including testing accommodations for entrance into and progress in higher education, has a direct bearing on the ability of students with disabilities to achieve a successful transition.  In addition, the President has set a goal for the United States to lead the world in college completion.  Meeting this goal requires equitable access to the tests for all students, including testing accommodations for students with disabilities, so that they may accurately demonstrate their knowledge and achievement, and, thus, enter and progress in higher education.

The draft report contains a single recommendation for Executive action, to the Attorney General.  The recommendation has three parts.  The second part calls for the Department of Justice (DOJ) to work with the Department to develop a formal coordination strategy for enforcement efforts related to testing accommodations.  The Department intends to work with DOJ to coordinate efforts in connection with our very important mutual goal of ensuring equity in testing for all students, including students with disabilities, consistent with the laws we enforce.  The Department appreciates GAO's work in this area.

Sincerely,

Alexa Posny, Ph.D.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2500
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | George A. Scott, Director, (202) 512-7215, or scottg@gao.gov |
| **Staff Acknowledgments** | In addition to the individual above, Debra Prescott (Assistant Director), Anjali Tekchandani (Analyst-in-Charge), Jennifer Cook, Nisha Hazra, and Justine Lazaro made significant contributions to this report. Jean McSween provided methodological support; Jessica Botsford provided legal support; Susan Bernstein assisted in report development; and Mimi Nguyen assisted with graphics. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |

Please Print on Recycled Paper