# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD KATZ, **Plaintiff,** | CIVIL ACTION NO. 3:15-cv-01187 |
| v. | (MARIANI, J.) (SAPORITO, M.J.) |
| NATIONAL BOARD OF MEDICAL EXAMINERS, et al., **Defendants.** | |

**THE PRO SE PLAINTIFF RICHARD KATZ RESPONDS TO THE DEFENDANTS NATIONAL BOARD OF MEDICAL EXAMINERS (NBME) AND THE FEDERATION OF STATE MEDICAL BOARDS' (FSMB) RESPONSE TO PLAINTIFF'S REPLY & OBJECTIONS TO MAGISTRATE JUDGE JOSEPH F. SAPORITO, JR.'S NOVEMBER 30, 2016, REPORT AND RECOMMENDATION (R&R)**

**INTRODUCTION:**

The Pro Se Plaintiff Richard Katz submits this reply to Defendants, the National Board of Medical Examiners (NBME) and the Federation of State Medical Boards (FSMB), RESPONSE TO PLAINTIFF'S REPLY & OBJECTIONS TO MAGISTRATE JUDGE JOSEPH F. SAPORITO, JR.'S NOVEMBER 30, 2016, REPORT AND RECOMMENDATION.

Richard Katz incorporates and relies upon his Reply & Objections to the November 30, 2016 Magistrate's Report and Recommendation (R&R) (DKT #201), Brief in Opposition to Motion for Summary Judgment (DKT # 129), Statement of Facts (DKT #130), Memorandum of Law (DKT # 131) and response to the defendants' Reply Memorandum Opposing Their Motion for Summary Judgment (DKT # 198).

For the reasons enumerated below, Richard Katz respectfully submits that Judge Saporito incorrectly omitted or found that plaintiff's claims are barred by the applicable statute of limitations.

   A. **Magistrate Judge Saporito Incorrectly Determined the Statute of Limitations of Applicable Disability Claims and Incorrectly Rejected Plaintiff's Equitable Tolling, Continuing Violation and Discovery Rule Arguments.**

   1. **The Court Should NOT Reject Plaintiff's Assertion that the Defendants Improperly Interpret the ADA to Deny Accommodations to Disabled Individuals.**

   **The Defendants claim:**

   "Plaintiff begins his discussion with a general critique of the defendants, claiming – with no support – that the NBME has interpreted the ADA "to severely limit who is covered," and has disregarded the "spirit and intent" of the ADA as well as "scientific evidence" demonstrating the need for accommodations. (Plaintiff's Objections, p. 12). The defendants addressed this erroneous assertion in their initial motion papers, their amended motion papers, and in their reply memorandum."

   **The above discussion in question is cited from Dyslexia and the Americans with Disabilities Act Amendment Act; A Q&A with Dr. Sally Shaywitz co-director of *The Yale Center for Dyslexia & Creativity*.[1]  This is not Katz's critique, but rather the experience of Dr. Shaywitz the doctor who justified to the Department of Justice the need for students like Frederick Romberg a Yale medical student with dyslexia to be granted double the standard testing time and a separate testing area to take his USMLE.  Romberg was twice refused accommodations by the NBME.  This was a result of a settlement reached by the U.S. Department of Justice and the National Board of Medical Examiners (DJ# 20216-181) on Feb. 22, 2011 in accordance with the provisions of the Americans with Disabilities Act.  <u>The settlement required NBME</u>**

   ---

   [1] Shaywitz, Sally.  "Dyslexia and the Americans with Disabilities Act Amendment Act; A Q&A" The Yale Center for Dyslexia & Creativity   Copyright 2016, The Yale Center for Dyslexia & Creativity • Yale School of Medicine.  http://dyslexia.yale.edu/Policy_QA.html

**to provide reasonable testing accommodations to persons with disabilities who seek to take the test, a press release issued by the DOJ on February 22, 2011 stated. Romberg's case, which was initially filed in January 2008 when the board refused Romberg's request, has national implications for medical students with disabilities because it has introduced new guidelines for the administration of standardized exams.** This was reached under Title III of the Americans with Disabilities Act, which prohibits discrimination against individuals with disabilities by private testing entities line NBME that administer examinations related to professional licensing.[2]

The DSM-5 (the most recent version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), which is published by the American Psychiatric Association (APA), provides diagnostic criteria for mental health impairments. According to the DSM-5 (APA, 2013), a mental health impairment is:

"a mental disorder is a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress in social, occupational, or other important activities. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (e.g., political, religious, or sexual) and conflicts that are primarily between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual, as described above."

**The National Alliance on Mental Illness (NAMI) (n.d.a) defines a mental health impairment as:**

"a medical condition that disrupts a person's thinking, feeling, mood, ability to relate to others, and daily functioning. Just as diabetes is a disorder of the pancreas, mental illnesses

---

[2] Giambrone, Andrew.  "Yalie wins disability lawsuit" Yale News Feb.  28, 2011
http://yaledailynews.com/blog/2011/02/28/yalie-wins-disability-lawsuit/

are medical conditions that often result in a diminished capacity for coping with the ordinary demands of life."

Bipolar disorder, sometimes referred to as manic depression, "is a medical illness that causes extreme shifts in mood, energy, and functioning. Bipolar disorder is a chronic and generally life-long condition with recurring episodes of mania and depression that can last from days to months that often begin in adolescence or early adulthood, and occasionally even in children."

Estimates indicate approximately 2.6% of American adults, or 6.1 million people, have bipolar disorder (NAMI, 2013)

Panic disorder occurs when a person "experiences recurrent panic attacks, at least one of which leads to at least a month of increased anxiety or avoidant behavior. Panic disorder may also be indicated if a person experiences fewer than four panic episodes but has recurrent or constant fears of having another panic attack."

Estimates indicate that 6 million American adults have panic disorder (NAMI, 2013).

**The defendants claim:**

"In contrast to plaintiff's unsupported assertion that the NBME has or had a predisposition to deny requests for accommodations, the defendants submitted actual evidence. Dr. Catherine Farmer, the NBME's Director of Disability Services, states in her affidavit that in 2005-2006, when plaintiff submitted his request for accommodations, the NBME granted approximately 75 percent of the requests it received. (Farmer affidavit, Docket No. 105, Ex. 22). That fact is uncontroverted, and belies the implication that defendants are or were predisposed to deny plaintiff's or anyone else's request for accommodations."

"That fact is uncontroverted, and belies the implication that defendants are or were predisposed to deny plaintiff's or anyone else's request for accommodations" **is**

**confusing, conclusory, and seeks the legal reasoning and theories of Defendants' contentions.**

**Katz respectfully brings to the Courts attention that Catherine Farmer holds no licensure in the discipline of psychology (she only has an EXPIRED LPN - Nursing license) any opinion stated in her affidavit holds no merit and should be completely disregarded by the Court.**

2. **The Defendants state that;** "The Court Should Reject Plaintiff's Claim for Equitable Tolling Based Upon the Erroneous Assertion that the Defendants Actively Misled Him." **Katz was misled and this evidence exists in the record in Black & White print as explained below.**

**After his role of Manager of Disability/ADA Compliance and 'decision-maker' for NBME J. Abram Doane became a Consultant for NBME Office of General Counsel on July 2006 until leaving the NBME organization in July 2008. Doane in his March 13, 2006 letter made a false representation stating that Katz's documentation was given to "EXPERTS" in the fieldS of Learning Disability and Mental DisorderS to assist NBME Disability Services in reviewing the documentation" (EXHIBIT 16 & 35). Doane misled Katz expecting he would believe his story as true and move on without the much needed accommodation that he required for success due to his disability. Doane knew that Katz would never get to see Farmer's review denying his accommodation as this review was never made available to Katz despite his request (EXHIBIT 36). Katz supplied sufficient facts in his second amended complaint to support these erroneous claims that conceivably would constitute a specific violation of his constitutional rights.**

**The Defendants state;** "Judge Saporito did not address plaintiff's equitable tolling argument, implicitly rejecting it." **This is a gross assumption on the part of the Defendants and is nothing more than a THEORY. How do the defendants know the true intentions of Magistrate Judge Saporito? For all we know, the Magistrate hedged on this topic, as Katz made viable points accurately substantiated by the case law.**

**The Defendants state;** "Farmer, a doctorate level psychologist, was and is an expert with respect to reviewing requests for accommodation based on claimed cognitive or mental disabilities. Licensure is irrelevant, since Dr. Farmer does not treat patients as a clinical psychologist or bill insurance companies, and no law or regulation requires that a person employed to review requests for accommodation be licensed."

**"In the United States, both the Psy.D. and Ph.D. are the only two doctorate degrees**

**eligible to sit for the Examination for Professional Practice of Psychology (EPPP). This is the national licensing exam and successful completion is required in order to obtain a license to practice psychology. Schaffer and colleagues (2012) found that students trained in Ph.D. programs passed the EPPP at higher rates (82%) than students trained in Psy.D. programs (69%)."[3]**

**It should be noted that the NBME "EXPERT(S)" are unlicensed Psy.D.'s.  How does an unlicensed Psy.D. make determinations that negates scientific evidence of licensed psychiatrists and psychologists?  Shouldn't these NBME so-called "EXPERT(S)" be held to some standard as Katz's licensed caregivers?  Licensure is NOT irrelevant because such determinations have derailed the careers and livelihoods of testing applicants' with disabilities.  Katz was never personally evaluated by any NBME so-called "EXPERT."  This is the motivation for Katz's 56d Affidavit submitted with his opposition to summary judgment.  Katz has questions for NBME that can only be properly executed through deposition.**

**The defendants state**; "no law or regulation requires that a person employed to review requests for accommodation be licensed."    **But the Defendants discount the fact that a law does exist, the ADAAA, mandating the NBME to give considerable deference to Katz's LICENSED evaluators and their recommendation to provide accommodations.**

**The guidelines to the regulations promulgated under the ADA, provide that testing entities should accept without further inquiry, "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modifications, accommodation, or aid requested." See 28 C.F.R. pt. 36, app. A, at 795. The guidance further explains that, "[r]eports from**

---

[3] Schaffer, Jack B.; Rodolfa, Emil; Owen, Jesse; Lipkins, Robert; Webb, Carol; Horn, Jacqueline (February 2012). "The Examination for Professional Practice in Psychology: New data–practical implications". Training and Education in Professional Psychology 6 (1): 1–7 Doi: 10 1037/a0026823. Please note* At the time of drafting and submitting his 'second amended complaint' plaintiff was not yet aware that the NBME DS "EXPERT(S)" are UNLICENSED in their respective fields. Plaintiff took a leap of faith and only recently
checked the NBME DS EXPERT(S) credentials with the PA Dept. of State.

**experts who have personal familiarity with the candidates should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." 28 C.F.R. pt. 36, app. A, at 796 (emphasis added). Accordingly, NBME is precluded from second-guessing and rejecting Plaintiffs' evaluators' recommendations.**

**The Defendants state;** "Moreover, the use of the plural term experts was correct, since Dr. Farmer was an outside consultant when she performed the detailed review in February 2006, and Abram Doane, then the NBME's in-house Manager of Disability Services, was also an experienced reviewer with appropriate (Master's Degree level) credentials. Mr. Doane reviewed and agreed with Dr. Farmer's detailed rationale for recommending against granting plaintiff's request for accommodations, and he explained those reasons in his March 2006 letter to plaintiff. As defendants noted in their reply memorandum, both Dr. Farmer and Mr. Doane would qualify as experts under Federal Rule of Evidence 702 because each is "qualified … by knowledge, skill, experience, training, or education ..."

**Rule 702 has been amended in response to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and to the many cases applying Daubert, including Kumho Tire Co. v. Carmichael, 119 S.Ct. 1167 (1999). <u>In Daubert the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science. See also Kumho, 119 S.Ct. at 1178 (citing the Committee Note to the proposed amendment to Rule 702, which had been released for public comment before the date of the Kumho decision).</u> The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with Kumho, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable an helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171 (1987).15**

**Plaintiff respectfully defers to the District Court as "gatekeeper" to evaluate the "UNLICENSED 'EXPERT' ARGUMENT." Hopefully the Court will veer on the side of Rush in Rush v. NBME, where a second year medical student with reading and visual processing skills impairments requested and was denied extended time on USMLE Step 1. THE COURT, CRITICAL OF THE BOARD'S (NBME) "EXPERTS", granted an injunction requiring the NBME to provide Rush with the accommodations of double time for the exam, stating that without such accommodations the exam would test his disability and not his mastery of the subject matter.**

**The defendants cite** Ruehl v. Viacom Inc., 500 F.3d 375 (3d Cir. 2007), however courts have held that the Fair Labor Standards Act (FLSA) statute of limitations is subject to tolling, e.g., Kelly v. Eckerd Corp., No. 03-4087, 2004 WL 614822, at *2 (E.D. Pa. Mar. 11, 2004), **courts have held that tolling is only available when a defendant has "actively misled" a plaintiff in a way that resulted in a delayed filing. See Woodward v. FedEx Freight E., Inc., 250 F.R.D. 178, 193 (M.D. Pa.2008)) as is the case in Katz v. NBME et al.**

3. **The Defendants' claim;** "The Court Should Also Reject Plaintiff's Claim of Equitable Tolling Based on Mental Incapacity completely discounting a psychiatrists' clinical determination." **In March of 2013 Katz required a week-long hospitalization at Pocono Medical Center's Behavioral Health Unit  The attending psychiatrist at Pocono Medical stated in her March 9, 2013 note; Richard Katz "has thoughts of worthlessness, hopelessness, judgment is impaired." "Insight is poor!" (EXHIBIT 59). The Magistrate Judge does NOT discuss this material fact in his November 30, 2016 R & R.**

**The Defendants state:** "Plaintiff also asserts in his objections that the Court should have applied the doctrine of equitable tolling based upon his alleged mental incapacity."[4] **The Defendants attempt to minimize the damage that they have caused plaintiff and completely disregard medical reports by psychiatrists that document Katz's mental impairment.**

**The Defendants state;**

---

[4] The Defendants' **theory** is that Magistrate Judge Saporito did not address plaintiff's equitable tolling based on mental incapacity argument, and regard this as implicitly rejecting it. Judge Saporito accurately recited the time-line facts but makes many omissions that do NOT justify rejecting equitable tolling based on mental incapacity on pages 16-17 of the Report and Recommendation.

"In contrast, plaintiff in this case knew on and after March 2006 that the NBME had denied his request for accommodations as well as the reasons for the denial, and had a complete understanding of the six attempt limit from the time it was announced in 2011, taking the Step 1 exam additional times, including in 2013, his final eligible year. Moreover, the evidence shows that during the time plaintiff claims to have been mentally incapacitated to such an extent that he allegedly could not comply with the statute of limitations on challenging the six attempt limit (2011, 2012, 2013, 2014 and 2015), he applied for numerous scientific and other jobs. (Plaintiff's Exhibit 26)."

**As stated in his previous motions, Katz suffers from bipolar disorder he experiences mood swings, there are highs and lows, the highs are marked by unrealistically powerful, important, and an invincible, and "nothing can stop me reality." After diagnosis of bipolar disorder in March of 2013 he continued to experience highs as a new medication regimen was instituted in order to combat these symptoms (EXHIBIT 59). <u>The point is, that with an exalted surge of energy associated with mania it would not have been unusual for Katz to have been furiously applying to jobs via the internet. His presentation (mental state) during job interviews would have revealed a very different circumstance. The defendants are not psychiatrists and have no authority to make such clinical determinations about Katz's mental impairments.</u>**

4. **The Defendants state that**; "The Court Should Reject Plaintiff's Objection Regarding the Discovery Rule."   "Plaintiff alleges that he obtained documents in discovery in this case that made him "better able to examine what took place in 2005-2006." (Plaintiff's Objections, p. 11). Presumably plaintiff is referring again to the information as to who reviewed his request for accommodations in 2005-2006. Notably, however, plaintiff received a full explanation in 2006 as to why the NBME denied his request for accommodations, and he did not learn any new information on that issue.  Under these facts, the discovery rule provides no relief."

**The Defendants make a false statement.  In   J. Abram Doane's   March 13, 2006 denial letter to Katz, Doane knew that Katz would never get to see Farmer's review denying his accommodation as this review was never made available to him despite his request.  The disability applicant is kept in the dark about the identity of the NBME "EXPERT."   <u>Therefore, Katz could not have access to this information until the rather limited discovery phase of this lawsuit.</u>**

5. **The Defendants state;** "The Court Should Reject Plaintiff's Objection that the Magistrate Judge Erred in Not Finding a Continuing Violation."

**Katz can use the continuing violations doctrine to circumvent the statute of limitations as he was NOT aware of the alleged emotional distress at the time it occurred and was lulled into inactivity by the Defendants deception as enumerated above (see Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal quotations marks omitted) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)). The focus of the continuing violations doctrine is on affirmative acts of the defendants that are unlawful. Id. at 293. Courts consider two factors in determining whether to apply the continuing violations doctrine:**
**(1) whether the violations were related in subject matter and (Affirmative in Katz's case)**
**(2) whether the acts were recurring. Id. at 292. (Affirmative in Katz's case)**
**<u>In considering the frequency of the acts, courts have NOT set a standard for how close the acts must occur to amount to a continuing violation. Id. At 295.</u>**

**Katz agrees with the Cowell court that the continuing violations doctrine is not a substitute for a plaintiff's "awareness of and duty to assert his/her rights" in a timely fashion (Cowell at 295). Katz was not treated with mood stabilizers for his bipolar disorder until March of 2013 and stabilizing his symptoms to baseline was not immediate and required time. Katz would not have been aware of any duty to assert his rights prior to this period.**

B. **The Defendants have enjoyed having the advantage in this David vs. Goliath Contest and they believe** "The Court Should Reject Plaintiff's Objection to Judge Saporito's Decision Not to Appoint Counsel."

**They claim;** "In his Report and Recommendation, Judge Saporito did not discuss his earlier decision to deny plaintiff's request for counsel. Plaintiff moved for the appointment

of counsel twice, and Judge Saporito denied the motion for the second time on May 12, 2016 (Docket No. 118). Judge Saporito's decision of May 12, 2016, was reviewable within 14 days under Local Rule 72.2, which covers appeals from magistrate judges' decisions on non-dispositive issues. Plaintiff did not appeal under Local Rule 72.2."

**On June 17, 2015 Katz submitted a MOTION for leave to proceed in forma pauperis (DKT#3) and MOTION to Appoint Counsel (DKT#2). On September 16, 2015 the Magistrate Judge (DKT#43) denied Katz's Motion to Appoint Counsel stating he had "not undertaken a diligent enough effort to obtain counsel." Katz consulted seven attorneys between December 2013 and December 2014. The Magistrate was under the mistaken impression that he had only consulted one attorney. On December 1, 2015 a second MOTION (DKT#66) to appoint counsel was submitted, with Katz making a copious effort, speaking with disability advocacy groups, special interest groups, and private attorneys locally and nationally. He consulted a total of 29 advocacy groups and private attorneys (EXHIBIT 40) with no success on a pro bono or contingency basis, he tabulated this data and submitted to the Court with his Second Motion to Appoint Counsel. The chart also contained five attorneys and advocacy groups contacted prior to his First MOTION to Appoint Counsel. The Court responded (DKT#118) on May 12, 2016 denying Katz's second motion to appoint counsel, stating under Ficken and Poindexter that he met all criteria, except criteria two which pertains to the 'merits of the plaintiff's case.'   Limitations are said to reduce the number of meritless cases filed, but the assumed connection between merit and timeliness requires further empirical analysis.[5]   Moreover, The Department of Justice Civil Rights Division would not have gotten involved if Katz's case were "meritless." [6]**

**The Defendants state:** "Further, Judge Saporito's decision against appointing counsel was well reasoned and within his discretion. His decision to deny appointment of counsel because plaintiff has shown the capacity to understand and competently present legal arguments is well supported."

---

[5] Ochoa & Wistrich, supra note 43, at 497-499
[6] It should be noted that the Department of Justice Civil Rights Division  has been following the progress of this lawsuit and an investigation against the NBME has been in progress predating Katz's November 28, 2014 DOJ complaint.

Katz has countless hours of self-advocacy invested in this lawsuit his so-called "proficiency in self-representation" and examining the case-law has been compensatory, both in the application of enormous amounts of his time and the implementation of other strategies to help ameliorate the effects of his mental illness and subsequent cognitive and emotional impairment. Many of these same strategies were implemented when Katz was a medical student in order to get through the rigors of medical education (EXHIBIT 55). "Individuals who have difficulty reading as a result of their disability may, nonetheless, possess superior intelligence and reasoning skills (see Turner et al. v. Association of American Medical Colleges).[7]" "Those with bipolar disorder – suffer from cognitive impairment. Investigators suggest that tasks that demand the most effort or speed are difficult for individuals with bipolar disorder. "[8] Individuals requesting accommodations on professional licensing exams often have a history of academic success, which has caused courts to question whether such individuals could possibly have an impairment that substantially limits a major life activity Sutton v. United Air Lines, Inc. has become the most commonly cited case. Mitigating measures are corrective actions that ameliorate the effects of an impairment without actually eliminating the impairment itself. In Bartlett v. NYSBLE, (970 F. Supp. At 1117) Judge Sotomayor held that Bartlett's real world achievements were "not inconsistent with" the court finding her to be substantially limited in the major life activity of reading. The court held that Bartlett's success was the result of her "creativity in finding methods around reading . . . and [is] further evidence that she is substantially limited in reading when compared to 'most people.'" The House Committee on Education and Labor expressed its belief that someone should not be penalized simply because they have "managed their own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of their disability."

---

[7] IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE DISTRICT DIVISION FIVE caselaw.lp.findlaw.com/data2/californiastatecases/A117071.DOC
[8] http://www.treatmentadvocacycenter.org/test/1366-cognitive-impairment-a-major-problem-for-individuals-withschizophrenia- and-bipolar-disorder

The Defendants claim that Katz never appealed the Magistrate's decision to appoint counsel under LR 72.2 Appeals from Non-Dispositive Orders of Magistrate Judges. This is one of many Catch-22 situations riddling this lawsuit.  Katz is not an attorney, he has no legal background and he would have needed to rely on attorney guidance to make him privy of such a law.

C.  **The Defendants believe that;** "The Court Should Reject Plaintiff's Objection Concerning His Alleged Need for Additional Discovery."
**The Defendants again THEORIZE that "Judge Saporito did not discuss in the Report and Recommendation plaintiff's request for additional discovery, and that this is indicative of "implicitly rejecting the request.""**

**Plaintiff makes compelling arguments in his 56d affidavit in support of additional discovery, he also provides ongoing correspondence with Rebecca Fuhrman Right-to-Know Law Records Officer of the Department of State Commonwealth of Pennsylvania Office of Chief Counsel to substantiate his claims.**
**Katz does not find the need to respond any further to the Defendants rhetoric as these documents speak for themselves.**

D.  **The Defendants believe;** "The Court Should Reject Plaintiff's Objection to Judge Saporito's Sua Sponte Dismisssal of Plaintiff's Claims for Criminal Obstruction of Justice and Breach of Contract."

**Obstruction of justice is interfering with the (1) <u>administration or process of law, (2)</u> <u>withholding material information or giving false testimony,</u> or (3) harming or intimidating a juror, witness, or officer of law.[9]**
**Katz invokes criteria one and two as stated above in this lawsuit.**

---

[9] "http://law.jrank.org/pages/1623/Obstruction-Justice.html">Obstruction of Justice - General Obstruction Provision, Witness Tampering And Retaliation, Obstruction Of Agency Proceedings And Congressional Inquiries, Other Obstruction Provisions.

**Obstruction of Justice is a broad concept that extends to any effort to prevent the execution of lawful process or the administration of justice in either criminal or <u>civil matters.</u>   If a defendant lies to a Target hoping the Target will believe his story, this is misleading conduct.   Any act interfering with administration of justice constitutes obstruction.   No official proceeding needs to be pending.   <u>This law applies to all businesses.</u>**

**The Defendants claim;** that "Judge Saporito also correctly recommended dismissal of plaintiff's claim for breach of contract as frivolous."

**To maintain an action for breach of contract under Pennsylvania law a plaintiff must Demonstrate; (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. Jones v. Select Portfolio Servicing, Inc., 2008 WL 1820935, at \*5 (E.D. Pa. 2008), quoting J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002). The determination of a meeting of their minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not their subjective state of mind.[10] Unexpressed subjective intent is irrelevant. In determining whether mutual assent is present, the court looks to the communications between the parties and to the acts and circumstances surrounding these communications.[11]  Contracts may be oral, in writing or inferred from the acts and conduct of the parties J.F. Walker, 792 A.2d at 1272, citing John Edward Murray, Jr., Cases and Materials on Contracts 184 (3rd ed.1983); Axilbund v. McAllister, 180 A.2d 244, 249 (Pa. 1962), noting that commissions can be proven through oral agreement. An enforceable contract requires an offer, acceptance, consideration and mutual meeting of the minds. Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993). In "meeting of the minds" if one party had no reasonable basis for believing that the second party had a different understanding, but the second party had a reasonable basis for understanding that his or her interpretation was different from that of the first party,**

---

[10] Weynand v Weynand, 990 S.W.2d 843, 846 (Tex. App.-Dallas 1999, pet. denied).
[11] Wiley V. Bertelson, 770 S.W.2d 878,882 (Tex. App.-Texarkana 1989, no writ).

then the court will likely find that there was a meeting of the minds and will interpret the contract in accordance with the first party's intent. See, Merced County Employees v. County of Merced (1987) 188 Cal. App.2d662; Restatement of Contracts 2d § 201(2). This rule essentially penalizes a party for not being straightforward, consistent with a similar legal rule that an ambiguity should be construed against the party causing it to be present. CC § 1654.

Material Breach of Contract - Failure of one party to perform his obligations under the contract in such a way that the value of the contract is destroyed, exposes that party to liability for breach of contract damages. As already established the NBME made a false statement regarding their external procedures and the qualifications of their evaluators ("expert(s)") in their respective fields. The NBME evaluators in 2006 were NO EXPERTS and to date hold NO Professional LICENSURE this is likely why they were hidden from public view by J. Abram Doane. This constitutes a material breach of contract, the aggrieved party (Katz) is well within his right to sue for damages. Such a total breakdown of the material provisions of a contract may be referred to as a "fundamental" or "repudiatory" breach.

NBME provided a case coordinator that they employed by the name of Maria Fuentes in 2005-2006.  This individual was Katz's point of contact for all communications with NBME (EXHIBIT 53). Katz established a therapeutic alliance with Fuentes via telephone and email, who in turn forwarded his materials to NBME. There was an obvious acceptance of Katz's materials from his caregivers by Fuentes, there was a consideration and a subsequent "mutual meeting of the minds" between Katz and Fuentes Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993). Katz learned of violation of his due process rights via the discovery process of this lawsuit when he had the opportunity to examine what took place in 2005-2006. Katz submitted an April 1, 2014 APPEAL to the defendants, they had an ethical fiduciary duty to consider his 2013 diagnosis of bipolar disorder, instead of completely ignoring it.

E. **The Defendants state.** "The Court Should Reject Plaintiff's Objection that Judge Saporito Failed to "Link" the Defendants' Supposed Previous Civil Rights Violations to the Justice Department's Investigation of His Case."

**The Defendants contradict themselves by stating; "**Plaintiff has repeatedly tried to inject into this case the fact that he has communicated with the Justice Department about the NBME's denial of his request for accommodations. In his objections to the Report and Recommendation, plaintiff argues that Judge Saporito should have linked the defendants' supposed "prior civil rights violations" to the Justice Department's investigation of his case."

**Yet the Defendants state "that Defendants note that the DOJ only recently requested plaintiff's file from the NBME and the reasons for denying his request for accommodations. The NBME responded to the DOJ's inquiry. Nothing further has happened."**

**The Defendants pontificate;** "Plaintiff's reference to "prior civil rights violations" apparently relates to Yale Medical School graduate Frederick Romberg, with whom the NBME entered into an administrative resolution regarding accommodations, and to whom plaintiff compares himself. Defendants have consistently said that plaintiff's attempt to invoke the Romberg matter is incomplete, misleading, and has no bearing on this case. (Defendants' amended memorandum of law, p. 27; defendants' reply memorandum, p. 9). Judge Saporito properly chose not to draw any inferences or conclusions from plaintiff's sketchy, one-sided version of the Romberg matter, or about the DOJ investigation into plaintiff's case. Those matters are not before this Court and are not relevant to plaintiff's claims.

**The Defendants obviously never familiarized themselves with the language of the SETTLEMENT AGREEMENT BETWEEN UNITED STATES OF AMERICA AND NATIONAL BOARD OF MEDICAL EXAMINERS DJ# 202-16-181.   On February 23, 2011, NBME entered into a settlement agreement DJ# 20216-181 with Justice (EXHIBIT 17) resolving a complaint by Frederick Romberg a Yale Medical Student with dyslexia.**

**Romberg was twice refused accommodations by NBME. The Board agreed to provide reasonable testing accommodations to people with disabilities when taking the USMLE and agreed to grant the accommodations he needed -- double the standard testing time and a separate testing area.**

**Under the agreement, NBME was only to request documentation about (a) the existence of a physical or mental impairment; (b) whether the impairment substantially limits one or more major life activities within the meaning of the ADA;**

and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions. The NBME – Justice settlement agreement DJ# 20216-181 was signed February 2011 and was over February 2013.

Katz sent an appeal to the defendants in April of 2014 and was denied accommodations by the USMLE Secretariat's Office (EXHIBIT 30).

In November 2011 the U.S. Government Accountability Office (GAO) in a report to Congressional Requesters "HIGHER EDUCATION AND DISABILITY: Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations " (EXHIBIT 41) stated; "Since we found testing companies believe their practices are already in compliance with the new regulatory requirements, it is unclear whether these changes will better protect the rights of students with disabilities. In order to ensure individuals with disabilities have equal opportunity to pursue their education and career goals, it is imperative for Justice to establish a credible enforcement presence to detect, correct, and prevent violations." This report says: "Given the critical role that standardized tests play in making decisions on higher education admissions, licensure, and job placement, federal laws require that individuals with disabilities are able to access these tests in a manner that allows them to accurately demonstrate their skill level. Test takers and disability advocates continue to raise questions about whether testing companies are complying with the law in making their determinations." The NBME was one of the participant organizations in this study leading to the above determinations by GAO.

CONCLUSION

In conclusion, the matter of Katz v. NBME and FSMB has been "David and Goliath" from the very beginning, denoting the underdog pro se plaintiff, facing-off against the "Philadelphia Power Lawyers" a much bigger adversary.
The ADA was meant to level the playing field for people with disabilities. Congress intended individuals, like Katz to be protected by the law. High Stakes testing

agencies like NBME have chosen to interpret the ADA in a way other than Congress intended. They have interpreted it to severely limit who is covered by the ADA totally disregarding the spirit and intent of the ADA and scientific evidence pointing to the absolute need for accommodations for people with disabilities.

Katz implores this Court to grant him a "first chance to successfully handle his disability," by not only adopting his arguments, but Congress' intended application of the ADA, a remedial legislation to "break down barriers to the integrated participation of people with disabilities in community life." H.R. Rep. No. 485 (III), 101st Cong., 2d Sess. 49-50 (1990).

For all the foregoing reasons, and those more fully set forth in Katz's Reply & Objections to the November 30, 2016 Magistrate's Report and Recommendation (R&R) (DKT #201), Brief in Opposition to Motion for Summary Judgment (DKT # 129), Statement of Facts (DKT #130), Memorandum of Law (DKT # 131) and response to the defendants' Reply Memorandum Opposing Their Motion for Summary Judgment (DKT # 198) the Court should reject the Magistrate Judges R & R on all counts as stated above as serious omissions of material fact exist that have not been accounted for necessitating the need for additional discovery as enumerated in Katz's 56d affidavit.  Moreover, the Defendants THEORIZE that these multiple omissions of material fact on the part of the Magistrate Judge means that he has "implicitly rejected them" which is nonsensical.

RESPECTFULLY SUBMITTED,

_____

Richard Katz

3364 Parker Lane

East Stroudsburg, PA 18301

Pro se

**CERTIFICATE OF SERVICE**

I certify that the foregoing Reply, is being filed electronically with the Clerk of Court on January 31, 2016 using the electronic case filing system, which will automatically send email notifications of such filing to registered parties.

**Michael E. Sacks**

HAMBURG & GOLDEN, P.C.

1601 Market Street, Suite 3310

Philadelphia, PA 19103-1443

(215) 255-8590

sacksme@hamburg-golden.com

Attorneys for Defendants,


_____

Richard Katz
3364 Parker Lane
East Stroudsburg, PA 18301
Pro se